UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; and CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,** *Plaintiffs,* <br><br> v. <br><br> **XAVIER BECERRA,** in his official capacity as Secretary of Health and Human Services; **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS); KAREN L. TRITZ,** in her official capacity as Director of the Survey and Operations Group for CMS; **DAVID R. WRIGHT,** in his official capacity as Director of the Quality Safety and Oversight Group for CMS, *Defendants.* | § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 5:22-cv-00185-H |

## PLAINTIFFS' AMENDED COMPLAINT

1.      The Biden Administration's response to *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), which ended the terrible regime of *Roe v. Wade*, is to attempt to use federal law to transform every emergency room in the country into a walk-in abortion clinic. President Biden is flagrantly disregarding the legislative and democratic process—and flouting the Supreme Court's ruling before the ink is dry—by having his appointed bureaucrats mandate that hospitals and emergency medicine physicians must perform abortions. But Defendants' Abortion Mandate

forces hospitals and doctors to commit crimes and risk their licensure under Texas law, while doing nothing to advance the health and safety of women. The Emergency Medical Treatment and Labor Act (EMTALA) that Defendants cite as the basis for their Abortion Mandate does not authorize— and has never authorized—the federal government to compel healthcare providers to perform abortions. Instead, it expressly requires that physicians protect the health and safety of both pregnant women and their unborn children. Defendants' Abortion Mandate is unlawful and must be set aside.

## I. PARTIES

2.    Plaintiff the State of Texas is a sovereign State of the United States.

3.    Plaintiff the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) is the largest organization of pro-life Ob/Gyns in the world and is headquartered in Michigan. AAPLOG includes Ob/Gyns and other physicians, with over 6,000 medical professionals nationwide, including over 300 members in Texas. AAPLOG members oppose elective abortion and are committed to the care and well-being of their patients including both pregnant women and their unborn children. AAPLOG sues on behalf of its members.

4.    Plaintiff the Christian Medical and Dental Associations (CMDA) is a national nonprofit organization, headquartered in Tennessee, of Christian physicians, dentists, and allied health care professionals, with over 12,000 members nationwide. This includes 1,237 overall members in Texas, of whom 607 are practicing or retired physicians, and 35 are Ob/Gyns. CMDA is opposed to the practice of abortion as contrary to Scripture, respect for the sanctity of human life, and traditional, historical and Judeo-Christian medical ethics. CMDA sues on behalf of its members.

5.    Defendant Xavier Becerra is Secretary of the United States Department of Health and Human Services (HHS). He is sued in his official capacity.

6.      Defendant HHS is a cabinet-level executive branch department of the United States.

7.      The Centers for Medicaid and Medicare Services (CMS) is a division of HHS.

8.      Defendant Karen L. Tritz is Director of the Survey & Operations Group of CMS. She is sued in her official capacity.

9.      David R. Wright is Director of the Quality, Safety and Oversight Group of CMS. He is sued in his official capacity.

## II.  JURISDICTION & VENUE

10.     This Court has jurisdiction under 5 U.S.C. §§ 702 and 703 and 28 U.S.C. §§ 1331, 1346, and 1361, and *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

11.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 705, and 706 and 28 U.S.C. §§ 1361, 2201, and 2202.

12.     The Court is authorized to award costs and attorneys' fees under 42 U.S.C. 1988(b) and 28 U.S.C. § 2412.

13.     Venue is proper within this District under 28 U.S.C. § 1391.

## III. BACKGROUND

14.     The Social Security Act, of which EMTALA is part, and its interaction with other federal healthcare laws are extensive and complex, but they have never required abortions. Defendants have instead weaponized the complexity of their authorizing statutes, while ignoring Congress' explicitly pro-life language, to issue a mandate that runs afoul of multiple federal statutes as described below. The interlocking federal statutes and requirements lead to one conclusion: the federal executive branch cannot achieve its unlawful policy outcomes by attempting to codify a federal right to abortion where none exists.

**A.**   *Dobbs v. Jackson Women's Health Organization*

15.   On June 24, 2022, the Supreme Court of the United States overturned *Roe v. Wade*, 410

U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833

(1992). *Dobbs*, 142 S. Ct. at 2242. The Supreme Court clarified that "the Constitution does not

confer a right to abortion," "does not prohibit the citizens of each State from regulating or

prohibiting abortion," and returned the issue of abortion to the States. *Id.* at 2279, 2284. "The

Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion."

*Id.* at 2284.

**B.**   **The Biden Administration's Response to *Dobbs***

16.   On the day the Supreme Court announced its decision in *Dobbs*, President Biden held a

press conference and announced that "[t]he only way we can secure a woman's right to choose

and the balance that existed is for Congress to restore the protections of *Roe v. Wade* as federal

law."[1]

17.   The next day, Secretary Becerra stated in an interview to NBC News that Americans "can

no longer trust" the Supreme Court.[2] When asked what Secretary Becerra was doing "in response

---

[1] *Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, The White House (June 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade/ (last visited July 28, 2022).

[2] *HHS Secretary Becerra talks women's future with abortion following Roe v. Wade decision* (NBC NEWS broadcast June 25, 2022), https://www.nbcnews.com/video/women-s-future-with-abortion-implementing-harm-reduction-with-addiction-142836293922, at 1:45 (last visited July 28, 2022).

*Plaintiffs' Amended Complaint*

to the Court's decision,"[3] he responded, "we have no right to do mild. And so we're going to be aggressive and go all the way."[4]

18.     On July 8, 2022, President Biden issued an Executive Order titled "Protecting Access to Reproductive Healthcare Services." Exec. Order No. 14,076, 87 Fed. Reg. 42053 (2022).[5] That Order required Secretary Becerra to submit a report to the President "identifying steps to ensure that all patients—including pregnant women and those experiencing pregnancy loss, such as miscarriages and ectopic pregnancies—receive the full protections for emergency medical care afforded under the law, including by considering updates to current guidance on obligations specific to emergency conditions and stabilizing care under the Emergency Medical Treatment and Labor Act [EMTALA], 42 U.S.C. 1395dd." *Id.* at 42054.

19.     That same day, Jen Klein, the Director of the White House Gender Policy Council, announced that President Biden "took immediate action under his executive authority to defend reproductive rights" when the *Dobbs* decision was issued, and that his July 8 order "builds on those actions."[6]

20.     Four days later, President Biden announced HHS's new mandate purporting to override individual states' abortion laws under the authority of EMTALA.[7]

---

[3] *Id.* at 2:19.

[4] *Id.* at 2:59.

[5] Available at https://www.federalregister.gov/documents/2022/07/13/2022-15138/protecting-access-to-reproductive-healthcare-services.

[6] Press Briefing by Press Secretary Karine Jean-Pierre, THE WHITE HOUSE (July 8, 2022), https://www.whitehouse.gov/briefing-room/press-briefings/2022/07/08/press-briefing-by-press-secretary-karine-jean-pierre-4/, (last visited July 28, 2022).

[7]     President     Biden     (@POTUS),     TWITTER     (July     12,     2022,     3:25     PM), https://twitter.com/potus/?lang=en.

## C.   EMTALA

21.    In 1986, Congress enacted the Emergency Medical Treatment & Labor Act (EMTALA). Congress enacted EMTALA "to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay." *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000). With the enactment of EMTALA, every Medicare-participating hospital must provide medical screening and stabilizing treatment for emergency medical conditions regardless of a patient's ability to pay. 42 U.S.C. § 1395dd.

22.    EMTALA specifically defines "stabilizing treatment" and "emergency medical conditions."

23.    EMTALA defines "emergency medical condition" to include "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain), such that the absence of immediate medical attention could reasonably be expected to result in–(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily function or part." 42 U.S.C. § 1395dd (e)(1)(A).

24.    "To stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3).

25.    But the Social Security Act, of which EMTALA is part, contains an important limitation: "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided . . . or to exercise any supervision or control over the administration or

operation of any such institution, agency, or person [providing health services]." 42 U.S.C. § 1395.

26.    EMTALA does not mandate, direct, approve, or even suggest the provision of any specific treatment. It says nothing requiring abortion.

27.    Instead, EMTALA requires the stabilization of emergency medical conditions posing serious jeopardy to patients *including* the "unborn child," specifying the need to protect the "unborn child" four times. *Id.*

28.    Federal appellate courts have confirmed that EMTALA confers no right to any specific treatment and does not operate as federal oversight on the practice of medicine. "The statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995).

29.    "Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure hospitals do not refuse essential emergency medical care because of a patient's inability to pay." *Id.* at 1258.

30.    Accordingly, the relevant inquiry under EMTALA is "whether the challenged procedure was identical to that provided similarly situated patients, as opposed to whether the procedure was adequate as judged by the medical profession." *Id.*; *see also Marshall on Behalf of Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 323–24 (5th Cir. 1998) (holding that to show a violation of EMTALA, a plaintiff must "show that the Hospital treated her differently from other patients"). "A hospital's liability under EMTALA is not based on whether the physician . . . failed to adhere to the appropriate standard of care." *Battle*, 228 F.3d at 557; *see also Guzman v. Mem'l*

*Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 487 (S.D. Tex. 2009) (Rosenthal, J.) ("EMTALA does not create a national standard of care and is not a medical malpractice statute.").

31.    The standard of medical care is determined by the state and the community in which the treatment took place. *E.g.*, *Hannah v. United States*, 523 F.3d 597 (5th Cir. 2008); *Quijano v. United States*, 325 F.3d 564 (5th Cir. 2003); *see also Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361 (Tex. 1987).

32.    State laws regulating abortion, and state laws protecting conscientious objections to abortion, form an essential part of the state's regulation of the practice of medicine and of the standard of medical care relating to abortion.

33.    No federal statute confers a right to abortion. EMTALA is no different. It does not guarantee access to abortion. On the contrary, EMTALA contemplates that one of the qualifying requirements for treatment of an emergency medical condition is one that threatens the life of the unborn child. *See* 42 U.S.C. § 1395dd(e)(1)(A)(i). It is obvious that abortion does not stabilize the unborn child from serious jeopardy faced by an emergency medical condition, nor does it preserve the life or health of an unborn child.

34.    EMTALA provides for civil enforcement actions against both hospitals and physicians. 42 U.S.C. § 1395dd(d). Hospitals and physicians are each subject to a civil penalty of up to $119,942 for each violation. *Id.* at § 1395dd(d)(1)(A)–(B); 45 C.F.R. § 102.3.

**D.    The Abortion Mandate**

35.    On July 11, 2022, the Centers for Medicare and Medicaid Services issued agency guidance to all State Survey Agency Directors titled "Reinforcement of EMTALA Obligations specific to

Patients who are Pregnant or are Experiencing Pregnancy Loss" (EMTALA Guidance).[8] Additionally, Secretary Becerra issued a letter to providers[9] describing the guidance (together, the "Abortion Mandate"). The EMTALA Guidance purports to simply remind hospitals of their existing obligations under federal law.[10] But it does not: it includes several new requirements related to the provision of abortions that do not exist under federal law.

36.    The Abortion Mandate requires that a provider perform an abortion if "abortion is the stabilizing treatment necessary to resolve [an emergency medical condition]."[11] This condition has never been a part of EMTALA.

37.    At the time of the Abortion Mandate and the Executive Order that preceded it, there was no evidence that violations of EMTALA were occurring which precluded women from receiving emergency care for miscarriages and ectopic pregnancies, and Defendants cited no such evidence.

38.    Indeed, Texas law already expressly provides that treatment of a miscarriage and removal of an ectopic pregnancy do not constitute abortion. Tex. Health & Safety Code §245.002(1)(B)-(C). Even until very recently Planned Parenthood distinguished between abortion and treatment

---

[8] Exh. 1 *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-20-15-hospital-cah-emtala-revised.pdf (last visited July 28, 2022).

[9] Exh. 2 Letter to Health Care Providers, SECRETARY OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf (last visited July 28, 2022).

[10] Exh. 1 at 2.

[11] Exh. 1 at 1.

of ectopic pregnancies—but that distinction was removed from Planned Parenthood's website shortly after the EMTALA Abortion Mandate was released.[12]

39.     The Abortion Mandate nowhere acknowledges the duty under EMTALA to stabilize the unborn child from serious jeopardy posed by an emergency medical condition.

40.     The EMTALA Guidance also claims that "[w]hen a state law prohibits abortion and does not include an exception for the life of the pregnant person—or draws the exception more narrowly than EMTALA's emergency medical condition definition—*that state law is preempted*."[13]

41.     This has also never been a part of EMTALA. To the contrary, EMTALA "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of [EMTALA]." 42 U.S.C. § 1395dd(f).

42.     The health conditions in which the EMTALA Guidance purports to require abortions are far broader than the life of the mother exception found in Texas laws concerning abortion or the federal Hyde Amendment, but instead include undefined "health" conditions of a pregnant woman (which, under *Roe*, included emotional and social health), situations such as "incomplete medical abortions," and undefined and open-ended situations that do not presently threaten the life of the mother but are "likely . . . to become emergent."[14]

43.     EMTALA does not mandate access to abortion or codify a right to an abortion as "stabilizing treatment" for an "emergency medical condition." The Abortion Mandate cites no

---

[12] Chloe Folmar, "Planned Parenthood website removes distinction between etopic pregnancy and abortion," *The Hill* (July 26, 2022), https://thehill.com/homenews/state-watch/3570880-planned-parenthood-website-removes-distinction-between-ectopic-pregnancy-and-abortion/ (last visited July 28, 2022).

[13] Exh. 1 at 1–2 (emphasis in original).

[14] Exh. 1 at 1.

other federal law that would authorize or require an abortion. No federal statute, including EMTALA, supersedes or preempts the States' power to regulate or prohibit abortion.

44.    The EMTALA Guidance further specifies that "an emergency medical condition that has not been stabilized" can include "a patient with an incomplete medical abortion," and that the sorts of abortion that EMTALA can require include "methotrexate therapy" or "dilation and curettage."[15]

45.    Thus the EMTALA Guidance attempts to force hospitals and physicians to complete medical abortions (otherwise known as chemical abortions) that began elsewhere, even illegally.

46.    The Abortion Mandate, by threatening to punish hospitals and physicians in failing their duty to stabilize patients, inherently threatens to second-guess the medical judgment or moral or religious beliefs of a hospital or physician who concludes that an abortion is not an appropriate response in a particular situation, and to subject the hospital or physician to penalties after the fact for allegedly failing in their stabilization duty based on the new abortion standard of care set forth in the EMTALA Guidance.

47.    The risk of after-the-fact liability is not hypothetical. It is how EMTALA is enforced by HHS. For instance, a physician or hospital could decline to complete a chemical abortion, proposing instead to reverse the abortion and stabilize both the mother and the unborn child as EMTALA requires. Should the woman refuse that treatment and subsequently complete the abortion elsewhere, however, the refusing physician or hospital may be accused of "dumping" the patient, triggering potential liability by HHS CMS and HHS's Office of the Inspector General.

---

[15] *Id.* at 4, 6.

**E.**     **Federal Laws and Appropriation Statutes Prevent Federal Abortion Mandates**

48.     None of these mandates existed in federal law before this Executive Order.

49.     Instead, the Hyde Amendment prohibits federal funds from being used to pay for abortions except in cases of rape, incest, or a threat to the life of the mother. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506–07.

50.     The Weldon Amendment prohibits federal agencies from discriminating against any institutional or individual health care entity "on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." *Id.*

51.     The Coats-Snowe Amendment prohibits "[t]he Federal Government" from discriminating against any health care entity on the basis that it refuses to perform induced abortions or to provide referrals for such abortions. 42 U.S.C. § 238n.

52.     The Church Amendments prohibits recipients of funds from HHS from discriminating against personnel because they refuse to perform or assist an abortion based on their religious or moral beliefs, and prohibits any requirement that an individual in an HHS funded health or research program perform or assist in procedures contrary to his religious or moral beliefs. 42 U.S.C. § 300a-7(c) & (d).

53.     And an agency cannot accomplish through administrative action something that which it is prohibited from doing by statute. *See, e.g.*, *BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604, 611–12 (5th Cir. 2021).

**F.**     **Texas Abortion Statutes**

   **1. Human Life Protection Act**

54.     The Human Life Protection Act states that "[a] person may not knowingly perform, induce, or attempt an abortion." Act of May 25, 2021, 87th Leg., R.S., ch. 800, 2021 Tex. Sess.

Law Serv. 1887 (H.B. 1280) (to be codified at Tex. Health & Safety Code Ch. 170A). That prohibition does not apply if the woman on whom the abortion is performed "has a life-threatening physical condition" arising from a pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed." H.B. 1280 at § 2 (to be codified at Tex. Health & Safety Code § 170A.002(b)(2)). The potential criminal penalty for violating this law is anywhere from two years to life in prison and a civil penalty not less than $100,000. *Id.* (to be codified at Tex. Health & Safety Code §§170A.004–.005); Tex. Penal Code §§ 12.32–.33.

55.     The Human Life Protection Act is effective on the thirtieth-day after the issuance of a United States Supreme Court judgment in a decision overruling *Roe v. Wade*. H.B. 1280 at § 3(1). No further action by the Texas Legislature or any state official is required—it is certain that these provisions will become effective.

56.     Texas law protects the right of physicians to decline to directly or indirectly perform or participate in an abortion procedure. Tex. Occ. Code § 103.001.

### 2. Pre-*Roe* Criminal Statutes

57.     In addition to the Human Life Protection Act, Texas has several statues predating *Roe* that address the subject of abortion. *See* Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6. (2010) (former Tex. Penal Code arts. 1191–1194, 1196 (1925)). Under those statutes, any person who causes an abortion is guilty of an offense and shall be confined in a penitentiary. *Id.* at 4512.1. Moreover, an individual may not act as an accomplice to abortion or an attempted abortion. *Id.* at 4512.2–.3. However, it is not on offense if the abortion is performed under "medical advice for the purpose of saving the life of the mother." *Id.* at 4512.6.

58.     These laws have never been repealed, and this criminal prohibition on abortion is currently the law in Texas. As the Texas Supreme Court has explained, "[w]hen a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it." *Pidgeon v. Turner*, 538 S.W.3d 73, 88 n.21 (Tex. 2017). And the Legislature never repealed Articles 4512.1–.4 and .6. Instead, they were merely moved from the Texas Penal Code to the Texas Revised Civil Statutes. *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 399, § 5(a), 1973 Tex. Gen. Laws 883, 995 ("provid[ing] for the transfer of articles of the Penal Code of Texas, 1925, which are not repealed by this Act to the civil statutes or other appropriate places within the framework of Texas statute law, without reenactment and without altering the meaning or effect of the unrepealed articles.").

### G.     The Effects of the Abortion Mandate in Texas

59.     Texas is injured because the Abortion Mandate purports to preempt its laws. This violates Texas's "sovereign interest in the power to create and enforce a legal code." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (quotation omitted). The sovereign right to enforce its criminal laws is the epitome of Texas's police power.

60.     Furthermore, the State of Texas operates hospitals that participate in Medicare and Medicaid. The EMTALA Guidance explicitly threatens the CMS provider agreements for any healthcare providers that refuse to abide by the Abortion Mandate.[16] These hospitals are now

---

[16] Exh. 1 at 5 ("HHS OIG may also exclude physicians from participation in Medicare and State health care programs. CMS may also penalize a hospital by terminating its provider agreement."); *see also* 1 Tex. Admin. Code § 354.1077 (requiring a hospital to "be enrolled and participating in the Medicare Program as a hospital" to participate as a hospital in Texas Medicaid).

*Plaintiffs' Amended Complaint*                                                                                   Page 14 of 33

threatened with having to choose between violating state law under threat of criminal penalty or jeopardizing their ability to participate in Medicare and State health care programs, *e.g.*, Medicaid.

61.     By requiring Medicare-participating hospitals, including hospitals operated by the State of Texas, to provide abortions when the life of the mother is *not* in danger, the Abortion Mandate directly infringes on Texas's sovereign and quasi-sovereign authority.

62.     In 2020, Medicare hospital expenditures exceeded $1.2 billion, amounting to 36% of total national health expenditures.[17] For most hospitals, more than half of patient revenue is attributable to Medicaid and Medicare.[18] The intended consequence of the Abortion Mandate is that numerous physicians and hospitals in Texas will be threatened with extensive civil penalties and loss of livelihood as a result of following State law.

63.     Under Texas law, if a physician commits a violation of State law "connected with the physician's practice of medicine," Tex. Occ. Code § 164.053(a)(1), the physician's license may be revoked or suspended. *Id.* at § 164.001; § 164.052(a)(5). Accordingly, if Texas physicians violate State law by providing abortions when the life of the mother is not in danger, they risk losing their medical licenses.

64.     Texas has a quasi-sovereign and *parens patriae* interest in protecting the rights of its citizens and vindicating them in court. Thus, Texas may sue to challenge unlawful actions that "affect [its] public at large." *In re Debs*, 158 U.S. 51, 584 (1895).

---

[17] *NHE Fact Sheet*, CENTERS FOR MEDICARE & MEDICAID SERVICES, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet (last visited July 14, 2022).

[18] *Medicare and Medicaid*, TEXAS HOSPITAL ASSOCIATION, https://www.tha.org/issues/medicare-and-medicaid/ (last visited July 14, 2022).

**H.**     **The Effects of the Abortion Mandate on AAPLOG and CMDA**

65.     AAPLOG and CMDA have members in Texas and around the country who care for pregnant women in emergency situations at hospitals subject to EMTALA.

66.     AAPLOG's and CMDA's Texas members are protected by law in their conscientious objection to participating in abortions under Tex. Occ. Code § 103.001, and under the Church, Coats-Snowe, and Weldon Amendments listed above.

67.     The Abortion Mandate purports to establish a standard of care that requires abortions in various circumstances faced by AAPLOG's and CMDA's members in Texas and other states.

68.     The Abortion Mandate purports to require abortions by AAPLOG's and CMDA's members in various circumstances not posing a risk to the life of the mother.

69.     For example, the Abortion Mandate requires performing essentially an elective abortion where women present to an emergency room, having previously initiated chemical abortions, but where the unborn child is still living and may still be preserved.

70.     Intrauterine pregnancy itself is not an acute condition requiring any immediate intervention under EMTALA, and thus does not fit the criteria for EMTALA intervention. Intrauterine pregnancy is a normal bodily function.

71.     Because these broader conditions include elective abortions where the woman's life is not at stake but which may constitute "stabilizing care" under the Abortion Mandate, the effect of the Abortion Mandate is to force the performance of elective abortions by both physicians and health care entities, to protect abortion providers who violate state law, and to require pro-life hospitals to allow those doctors to perform abortions in their facilities.

72.     In cases where the unborn child's life can still be preserved, the Abortion Mandate purports to require AAPLOG's and CMDA's members to perform, assist in, or refer for abortions in

violation of Texas law, the pro-life laws of other states, and EMTALA itself which requires stabilization of the unborn child.

73.     AAPLOG and its members object to being forced to end the life of a human being in the womb for no medical reason. The objections are both ethical and medical and stem from the purpose of medicine itself, which is to heal and not to electively kill human beings regardless of their location.[19]

74.     AAPLOG has issued several position statements and medical practice bulletins on situations threatening the life of the mother and the need to not conflate legitimate treatments provided in such circumstances with abortion provided in broader circumstances.[20]

75.     CMDA and its members similarly affirm the historical prohibition against abortion in the Christian Church and in application of the Hippocratic Oath. Their objections are Biblical, biological, social, medical, and ethical.[21]

76.     The Abortion Mandate's requirement that AAPLOG's members perform abortions in elective circumstances would force AAPLOG's members to violate their sincerely held religious or moral beliefs or medical judgment.

---

[19] *See Position Statements*, AAPLOG, https://aaplog.org/resources/position-statements/(last visited July 28, 2022).

[20] *See, e.g.*, *What is AAPLOG's Position on "Abortion to Save the Life of the Mother?"?*, AAPLOG, https://aaplog.org/what-is-aaplogs-position-on-abortion-to-save-the-life-of-the-mother/     (last visited July 28, 2022); *Premature Delivery is Not Induced Abortion*, AAPLOG, https://aaplog.org/premature-delivery-is-not-induced-abortion/ (last visited July 28, 2022); and *Practice Bulletin 10*, AAPLOG, https://aaplog.org/wp-content/uploads/2020/12/FINAL-AAPLOG-PB-10-Defining-the-End-of-Pregnancy.pdf (last visited July 28, 2022).

[21] *See Abortion*, CHRISTIAN MED. & DENTAL ASS'NS, https://cmda.org/abortion/ (last visited July 28, 2022).

77.     The Abortion Mandate's requirement that CMDA's members perform abortions in circumstances not justified by CMDA's members' religious beliefs about protecting the life of the mother and her unborn child would force CMDA's members to violate their sincerely held religious or moral beliefs or medical judgment.

78.     The Abortion Mandate forces AAPLOG's and CMDA's Texas members to choose between following state laws and their own consciences prohibiting certain abortions and violating the Abortion Mandate, or following the Abortion Mandate and violating state law and their consciences.

79.     The Abortion Mandate threatens crippling punishments against AAPLOG's and CMDA's members for failing to comply, including fines of $119,942 per violation and loss of qualification for federal programs such as Medicaid and Medicare.

80.     These threats of punishment under EMTALA chill the exercise of religion of CMDA's members and AAPLOG's religious members.  Further these threats of punishment serve to coerce both AAPLOG and CMDA members to act in violation of their best medical judgement exercised on behalf of both of their patients, the pregnant mother and the human being in her womb.

81.     As examples, the following members of AAPLOG or CMDA illustrate the harms imposed by the Abortion Mandate.

82.     Dr. Sean Hutzler is an emergency medicine physician in Corpus Christi, Texas, and is affiliated with multiple hospitals in the area.

83.     Dr. Hutzler is a member of AAPLOG and is also a member of the Catholic Church.

84.     Dr. Hutzler shares the views of AAPLOG and of the Catholic Church concerning abortion and the medical treatment that is appropriate for women and their unborn children.

85.     As an emergency medicine physician, Dr. Hutzler regularly treats pregnant women who come to the emergency room in situations subject to EMTALA. He has treated many women with complications arising during pregnancy, including ectopic pregnancy.

86.     Dr. Hutzler provides the best care possible to women and their unborn children in such circumstances, and has complied with EMTALA, state law, and his medical, ethical, and religious beliefs.

87.     Dr. Hutzler seeks to practice medicine consistent with his medical and ethical views, his religious beliefs, and state law, but is concerned that the Abortion Mandate could be enforced to require involvement in abortions inconsistent with his views, his beliefs, and state law.

88.     Dr. Michael T. Valley is an Ob/Gyn with board certified specialties in obstetrics and gynecology and urogynecology.

89.     Dr. Valley practices in Minnesota and covers the emergency department at hospitals in Waconie and Chaska, Minnesota.

90.     Dr. Valley is a member of AAPLOG and is also a member of the Catholic Church.

91.     Dr. Valley shares the views of AAPLOG and of the Catholic Church concerning abortion and the medical treatment that is appropriate for women and their unborn children.

92.     In covering the emergency department of two hospitals as an Ob/Gyn, Dr. Valley regularly treats pregnant women who come to the emergency room in situations subject to EMTALA.

93.     Dr. Valley provides the best care possible to women and their unborn children in such circumstances, and has complied with EMTALA, state law, and his medical, ethical, and religious beliefs.

94.     Dr. Valley seeks to practice medicine consistent with his medical, ethical, and religious views, but is concerned that the Abortion Mandate could be enforced to require involvement in abortions inconsistent with those views.

95.     Dr. Steven A. Foley is an Ob/Gyn in Anderson, Indiana, and he also practices in Colorado Springs, Colorado.

96.     Dr. Foley is a member of CMDA and shares its views concerning abortion and the medical treatment that is appropriate for women and their unborn children.

97.     Dr. Foley is associated with several hospitals, works as a hospitalist, and also covers the emergency department for hospitals.

98.     Dr. Foley regularly treats pregnant women who come to the emergency room in situations subject to EMTALA.

99.     Dr. Foley provides the best care possible to women and their unborn children in such circumstances, and has complied with EMTALA, state law, and his medical, ethical, and religious beliefs.

100.     Dr. Foley seeks to practice medicine consistent with his medical, ethical, and religious views, but is concerned that the Abortion Mandate could be enforced to require involvement in abortions inconsistent with those views.

101.     Without injunctive relief, the members of AAPLOG and CMDA will be forced to violate their best medical judgement as well as their conscience and religious liberty rights and compliance with state abortion bans, in order to avoid massive financial federal penalties and maintain Medicaid and Medicare eligibility—and therefore preserve their livelihoods as physicians and careers serving patients.

102.    AAPLOG and CMDA have no remedies available at law.

103.    For each of the claims below, Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through this paragraph of this first amended complaint.

### IV. CLAIMS FOR RELIEF

### COUNT 1
### Defendants Acted *Ultra Vires* in Promulgating the Guidance

104.    Defendants lack statutory authority to promulgate regulations altering or amending the requirements of EMTALA.

105.    Defendants lack statutory authority to promulgate rules or regulations mandating that Medicare-participating hospitals and their physicians provide access to—and perform—abortions.

106.    Moreover, under the Social Security Act, only the Secretary of HHS has authority to promulgate rules or regulations. 42 U.S.C. § 1395hh(a). The EMTALA Guidance was not issued by the Secretary of HHS but by Defendants Wright and Tritz, who lack authority to promulgate rules or regulations. *See id.*

107.    Further, whether Defendants possess the political and constitutional authority they claim is a major question of "deep economic and political significance" that Courts will not assume that Congress has assigned to the Executive Branch. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). "We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022) (internal quotations omitted).

108.     As the President has acknowledged,[22] and as the Supreme Court has held,[23] the question of abortion is now properly up to the people's elected representatives—not unelected bureaucrats. Using EMTALA to impose an abortion mandate is "unprecedented" in the statute's 36 year history. *Cf. West Virginia*, 142 S. Ct. at 2611.

109.     Defendants acted *ultra vires* and exceeded the scope of their authority.

**COUNT 2**
**The Abortion Mandate Exceeds Statutory Authority**
**and Is Not in Accordance with Law**
**5 U.S.C. § 706**

110.     The Abortion Mandate is being "applied . . . in a way that indicates it is binding." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Therefore, it is an agency action subject to judicial review under the APA.

111.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

112.     EMTALA does not authorize the Abortion Mandate. It nowhere allows Defendants to require abortions, nor to establish a nationwide standard of care requiring abortions. Instead, in EMTALA itself Congress denied Defendants authority to mandate abortions by requiring that the "unborn child" be stabilized. And EMTALA explicitly precludes the Abortion Mandate's attempt

---

[22] *Remarks by President Biden on Protecting Access to Reproductive Health Care Services*, THE WHITE HOUSE (July 8, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/08/remarks-by-president-biden-on-protecting-access-to-reproductive-health-care-services/ (last visited July 14, 2022).

[23] *Dobbs*, 142 S Ct. at 2284.

to preempt state law since EMTALA contains no abortion mandate, much less one that "directly conflicts" with state law. 42 U.S.C. § 1395dd(f).

113.    The Abortion Mandate is promulgated "[i]n light of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*" and attempts so codify a "legal duty" to provide an abortion.[24] But Defendants lack statutory authority to exercise "any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Defendants also lack statutory authority to codify a federal right to abortion.

114.    The Abortion Mandate also conflicts with federal law's ban on the federal government discriminating against hospitals and healthcare providers that do not provide, assist, or refer patients for abortions. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506–07; 42 U.S.C. § 238n; 42 U.S.C. § 300a-7.

115.    In addition, the Abortion Mandate conflicts with the Hyde Amendment, which prohibits federal dollars from being used for abortions except when the pregnancy is the result of rape or incest or the woman's life is in danger. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506–07. By conditioning the receipt of Medicare funds on providing abortions under the terms of the Abortion Mandate, Defendants are requiring the use of federal dollars to coerce healthcare providers to supply abortions outside the allowable scope under the Hyde Amendment. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506–07.

116.    The Department of Justice's appropriation act prevents it from using any funds to "require any person to perform, or facilitate in any way the performance of, any abortion." Consolidated

---

[24] Exhibit 1 at 1, 5.

Appropriations Act of 2022, Pub. L. 117-103, 136 Stat. 131, Div. B., Tit. II, § 203. The DOJ's defense of the Abortion Mandate would necessarily mean that it would be expending federal dollars to facilitate the performance of abortions.

117.    Defendants did not act in accordance with the law and exceeded their statutory authority when they issued the Abortion Mandate.

**COUNT 3**
**Failure to Conduct Notice and Comment**
**5 U.S.C. § 553**
**42 U.S.C. § 1395hh**

118.    Defendants must comply with notice-and-comment requirements before promulgating a rule. 5 U.S.C. § 553; 42 U.S.C. § 1395hh(b).

119.    Subject to certain statutory exceptions not implicated here, a "[g]eneral notice of proposed rulemaking shall be published in the Federal Register." 5 U.S.C. § 553(b). "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). "The required publications or service of a substantive rule shall be made not less than 30 days before its effective date [with applicable exceptions]." 5 U.S.C. § 553(d).

120.    The Social Security Act stipulates that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits" or "payment for services . . . shall take effect unless it is promulgated by the Secretary," and subject to limited exceptions not applicable here, subject to notice and comment. 42 U.S.C. § 1395hh(a)(2), (b).

121.    Notwithstanding its unconvincing disclaimer,[25] the Abortion Mandate substantively changes the conditions for payment for services by requiring Medicare-participating hospitals and physicians to perform abortions.

122.    The Abortion Mandate has binding effect, uses mandatory language, imposes rights, obligations, and duties, and leaves the agency and its decision-makers without discretion to interpret or apply EMTALA in a contrary way.

123.    Accordingly, Defendants were required to provide an opportunity for public notice and comment.

124.    Even if Defendants were authorized by statute to promulgate the Abortion Mandate, which they are not, the Court would still have to set it aside for failure to comply with the notice-and-comment requirements. "The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT 4
## Arbitrary and Capricious Agency Action
## 5 U.S.C. § 706(2)(A)

125.    "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

---

[25] Exh. 1 at 1.

126.     "[A]gency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement or general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* at § 551(4).

127.     An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).

128.     Defendants did not engage in reasoned decision-making, but instead acted arbitrarily and capriciously, in issuing the Abortion Mandate. The Guidance contains no explanation or reasoning at all. Mere executive fiat falls well short of the requirement of a "satisfactory explanation."

129.     The Abortion Mandate does not acknowledge the agency's change in position from never having previously required abortions under EMTALA; it offers no reasoned explanation of how EMTALA can require abortions when EMTALA requires stabilizing the "unborn child"; it offers no explanation of the interaction between its mandate and religious freedom and conscience laws; it discusses no reliance interests by regulated entities, especially pro-life physicians and hospitals, on never having previously been subject to an abortion mandate under EMTALA; and it discusses no alternative approaches.

130.     The Guidance is arbitrary and capricious and must be set aside.

## COUNT 5
### *Ultra vires*
### Unconstitutional Exercise of Spending Power

131.    "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The executive branch cannot impose conditions on spending that the Constitution would prohibit it from imposing directly because that authority belongs to Congress. *See id.* at 17. Only Congress can condition the receipt of federal funds.

132.    EMTALA does not condition—let alone unambiguously condition—the receipt of Medicare funds on providing abortions. Texas did not—and could not—have knowingly chosen to accept Medicare funds on the condition that its abortion laws be preempted because such a preemption does not exist and would be prohibited.

133.    The Guidance is an unconstitutional condition on the State's receipt of federal funds.

134.    The Court must set aside the Abortion Mandate because it is an unconstitutional exercise of Spending Power. 5 U.S.C. § 706(A), (c).

## COUNT 6
### *Ultra vires*
### Unconstitutional Delegation of Legislative Power

135.    Under Article I, § 1 of the Constitution, because "[a]ll legislative powers herein granted shall be vested in a Congress of the United States," only Congress may engage in lawmaking. "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935).

136.    This nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government.

137.    Congress may delegate power to executive agencies only if that delegation includes an intelligible principle to which the delegee "is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

138.    This is necessary to preserve the Constitutionally mandated separation of powers.

139.    If the Social Security Act is so broad it allows Defendants to implement a national right to abortion—irrespective of State laws—Congress did not articulate an intelligible principle authorizing such agency action.

### COUNT 7
### *Ultra Vires*
### Violation of the Tenth Amendment

140.    The structure of the U.S. Constitution and the text of the Tenth Amendment protect federalism.

141.    The powers not delegated by the Constitution to the federal government are reserved to the States.

142.    "[T]he Constitution does not confer a right to abortion," "does not prohibit the citizens of each State from regulating or prohibiting abortion," and "return[ed] that authority to the people and their elected representatives." *Dobbs*, 142 S. Ct. at 2279, 2284. Thus, the authority to regulate abortion in Texas rests with the State of Texas.

143.    "[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsbrough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985). "Historic police powers of the States" are not superseded by federal law unless that is "the clear and manifest purpose of Congress." *Id.*; *City of Columbus v. Ours Garage & Wrecker Serv. Inc.*, 536 U.S. 424, 432 (2002).

144.    For all these reasons, the Abortion Mandate an unconstitutional exercise of authority and must be held unlawful and set aside.

**COUNT 8**
***Religious Liberty***
**Violation of RFRA and the Free Exercise Clause**
**of the First Amendment**

145.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. And under the Fifth Amendment to the U.S. Constitution, "No person shall be * * * deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

146.    The Religious Freedom Restoration Act (RFRA) prohibits the federal government from substantially burdening a person's exercise of religion, unless the government demonstrates that the burden is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1(a).

147.    CMDA asserts the rights of its members under the Free Exercise Clause and RFRA.

148.    CMDA's members exercise their religious beliefs in practicing medicine by caring for patients generally, and in caring for patients in situations subject to EMTALA.

149.    CMDA's members exercise their religious beliefs in treating pregnant women and their unborn children with respect and dignity, and in opposing involvement in the direct and intentional killing of unborn children in abortion.

150.    The Abortion Mandate burdens the religious exercise of CMDA's sincerely held religious beliefs, and does so in a substantial way.

151.    The Abortion Mandate is not supported by a compelling government interest, and is not the least restrictive means of advancing such an interest.

152.    The Abortion Mandate exerts significant pressure on CMDA's members to violate their beliefs in order to continue providing healthcare in federally funded health programs and activities or else face exclusion from those programs, loss of funding, loss of livelihood, and fines, investigations, and other punishments from Defendants.

153.    Upon information and belief, the Abortion Mandate specifically and primarily burdens religious conduct, favors some religious beliefs over others, and is motivated by animus and hostility towards the religious beliefs of pro-life physicians and hospitals.

154.    The Abortion Mandate allows prosecutorial discretion by Defendants so as to not be neutral or generally applicable under the Free Exercise Clause.

155.    The Abortion Mandate, and Defendants' enforcement thereof, violates the rights of CMDA's members under the Free Exercise Clause of the First Amendment and RFRA.

## V.  DECLARATORY JUDGMENT

156.    The federal Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n. 11 (1974).

157.    For the reasons described above, Plaintiffs are entitled to a declaration that the Defendants are violating the law and the Abortion Mandate is unlawful, unconstitutional, and unenforceable.

## VI. PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request that the Court:

i.    Hold unlawful and set aside the Abortion Mandate.

ii.    Declare the Defendants' actions unlawful.

iii.    Issue preliminary and permanent injunctions prohibiting Defendants from enforcing the Abortion Mandate.

iv.    Award Plaintiffs' costs and reasonable attorneys' fees.

v.    Award such other relief as the Court deems equitable and just.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Texas Bar No. 24087727
Christopher.Hilton@oag.texas.gov

*/s/ Amy Snow Hilton*
AMY SNOW HILTON
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

WILLIAM D. WASSDORF
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

CHARLES K. ELDRED
Special Counsel for Legal Strategy
Texas Bar No. 00793681
Charles.Eldred@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**COUNSEL FOR THE STATE OF TEXAS**

*/s/ Ryan L. Bangert*
**RYAN L. BANGERT**
TX Bar No. 24045446
rbangert@ADFlegal.org

**MATTHEW S. BOWMAN\***
DC Bar No. 993261
mbowman@ADFlegal.org

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622

**COUNSEL FOR AMERICAN ASSOCIATION
OF PRO-LIFE OBSTETRICIANS AND
GYNECOLOGISTS, AND CHRISTIAN
MEDICAL AND DENTAL ASSOCIATIONS**

*\*Application for admission forthcoming*