UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; and CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,** | § | |
| *Plaintiffs,* | § | |
| | § | **CIVIL ACTION NO. 5:22-CV-00185** |
| **v.** | § | |
| | § | |
| **XAVIER BECERRA,** in his official capacity as Secretary of Health and Human Services**; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS); KAREN L. TRITZ,** in her official capacity as Director of the Survey and Operations Group for CMS**; DAVID R. WRIGHT,** in his official capacity as Director of the Quality Safety and Oversight Group for CMS**,** | § | |
| *Defendants.* | § | |

---

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Index of Authorities ............................................................................................ ii

I.   Background ................................................................................................ 1

    A.   The Abortion Mandate ......................................................................2

    B.   The Mandate Infringes on Texas's Abortion Laws and Physicians'
        Consciences .......................................................................................6

II.   Argument .................................................................................................. 8

    A.   Texas and the Medical Groups are likely to succeed on the merits of their
        claims..................................................................................................9

    1.   Defendants acted *ultra vires* in issuing the Abortion Mandate.................... 9

    2.   The Abortion Mandate violates the APA............................................... 13

        a.   The Abortion Mandate exceeds statutory authority and is not in accordance
            with law. ......................................................................................14

        b.   Defendants failed to conduct notice and comment. ...................................15

        c.   The Abortion Mandate is arbitrary and capricious. .................................16

    3.   Defendants' actions violate the Constitution........................................ 18

        a.   Unconstitutional delegation of legislative power ...................................18

        b.   Major Questions Doctrine Applies...................................................19

        c.   Violation of the Spending Clause ....................................................19

        d.   Violation of the Tenth Amendment ..................................................22

        e.   Defendants' actions violate RFRA....................................................22

    B.   Plaintiffs are likely to suffer irreparable harm. ......................................23

    C.   The balance of the equities and public interest favor preliminary injunctive
        relief...................................................................................................25

III.   Conclusion .............................................................................................. 25

Certificate of Service................................................................................... 27

## INDEX OF AUTHORITIES

### Cases

*A.L.A. Schechter* and *Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ............................................................................... 24

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ......................................................................... 31

*Baber v. Hosp. Corp. of America*,
    977 F.2d 872 (4th Cir. 1992) ................................................................. 5

*Batterton v. Marshall*,
    48 F.2d 694 (D.C. Cir. 1980) ............................................................... 20

*Battle ex rel. Battle v Mem'l Hosp. at Gulfport*,
    228 F.3d 544 (5th Cir. 2000) ................................................................. 5

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) ......................................................................... 30

*Bond v. United States*,
    564 U.S. 211 (2011) .............................................................................. 26

*BST Holdings, LLC v. Occupational Safety & Health Admin.*,
    17 F.4th 604 (5th Cir. 2021) ...............................................13, 21, 23, 33

*Burditt v. U.S. Dept. of Health & Human Servs.*,
    934 F.2d 1362 (5th Cir. 1991) ............................................................... 4

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) .............................................................................. 30

*Chamber of Commerce of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................. 12

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ....................................................... 22, 26

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
    636 F.2d 1084 (5th Cir. 1981) ............................................................. 33

*City of Columbus v. Ours Garage & Wrecker Serv. Inc.*,
    536 U.S. 424 (2002) .............................................................................. 29

*Clark v. Richard*,
    812 F.2d 991 (5th Cir. 1987) ............................................................... 11

*Coal. for Econ. Equity v. Wilson*,
    122 F.3d 718 (9th Cir. 1997) ............................................................... 31

*Coliseum Square Ass'n, Inc. v. Jackson*,
    465 F.3d 215 (5th Cir. 2006) ............................................................... 11

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  140 S. Ct 1891 (2020) ................................................................. 22

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ...................................... 1, 2, 28, 29

*Eberhardt v. City of Los Angeles*,
  62 F.3d 1253 (9th Cir. 1995) ........................................................ 4, 5

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211, 136 S. Ct. 2117 (2016) ...................................................... 22

*Guzman v. Mem'l Hermann Hosp. Sys.*,
  637 F. Supp. 2d 464 (S.D. Tex. 2009) ...................................................... 5

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ................................................................... 16

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985) ................................................................... 28

*Humana, Inc. v. Jacobson*,
  804 F.2d 1390 (5th Cir. 1986) ......................................................... 30

*Indus. Union Dep't, AFL-CIO v. American Petroleum Inst.*,
  448 U.S. 607 (1980) ................................................................... 24

*J.W. Hampton v. United States*,
  276 U.S. 394 (1928) ................................................................... 24

*Marshall on Behalf of Marshall v. E. Carroll Par. Hosp. Serv. Dist.*,
  134 F.3d 319 (5th Cir. 1998) .......................................................... 4

*Maryland v. King*,
  567 U.S. 1301 (2012) .................................................................. 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................ 20, 23

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ......................................................... 17

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ............................................................ 25, 26, 27

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................... 32

*Org. for Black Struggle v. Ashcroft*,
  978 F.3d 603 (8th Cir. 2020) .......................................................... 31

*Pennhurst State School & Hospital v. Halderman*,
  451 U.S. 1 (1981) ................................................................. 26, 27

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  734 F.3d 406 (5th Cir. 2013) .......................................................... 31

*Steward Machine Co. v. Davis*,
    301 U.S. 548 (1937) ............................................................................ 26

*Texas v. Becerra*,
    No. 5:21-cv-300-H, 2021 WL 6198109 (Dec. 31, 2021) ....................... 19

*Texas v. EEOC*,
    33 F.3d 433 (5th Cir. 2019) ....................................................... 11, 16, 17

*Texas v. United States*,
    524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................................. 11

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) ................................................. 11, 17, 32

*United States v. Idaho*,
    No. 1:22-cv-329 (D. Idaho Aug. 2, 2022) .................................... 7, 8, 18

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) ............................ 22

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................ 16

*West Virginia v. EPA*,
    142 S. Ct. 2587 (June 20, 2022) ................................................ 19, 24, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................ 11

**State Cases**

42 U.S.C. § 1301 ..................................................................................... 12
42 U.S.C. § 1320a ................................................................................ 6, 14
42 U.S.C. § 1395 .................................................................................. 5, 14
42 U.S.C. § 1395hh .......................................................................... 9, 12, 15
42 U.S.C. § 1396d ................................................................................... 21
42 U.S.C. § 2000bb .............................................................................. 8, 23
42 U.S.C. § 238n ................................................................................. 8, 11
42 U.S.C. § 300a ..................................................................................... 11
42 U.S.C. §1395dd ............................................................................ passim
5 U.S.C. § 553 ......................................................................................... 15
5 U.S.C. § 706 .................................................................................. 14, 16
Act of May 25, 2021, 87th Leg., R.S., ch. 800, 2021 Tex. Sess. Law Serv. 1887 (H.B. 1280) ..... 7
Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V ......................... 10
Tex. Occ. Code § 103.001 ......................................................................... 8
Tex. Occ. Code § 164.001 ......................................................................... 7
Tex. Occ. Code § 164.052 ......................................................................... 8
Tex. Occ. Code § 164.053 ......................................................................... 7
Tex. Penal Code § 12.32 ........................................................................... 7
Tex. Penal Code § 12.33 ........................................................................... 7
Tex. Rev. Civ. Stat. art. 4512.1 ................................................................. 7
Tex. Rev. Civ. Stat. art. 4512.6 ................................................................. 7

Tex. Rev. Civ. Stat. arts. 4512.2, ................................................................... 7
Tex. Rev. Civ. Stat. arts. 4512.3 .................................................................. 7
Tex. Rev. Civ. Stat. arts. 4512.4 .................................................................. 7
Texas Health & Safety Code § 245.002 .......................................................... 8
U.S. Const. art. I, § 8, cl.1 ........................................................................ 20
U.S. Const. art. I, § 9, cl. 7 ....................................................................... 20

## Regulations

1 Tex. Admin. Code § 354.1077 .................................................................. 7

42 C.F.R. § 489.24 .................................................................................. 6

## Other Authorities

"Protecting Access to Reproductive Healthcare Services." Exec. Order No. 14,076, 87 Fed.
   Reg. 42053 (2022), available at
   https://www.federalregister.gov/documents/2022/07/13/2022-15138/protecting-access-to-
   reproductive-healthcare-services ......................................................... 2, 3

*HHS Secretary Becerra talks women's future with abortion following Roe v. Wade decision* (NBC
   NEWS broadcast June 25, 2022) https://www.nbcnews.com/video/women-s-future-with-
   abortion-implementing-harm-reduction-with-addiction-142836293922, at 1:45 (last visited
   July 28, 2022) .................................................................................. 21

*NHE Fact Sheet*, CMS, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-
   Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet (last visited July 28,
   2022) ............................................................................................ 18

President Biden (@POTUS), TWITTER (July 12, 2022, 3:25 PM),
   https://twitter.com/potus/?lang=en ........................................................ 3

President Biden (@POTUS), Twitter (July 8, 2022, 11:39 AM),
   https://twitter.com/POTUS/status/1545447455558406145?cxt=HHwWgsC4-
   bmRxPIqAAAA ................................................................................. 2

*Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, THE WHITE
   HOUSE (June 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-
   remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-
   overturn-roe-v-wade/ ......................................................................... 1

*Senate fails to pass abortion rights bill—again*, POLITICO (May 11, 2022),
   https://www.politico.com/news/2022/05/11/senate-doomed-vote-roe-abortion-rights-
   00031732 (last visited July 27, 2022) ...................................................... 25

*What They Are Saying: President Biden Signs Executive Order to Protect Access to Reproductive
   Healthcare Services*, THE WHITE HOUSE (July 8, 2022), https://www.whitehouse.gov/briefing-
   room/statements-releases/2022/07/08/what-they-are-saying-president-biden-signs-
   executive-order-to-protect-access-to-reproductive-healthcare-services/ ................. 2

The Biden Administration seeks to codify a right to abortion by rogue agency action that requires hospitals and physicians to perform elective abortions in violation of Texas law. Defendants' unconstitutional Abortion Mandate, ostensibly issued under the Emergency Medical Treatment and Labor Act (EMTALA), is already in effect. It requires doctors and hospitals to choose between performing abortions in violation of State law, their consciences, and their medical licenses, or complying with State law and caring for women as they always have and losing their Medicare and Medicaid funding.

Defendants' novel Abortion Mandate is causing imminent and irreparable harm. Plaintiffs respectfully request that the Court temporarily and preliminarily enjoin Defendants from enforcing it in Texas and against members of the plaintiff associations AAPLOG and CMDA.

## I.   BACKGROUND

On the same day the Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), ending the era of *Roe v. Wade*, President Biden announced immediate steps to counteract what he characterized as the Court's "extreme decision."[1] *Dobbs* returns the issue of abortion to the States. *Dobbs*, 142 S. Ct. at 2279, 2284. Accordingly, Texas law governs the regulation of abortion in Texas. But the Biden Administration has made its goal clear: to subvert State laws that protect unborn life.[2]

---

[1] *Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, THE WHITE HOUSE (June 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade/; President Biden (@POTUS), Twitter (July 8, 2022, 11:39 AM), https://twitter.com/POTUS/status/1545447455558406145?cxt=HHwWgsC4-bmRxPIqAAAA.

[2] *See, e.g.*, *What They Are Saying: President Biden Signs Executive Order to Protect Access to Reproductive Healthcare Services*, THE WHITE HOUSE (July 8, 2022),

A.     <u>**The Abortion Mandate**</u>

On July 8, 2022, President Biden issued an Executive Order[3] that required HHS Secretary Becerra to submit a report to the President "identifying steps to ensure that all patients—including pregnant women and those experiencing pregnancy loss, such as miscarriages and ectopic pregnancies—receive the full protections for emergency medical care afforded under the law, including by considering updates to current guidance on obligations specific to emergency conditions and stabilizing care under the Emergency Medical Treatment and Labor Act [EMTALA], 42 U.S.C. §1395dd." *Id.* at 42054.

Four days later, President Biden announced HHS's new mandate purporting to override individual states' abortion laws under the authority of EMTALA,[4] and the Centers for Medicare and Medicaid Services (CMS) of HHS issued agency guidance to all State Directors entitled "Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss" (EMTALA Guidance).[5] Additionally, Secretary Becerra issued a

---

https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/08/what-they-are-saying-president-biden-signs-executive-order-to-protect-access-to-reproductive-healthcare-services/ ("This Executive Order builds on the actions his Administration has already taken to defend reproductive rights by . . . [s]afeguarding access to reproductive health care services, including abortion and contraception.").

[3] "Protecting Access to Reproductive Healthcare Services." Exec. Order No. 14,076, 87 Fed. Reg. 42053 (2022), available at https://www.federalregister.gov/documents/2022/07/13/2022-15138/protecting-access-to-reproductive-healthcare-services.

[4] President Biden (@POTUS), TWITTER (July 12, 2022, 3:25 PM), https://twitter.com/potus/?lang=en.

[5] Exh. 1, Appx. 002 *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-20-15-hospital-cah-emtala-revised.pdf (last visited Aug. 3, 2022).

---

letter to providers[6] describing the guidance (together, the "Abortion Mandate").

While the EMTALA Guidance claims to simply remind hospitals of existing legal obligations,[7] it does far more. It imposes unprecedented new requirements to provide abortions that have never existed under federal law or EMTALA. The Abortion Mandate requires that a provider perform an abortion if "abortion is the stabilizing treatment necessary to resolve [an emergency medical condition]," which could encompass elective abortions such as in the case of "incomplete medical abortion."[8] This mandate is novel, unauthorized, and illegal.

EMTALA does not mandate specific procedures. It is a provision of the Social Security Act that ensures Medicare-participating hospitals stabilize patients with emergency medical conditions regardless of the patient's ability to pay. 42 U.S.C. § 1395dd. This is an "anti-dumping" requirement. *See Burditt v. U.S. Dept. of Health & Human Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991). In EMTALA, Congress did not impose a "national standard of care" or seek "to improve the overall standard of medical care." *See, e.g., Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995). EMTALA requires only that hospitals stabilize indigent patients with the same care afforded to other patients. *See Marshall on Behalf of Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 323–24 (5th Cir. 1998) (holding that an EMTALA violation, requires "that the Hospital tread her differently from other patients"); *see also Baber v. Hosp. Corp. of America*, 977 F.2d 872, 878 (4th Cir. 1992) EMTALA only requires hospitals to apply their standard

---

[6] Exh. 2 at Appx. 009 Letter to Health Care Providers, Secretary of Health and Human Services,   https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf (last visited Aug. 3, 2022).

[7] Exh. 1 at Appx. 003.

[8] *Id.* at Appx. 002, 007.

screening procedure for identification of an emergency medical condition uniformly to all patients").

Under EMTALA, the relevant issue is "whether the challenged procedure was identical to that provided similarly situated patients, as opposed to whether the procedure was adequate as judged by the medical profession." *Eberhardt*, 62 F.3d at 1258. Indeed, "[a] hospital's liability under EMTALA is not based on whether the physician . . . failed to adhere to the appropriate standard of care." *Battle ex rel. Battle v Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000); *see also Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 487 (S.D. Tex. 2009) (Rosenthal, J.) ("EMTALA does not create a national standard of care and is not a medical malpractice statute."). EMTALA confers no right to any specific treatment and does not operate as federal oversight on the practice of medicine.

EMTALA requires stabilizing patients in an "emergency medical condition," which includes "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain), such that the absence of immediate medical attention could reasonably be expected to result in–(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily function or part." 42 U.S.C. § 1395dd(e)(1)(A). "To stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3).

EMTALA does not specify what treatment to provide, much less authorize an Abortion Mandate. Notably, EMTALA requires stabilizing "the unborn child," *id.* at 1395dd(c), (e), as do CMS rules. 42 C.F.R. § 489.24. By leaving standards of care to State law, Congress imposed a presumption against preemption of State law under EMTALA, unless a State requirement "directly conflicts with a requirement of this section." *Id.* at § 1395dd(f). The Social Security Act reiterates that "[n]othing in this subchapter [which includes § 1395dd] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided . . . or to exercise any supervision or control over the administration or operation of any such institution, agency, or person [providing health services]." 42 U.S.C. § 1395. Further, EMTALA's enforcement provisions show that State law sets the standard of care by specifying that a private suit for violating EMTALA will be subject to "the law of the *State* in which the hospital is located." 42 U.S.C. § 1395dd(d)(2) (emphasis added).

But the Biden administration has chosen to weaponize EMTALA to mandate abortions as a politicized reaction to the *Dobbs* decision. The Biden Administration has already filed suit against the State of Idaho, asserting that EMTALA requires the State's hospitals to provide abortions when the mother's "health"—but not her life—is at risk.[9] The Abortion Mandate's penalties include civil fines of over $119,000 per violation.[10] The Abortion Mandate threatens to terminate

---

[9] *United States v. Idaho*, No. 1:22-cv-329 (D. Idaho Aug. 2, 2022).

[10] Ex. 1 at Appx. 005-007.

hospitals' Medicare provider agreements and exclude them from State health care programs, which include Medicaid, CHIP, and certain block grants.[11]

This represents a significant amount of funding. Texas hospitals and physicians receive approximately $15.98 billion per year from the federal government in the form of reimbursements for services under Medicaid alone.[12] Texas Tech University System operates Texas Tech University Health Science Center and Texas Tech University Health Science Center El Paso, both of which are State of Texas institutions of higher education.[13] Those institutions received almost $149 million in Medicare and Medicaid funding since September 1, 2021 through August 2, 2022.[14] Under the Abortion Mandate, individual physicians and hospitals must risk these fines and exclusions, unless they violate their religious and conscience rights and risk prosecution under state abortion laws. An injunction from this Court is necessary to prevent these imminent and irreparable harms.

**B.**     **The Mandate Infringes on Texas's Abortion Laws and Physicians' Consciences**

The Abortion Mandate injures Texas because it purports to preempt Texas laws.[15] First, the Human Life Protection Act states that "[a] person may not knowingly perform, induce, or attempt an abortion." Act of May 25, 2021, 87th Leg., R.S., ch. 800, § 2, 2021 Tex. Sess. Law

---

[11] *Id.* at Appx. 005-007; 42 U.S.C. § 1395dd(d)(1); 42 U.S.C. § 1320a-7(h) (defining State health care programs); see also 1 Tex. Admin. Code § 354.1077(a) (requiring that a hospital must be "enrolled and participating in the Medicare Program as a hospital" to "qualify for participation as a hospital in the Texas Medical Assistance (Medicaid) Program").

[12] Exh. 3 at Appx. 012 (Declaration of Victoria Grady).

[13] Exh. 9 at Appx. 038 (Declaration of Eric Bentley).

[14] *Id.* at Appx. 039.

[15] Exh. 1 at Appx. 002. And the Federal Government has represented to the federal Court in Idaho that it does. *See United States v. Idaho*, No. 1:22-cv-329.

Serv. 1887 (H.B. 1280) (effective Aug. 25, 2022) (to be codified at Tex. Health & Safety Code Ch. 170A). The penalty for violating the HLPA includes two years to life in prison and a fine of not less than $100,000. *Id.* (to be codified at Tex. Health & Safety Code §§170A.004–.005); Tex. Penal Code §§ 12.32–.33. That prohibition contains an exception where the woman "has a life-threatening physical condition" arising from a pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed." H.B. 1280 at § 2 (to be codified at Tex. Health & Safety Code § 170A.002(b)(2)). The Human Life Protection Act is effective on the thirtieth-day after the issuance of a United States Supreme Court judgment in a decision overruling *Roe v. Wade*. H.B. 1280 at § 3(1)—which has already occurred. No further action by the Texas Legislature or any state official is required. Accordingly, it will become effective on August 25, 2022.

In addition to the Human Life Protection Act, Texas has current laws predating *Roe* that address the subject of abortion. *See* Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6 (2010) (former Tex. Penal Code arts. 1191–1194, 1196 (1925)). Under those statutes, any person who causes an abortion is guilty of an offense and shall be confined in a penitentiary. *Id.* at 4512.1. Moreover, an individual may not act as an accomplice to abortion or an attempted abortion. *Id.* at 4512.2–.3. However, it is not on offense if the abortion is performed under "medical advice for the purpose of saving the life of the mother." *Id.* at 4512.6.

In Texas, if a physician "commits an act that violates any state or federal law . . . connected with the physician's practice of medicine," Tex. Occ. Code § 164.053(a)(1), the Texas Medical Board may revoke or suspend the physician's license. Tex. Occ. Code § 164.001; Tex. Occ. Code

§ 164.052(a)(5). Accordingly, if Texas physicians violate State law by providing abortions when the life of the mother is not in danger, they risk losing their licenses.[16]

The Abortion Mandate also tramples on the statutory religious and conscience rights of members of plaintiff physician groups the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) and the Christian Medical and Dental Associations (CMDA), who practice in Texas and in states nationwide. The Abortion Mandate directly violates federal laws such as 42 U.S.C. § 238n, which prohibits the federal government from requiring a physician to perform an abortion, and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb–2000bb-4, which restricts the federal government from substantially burdening the religious beliefs of physicians. Texas also protects the conscience right of physicians to object to performing abortions, Tex. Occ. Code § 103.001, and EMTALA does not authorize Defendants to preempt that law.

## II.   ARGUMENT

A plaintiff seeking a temporary restraining order or preliminary injunction must establish (1) that it is likely to succeed on the merits of its claims, (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standards for securing a temporary restraining order or preliminary injunction are

---

[16] Moreover, Texas law explicitly provides that the removal of an ectopic pregnancy or a dead, unborn child is not an abortion. Under Texas Health and Safety Code § 245.002, "[a]n act is not an abortion if the act is done with the intent to: (A) save the life or preserve the health of an unborn child; (B) remove a dead, unborn child whose death was caused by spontaneous abortion; or (C) remove an ectopic pregnancy." If, for example, "stabilizing treatment" means treating an ectopic pregnancy, that is not a violation of Texas law.

substantively the same. *Clark v. Richard*, 812 F.2d 991, 993 (5th Cir. 1987); *Texas v. United States*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021). To preserve the status quo, federal courts have regularly enjoined federal agencies from implementing and enforcing new regulations pending litigation challenging them. *See, e.g.*, *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (enjoining executive order inconsistent with immigration statutes); *Texas*, 524 F. Supp. 3d at 667.

## A.   Texas and the Medical Groups are likely to succeed on the merits of their claims.

Agency rules and guidance are subject to judicial review. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019); *see also Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996). Plaintiffs challenge the Abortion Mandate on both statutory and constitutional grounds and are likely to succeed on the merits of their claims because the Abortion Mandate is unlawful. First, Defendants acted *ultra vires* in promulgating the Mandate. Second, the Abortion Mandate violates the Administrative Procedure Act (APA) and is contrary to law. Finally, the Abortion Mandate violates the United States Constitution.

### 1.   Defendants acted *ultra vires* in issuing the Abortion Mandate.

The Social Security Act contemplates limited rulemaking. The Secretary of HHS is authorized to prescribe only those regulations as are "necessary to carry out the *administration* of the insurance programs under this subchapter." 42 U.S.C. § 1395hh(a)(1) (emphasis added). That the "administration" of EMTALA would mandate abortions is belied by the very text of the statute. EMTALA recognizes and protects the unborn child in the context of an emergency medical condition. *See* 42 U.S.C. § 1395dd(e)(1)(A)(i); *Id.* at § 1395dd(e)(1)(B)(ii). EMTALA requires Medicare-participating hospitals to consider and "minimize[] the risk to . . . the health of the unborn child" when transferring the mother to another medical facility. *Id.* at

§ 1395dd(c)(2)(A). A requirement that physicians abort unborn children cuts squarely against this express command. No one disputes that, in some tragic cases, stabilizing treatment may result in the death of an unborn child—such as the treatment of an ectopic pregnancy.[17] But those cases have never justified an abortion *mandate* under EMTALA—that statute protects the "unborn child," does not impose a standard of care, and imposes a presumption against preempting state laws, including laws regulating abortion and protecting rights of conscience.

EMTALA's recognition and protection of unborn life demonstrates that Congress did not confer any authority to mandate abortions, much less "direct" preemption of Texas law. And at the very least, EMTALA's language protecting the unborn demonstrates that Congress could not have intended that abortion would constitute "stabilizing treatment" for any situation *other* than when the life of the mother is at risk. Defendants cannot accomplish through administrative action something they are prohibited from doing by statute. *See, e.g.*, *BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604, 611–12 (5th Cir. 2021).

EMTALA's recognition and protection of unborn life is consistent with other federal laws. The Hyde Amendment prohibits federal funds from being used to pay for abortions except in ses of rape, incest, or a threat to the life of the mother. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506–07. The Weldon Amendment prohibits federal agencies from discriminating against any institutional or individual health care entity "on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." *Id.* The Coats-Snowe Amendment (enacted in 1996) prohibits "[t]he Federal Government" from discriminating against any health care entity on the basis that it refuses to perform induced

---

[17] *See* Exh. 4 at Appx. 019.

abortions or to provide referrals for such abortions. 42 U.S.C. § 238n. The Church Amendments prohibit recipients of funds from HHS from discriminating against personnel because they refuse to perform or assist an abortion based on their religious or moral beliefs, and say an individual in an HHS funded health or research program cannot be forced to perform or assist in procedures contrary to his religious or moral beliefs. 42 U.S.C. § 300a-7(c) & (d). There is no evidence Congress intended to override these abortion conscience statutes—two of which were enacted after EMTALA—when EMTALA requires stabilizing the "unborn child."

Defendants lack statutory authority to promulgate the Abortion Mandate requiring Medicare-participating hospitals and their physicians to provide access to—and perform—abortions. The EMTALA Guidance includes a number of provisions that have never been part of EMTALA. The EMTALA Guidance claims that "[w]hen a state law prohibits abortion and does not include an exception for the life of the pregnant person—or draws the exception more narrowly than EMTALA's emergency medical condition definition—*that state law is preempted*." [18] This has never been part of EMTALA. To the contrary, EMTALA "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of [EMTALA]." 42 U.S.C. § 1395dd(f).

The health conditions in which the EMTALA Guidance purports to require abortions are far broader than the life of the mother exception found in Texas laws concerning abortion or the federal Hyde Amendment, but instead include undefined "health" conditions of a pregnant woman, including situations such as "incomplete medical abortions," and situations that do not

---

[18] Exh 1 at Appx. 002-003 (emphasis in original).

presently threaten the life of the mother but are "likely . . . to become emergent."[19] The EMTALA Guidance further specifies that "an emergency medical condition that has not been stabilized" can include "a patient with an incomplete medical abortion," and that the sorts of abortion that EMTALA can require include "methotrexate therapy" or "dilation and curettage."[20] Thus the EMTALA Guidance attempts to force hospitals and physicians to complete chemical abortions that began elsewhere—even illegally—even when the mother's life is not at risk.[21]

EMTALA does not authorize the promulgation of rules mandating certain procedures. Even if it did, the EMTALA Guidance was not issued by persons with statutory authority to do so. The Social Security Act authorizes the Secretary of HHS to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." 42 U.S.C. § 1395hh(a)(1); 42 U.S.C. § 1301(a)(6). Indeed, the Act stipulates that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payments for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits . . . shall take effect *unless* it is promulgated by the Secretary [of HHS]." 42 U.S.C. § 1395hh(2). But, here, the Guidance was issued by the Director of the Survey & Operations Group of CMS and the Director of the Quality, Safety & Oversight Group of CMS.[22]

Defendants' attempt to impose the Abortion Mandate (without regard to State law) is a question of deep economic and political significance, and Congress did not intend—nor does

---

[19] Exh. 1 at Appx. 002,007.

[20] *Id.* at Appx. 006.

[21] *See* Exh. 4 at Appx. 018, 020 (Declaration of Donna Harrison, M.D.).

[22] Exh. 1 at Appx. 007.

EMTALA allow—Defendants to exercise such broad authority in the absence of clear and explicit congressional authorization. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (holding that Congress must "speak clearly if it wishes to assign . . . decisions of vast economic and political significance."). "Whatever power the United States Constitution envisions for the Executive . . . it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). This is particularly significant here where the Abortion Mandate requires Texas hospitals to perform abortions in violation of State law.

EMTALA does not authorize Defendants to achieve their social policy objectives through the Abortion Mandate. Defendants exceeded their statutory authority and acted *ultra vires* in issuing the Abortion Mandate.

**2.  The Abortion Mandate violates the APA.**

The Abortion Mandate is final agency action subject to judicial review under the APA. *See Texas v. EEOC*, 933 F.3d at 441(explaining that agency action treated as binding is reviewable as final agency action). Though framed as guidance reminding hospitals and physicians of their existing obligations, the agency's characterization of its own action is not dispositive. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (Kavanaugh, J.); *Texas v. United* States, 787 F.3d at 764 (explaining that an agency's characterization of its own action as "guidance" or a "policy statement" is not determinative). Courts consider whether agency action constitutes "final agency action" with a "pragmatic approach" and "view[] the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d at 441 (internal quotations omitted). In determining whether agency action is final agency action, Courts consider whether the agency action imposes liability for failure to comply with its demands. *McCarthy*, 758 F.3d at 252.

Here, the Abortion Mandate includes several provisions that create new legal obligations

and threaten substantial legal and monetary penalties. *See id.* at 253. Plaintiffs are far from free to ignore the Abortion Mandate without consequence. *Id.* at 253. They risk their Medicare and Medicaid funding as well as significant civil monetary penalties up to $119,942.[23] According to CMS, in 2020, the United States' total spending for Medicare and Medicaid amounted to over $1.5 trillion.[24] Moreover, Defendants themselves are treating the Abortion Mandate as binding; the federal government has filed suit in the District of Idaho to enforce its terms.[25]

> a. *The Abortion Mandate exceeds statutory authority and is not in accordance with law.*

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

The Abortion Mandate attempts to codify a "legal duty" to perform abortions as an openly political reaction against *Dobbs*.[26] But Defendants lack statutory authority to exercise "any supervision or control over the practice of medicine or the manner in which medical services are provided," 42 U.S.C. § 1395, and EMTALA cannot be construed to "directly" preempt state abortion laws. *See* 42 U.S.C. § 1395dd(f). As explained above, the mandate also contradicts federal laws that prohibit Defendants from requiring physicians to perform abortions. Further, the major questions doctrine applies. If Congress intended to confer Defendants with authority to require

---

[23] Exh. 1 at Appx 006; 42 U.S.C. § 1395dd(d)(1); 42 U.S.C. § 1320a-7(h).

[24] *NHE Fact Sheet*, CMS, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet (last visited July 28, 2022).

[25] *See United States v. Idaho*, No. 1:22-cv-329.

[26] Exh. 1 at Appx. 002, 006.

physicians and hospitals to perform abortion even where they are prohibited by State law, it would have spoken clearly on the that subject. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (June 20, 2022). Defendants' promulgation of the Abortion Mandate exceeded their statutory authority and should be set aside.

  b. *Defendants failed to conduct notice and comment.*

   Defendants failed to conduct notice and comment as required under the Medicare-specific notice-and-comment procedures under 42 U.S.C. § 1395hh(b), as well as the notice-and-comment procedures under 5 U.S.C. § 553. *See Texas v. Becerra*, No. 5:21-cv-300-H, 2021 WL 6198109, at *13 n.12 (Dec. 31, 2021) (Hendrix, J.) (discussing applicable precedent). Under 42 U.S.C. § 1395hh(b)(1), the Secretary must "provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon." Defendants failed to comply with this statutory requirement before promulgating the Abortion Mandate.

   Defendants could only explain their failure to conduct notice and comment by invoking one of the exceptions in 42 U.S.C. § 1395hh(b)(2). But they have not—and they cannot. The first exception allows for a shorter notice and comment period when another statute so authorizes. 42 U.S.C. § 1395hh(b)(2)(A). The second exception applies when "a statute establishes a specific deadline for the implementation of a provision and the deadline is less than 150 days after the date of the enactment of the statute in which the deadline is contained." *Id.* § 1395hh(b)(2)(B). Here, the Abortion Mandate is effective immediately.[27] The final exception allows the Secretary to bypass the Social Security Act's notice and comment requirements by relying on the good cause exception under the APA. 42 U.S.C. § 1395hh(b)(2)(C); 5 U.S.C. § 553(b)(B). The agency did

---

[27] Exh. 1 at Appx. 007.

not invoke this exception; accordingly, it is inapplicable here.

"The essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980). Here, the Secretary deprived the public of this opportunity without any statutory basis.

    *c.*   *The Abortion Mandate is arbitrary and capricious.*

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Abortion Mandate was promulgated by mere executive fiat in response to the Supreme Court's decision in *Dobbs*.[28] After the *Dobbs* decision, Secretary Becerra announced that Americans "can no longer trust" the Supreme Court, and HHS would "be aggressive and go all the way" to pushback against the Court's decision.[29] As the Fifth Circuit has held, "courts have an affirmative duty *not* to" "turn a blind eye to the statements" of those promulgating these extreme mandates. *BST Holdings*, 17 F.4th at 614. "The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived

---

[28] Exh. 1 at Appx. 002, 006.

[29] *HHS Secretary Becerra talks women's future with abortion following Roe v. Wade decision* (NBC News broadcast June 25, 2022) https://www.nbcnews.com/video/women-s-future-with-abortion-implementing-harm-reduction-with-addiction-142836293922, at 1:45 (last visited July 28, 2022).

reasons would defeat the purpose of the enterprise." *Id.* at 2575–76.

The Abortion Mandate does not acknowledge the agency's change in position from never having previously required abortions under EMTALA; it offers no reasoned explanation of how EMTALA can require abortions when EMTALA requires stabilizing the "unborn child"; it offers no explanation of the interaction between its mandate and religious freedom and conscience laws; and it discusses no alternative approaches. To the contrary, Defendants justify the Abortion Mandate as necessary to fight the Supreme Court. More is required. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct 1891, 1911–15 (2020).

"[W]here the agency has failed to provide even that minimum level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117, 2125 (2016). Courts "do not defer to the agency's conclusory or unsupported suppositions," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010), nor are agency actions "involving an issue of deep economic and political significance" entitled to deference, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (cleaned up). This Court cannot "supply a reasoned basis for the agencies' actions that the agencies themselves have not given." *Id.* (cleaned up). Nor can the agency's litigation counsel. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action").

Further, the Abortion Mandate discusses no reliance interests by regulated entities, especially pro-life physicians and hospitals, on never having previously been subject to an abortion mandate under EMTALA. "Because it is generally arbitrary or capricious to depart from a prior policy *sub silentio*, agencies must typically provide a detailed explanation for contradicting a prior

policy, particularly when the prior policy has engendered serious reliance interests." *BST Holdings*, 17 F.4th at 614. Defendants provide no basis for the new mandate. Defendants provide no evidence that violations of EMTALA precluded women from receiving emergency care.

Defendants are hinging hundreds of billions in federal Medicare dollars on compliance with this mandate for the sole purpose of subverting the Supreme Court's holding in *Dobbs* and States' authority to regulate abortion.[30] The Abortion Mandate must be set aside and held unlawful.

### 3. Defendants' actions violate the Constitution.

#### a. *Unconstitutional delegation of legislative power*

If Defendants contend that the Social Security Act's delegation of authority to the Secretary is so broad that it authorizes him to impose an Abortion Mandate on hospitals and physicians as a condition of receiving Medicare funds, then the Social Security Act violates the nondelegation doctrine because it lacks any "intelligible principle" to guide the Secretary's actions. *See J.W. Hampton v. United States*, 276 U.S. 394, 409 (1928). "In the absence of a clear mandate" in the Social Security Act, "it is unreasonable to assume that Congress intended to give [the Secretary of HHS] unprecedented power" over American social policy and standards of care. *See Indus. Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 645 (1980). And if it did, it would be unconstitutional under *A.L.A. Schechter* and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Accordingly, if Congress wanted to delegate this legislative authority to the Secretary of HHS through the Social Security Act—and there is no evidence that it did—then Congress's attempt to do so was unconstitutional.

---

[30] *See* Exh. 2 at Appx. 009.

b.  *Major Questions Doctrine Applies*

Moreover, this is an issue of vast political significance to which the major question doctrine applies. *See West Virginia*, 142 S. Ct. at 2614. Whether and when to permit abortions is an issue of vast policy and political significance, as the Supreme Court explained in *Dobbs*. Those questions are to be answered by the States through their elected representatives. *See id.* at 2626 (Gorsuch, J., concurring). If Congress meant to impose abortion mandates through EMTALA, the major questions doctrine requires it to speak clearly. Indeed, that Defendants have found this purported authority to promulgate the Abortion Mandate in EMTALA after Congress has rejected attempts to codify a federal right to abortion demonstrates that this is an issue of vast political significance to which the major-question doctrine applies. In *West Virginia v. EPA*, the Court held that it could not "ignore that the regulatory writ EPA newly uncovered conveniently enabled it to enact a program that, long after the dangers posed by greenhouse gas emissions had become well known, Congress considered and rejected multiple times." *Id.* at 2614 (internal quotations omitted). Similarly, here, Congress has failed to codify a federal right to abortion, which is highly probative of the significance of the issue and, therefore, the application of the major-questions doctrine.[31]

c.  *Violation of the Spending Clause*

The central concerns of Spending Clause jurisprudence are federalism and individual liberty. *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) ("Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. That system 'rests on what might at first seem a

---

[31] *Senate fails to pass abortion rights bill—again*, POLITICO (May 11, 2022), https://www.politico.com/news/2022/05/11/senate-doomed-vote-roe-abortion-rights-00031732 (last visited July 27, 2022).

counterintuitive insight, that freedom is enhanced by the creation of two governments, not one.'") (citing *Bond v. United States*, 564 U.S. 211, 220–21 (2011)). In this case, separation-of-powers concerns are multiplied atop these traditional federalism and individual liberty concerns by the Executive's unilateral adoption of significant conditions on the recipients of federal funds because "[t]he United States Constitution exclusively grants the power of the purse to Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl.1).

The legitimacy of an exercise of the federal spending power "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Sebelius*, 567 U.S. at 577 (citing *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981)). This leads courts to "scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a 'power akin to undue influence.'" *Sebelius*, 567 U.S. at 577 (citing *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). When "conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes." *Id.* at 580.

While Congress may condition federal funding with certain obligations, "the States must have a genuine choice whether to accept the offer." *Id.* at 588. There is no such choice here. Texas hospitals must either accept the new condition or risk losing all Medicare, Medicaid, and other funding. "Though Congress' power to legislate under the spending power is broad, it does not include surprising the States with post-acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. Texas could not have known that Defendants would claim a new condition on hospitals' Medicare provider agreements that would force them to provide abortions in violation of State law.

Texas hospitals and physicians receive approximately $16 billion per year in federal dollars for Medicaid services.[32] The State of Texas receives approximately $30 billion per year from the federal government to fund the Texas Medicaid program.[33] Forcing Texas hospitals and physicians to comply with the Abortion mandate under threat of the loss of all Medicare funding is unconstitutionally coercive; it is a gun to the head that compels them to violate State law. *See Sebelius*, 567 U.S. at 580. Defendants have no authority to condition federal funding on such an untenable choice. *Pennhurst*, 451 U.S. at 25. Defendants promulgated the Abortion mandate via an unconstitutional exercise of authority, and it must be held unlawful and set aside. The Abortion Mandate is not a valid exercise of the Spending Power; it is an *ultra vires* order that is not enforceable against Plaintiffs.

Finally, a valid exercise of the Spending Power—which the Abortion Mandate is not—can only *induce* States to change their own laws. It does not preempt State law, and the Guidance's statement to the contrary is wrong. Non-State recipients of Medicare funds, such as local governments and private entities, cannot change State law, and are not licensed to violate State law just by accepting federal funds with allegedly preemptive conditions. For instance, if a condition of Medicare funding required a non-State recipient to provide abortions in violation of Texas law, the recipient would have a choice of (1) not taking the funds; (2) taking the funds and providing abortions in violation of State law; or (3) taking the funds but not performing abortions in violation of Texas law, potentially subjecting them to penalties from Defendants.

---

[32] Exh. 3 at Appx. 013.

[33] *Id.* at Appx. 013-014; *see also* 42 U.S.C. § 1396d.

d.  _Violation of the Tenth Amendment_

The powers not delegated by the Constitution to the federal government are reserved to the States. The Supreme Court has clarified that State law governs abortion. "[T]he Constitution does not confer a right to abortion," "does not prohibit the citizens of each State from regulating or prohibiting abortion," and "return[ed] that authority to the people and their elected representatives." *Dobbs*, 142 S. Ct. at 2279, 2284.

"[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985). The Supreme Court has clarified that this includes State laws regulating abortion. *Dobbs*, 142 S. Ct. at 2284. Texas has a legitimate interest in the "preservation of prenatal life at all stages of development." *Id.* This interest cannot be blithely dismissed by the Defendants' unlawful Abortion Mandate. "Historic police powers of the States" are not superseded by federal law unless that is "the clear and manifest purpose of Congress." *Id.*; *City of Columbus v. Ours Garage & Wrecker Serv. Inc.*, 536 U.S. 424, 432 (2002). Congress did not authorize Defendants to promulgate any right to an abortion. No provision of the Social Security Act authorizes Defendants to do so.

e.  _Defendants' actions violate RFRA._

All of CMDA's members are Christians who object to performing abortions, and many of AAPLOG's members have religious objections to abortions in addition to their medical and ethical views. [34] As to CMDA and AAPLOG's members who have religious objections, the Abortion Mandate violates RFRA, which prohibits Defendants from imposing a substantial burden on their religious exercise unless doing so serves the least restrictive means of advancing a compelling

---

[34] Exh. 4–8, Appx. 015-036 (Declarations of Drs. Harrison, Barrows, Hutzler, Valley, and Foley).

government interest. 42 U.S.C. § 2000bb-1. The sincere religious beliefs of CMDA's and many of AAPLOG's members are set forth in declarations, *id.*, and imposing massive monetary penalties and exclusions from Medicare, Medicaid, CHIP, and other medical programs for not violating those beliefs is undoubtedly a substantial burden on their religious exercise. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014).

The Abortion Mandate fails strict scrutiny. Defendants cannot have a compelling interest to mandate abortions because, as explained above: (1) Congress gave HHS no such power in EMTALA, which instead protects the "unborn child" in addition to her mother; (2) EMTALA leaves medical standards of care, necessarily including abortion, to state law, and Texas as well as other states protect physicians' conscience rights on abortion; and, (3) Congress prohibited federal abortion mandates by enacting the Weldon, Coats-Snowe, and Church Amendments. By definition, a federal agency has no compelling interest doing what Congress gave it no authority to do. As to specific circumstances, the Abortion Mandate's vague terms cover many elective abortions that are not even within EMTALA much less do they pose a compelling need. For example, the Abortion Mandate's application to "incomplete medical abortion" is a requirement that pro-life doctors complete abortions started elsewhere even where the child might be saved.

## B.   Plaintiffs are likely to suffer irreparable harm.

"To show irreparable injury . . . it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Rather, Plaintiffs need only demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).

Texas faces an imminent, irreparable, sovereign injury from the Abortion Mandate, which purports to preempt any State law that differs from its requirements.[35] Numerous courts have made clear that preventing the State from enforcing its laws is itself an irreparable harm. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) ("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable harms on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Robert, C.J.) ("Any me [a State is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 309 (8th Cir. 2020). When the State is blocked from implementing its laws, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

AAPLOG and CMDA's members are forced by the Abortion Mandate to choose between, on the one hand, continuing to care for women as they have always done and facing crippling fines from HHS and exclusion from Medicare, Medicaid, CHIP, and effectively all hospital practice, or on the other hand, violating their religious and moral beliefs and risking prosecution for committing elective abortions that may be illegal under state law. AAPLOG and CMDA need injunctive relief to protect all their members from this threat, both in Texas and other States. The loss of individual liberty and the trampling of religious freedom cannot be remedied. Simply put, if the Abortion Mandate is permitted to go into effect, the State of Texas's sovereignty will be affronted, and Plaintiffs' rights will be forever diminished.

---

[35] Exh. 1 at Appx. 003.

C.    <u>**The balance of the equities and public interest favor preliminary injunctive relief.**</u>

When governmental action is implicated, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To preserve the relative positions of the parties until a trial on the merits, federal courts regularly enjoin federal agencies from implementing and enforcing new regulations pending litigation challenging them. *Texas v. United States*, 787 F.3d 733. Here, the status quo since Congress enacted EMTALA has been no Abortion Mandate. Defendants should not be permitted to upset that status quo by purportedly finding new provisions in the law.

An injunction promotes and protects the public interest by avoiding the myriad harms that Defendants' lawlessness will bring. Texas physicians will be protected from having to choose between their employment and risking their medical licenses. Unborn children will be protected by Texas's abortion laws. Hospitals and physicians will be protected from the coercive threat of substantial penalties or violating State law. "The public interest is also served by maintaining our constitutional structure," giving Texas law its full due. *BST Holdings*, 17 F.4th at 618.

The balance of the equities and the public interest favor the intervention of the Court to preserve the status quo. [36]

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin Defendants from implementing and enforcing the Abortion Mandate.

---

[36] Because the injunctive relief requested would serve the public interest, Plaintiffs ask the Court to exercise its discretion to not require a security or bond under Fed. R. Civ. P. 65(c). *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981).

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Texas Bar No. 24087727
Christopher.Hilton@oag.texas.gov

*/s/ Amy Snow Hilton*
AMY SNOW HILTON
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

WILLIAM D. WASSDORF
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

CHARLES K. ELDRED
Special Counsel for Legal Strategy
Texas Bar No. 00793681
Charles.Eldred@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**COUNSEL FOR THE STATE OF TEXAS**

*/s/ Ryan L. Bangert*
**RYAN L. BANGERT**
TX Bar No. 24045446
rbangert@ADFlegal.org

**MATTHEW S. BOWMAN***
DC Bar No. 993261
mbowman@ADFlegal.org

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622

**COUNSEL FOR AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS, AND CHRISTIAN MEDICAL AND DENTAL ASSOCIATIONS**

*\*Application for admission forthcoming*

**CERTIFICATE OF SERVICE**

We certify that a true and accurate copy of the foregoing document was filed electronically via CM/ECF and is being sent via CMRRR to Defendants.

*/s/ Amy S. Hilton*          */s/ Ryan Bangert*
Amy S. Hilton          Ryan Bangert