**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

STATE OF TEXAS, *et al.*,

                Plaintiffs,

     v.

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services, *et al.*,

                Defendants.

Civil Action No. 5:22-cv-00185-H

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

BACKGROUND....................................................................................................3

I.      The Emergency Medical Treatment and Labor Act (EMTALA) .................3

II.     EMTALA Enforcement.................................................................................6

III.    Prior EMTALA Guidance on Emergency Care for Pregnant Patients .........7

IV.     The Challenged Guidance.............................................................................8

V.      This Case .......................................................................................................8

STANDARD OF REVIEW ...................................................................................9

ARGUMENT .......................................................................................................10

I.      The Court Lacks Jurisdiction over Plaintiffs' Claims................................10

        A.      Plaintiffs Fail to Establish Standing, Much Less Irreparable Harm............10

                1.      Texas Identifies No Concrete Conflict with State Law that Invalidation of the Guidance Would Remedy .........11

                2.      Texas Identifies No Imminent Risk to State Hospital Funding ...................15

                3.      Texas Cannot Assert *Parens Patriae* Standing Against the Federal Government.......................17

                4.      AAPLOG and CMDA Both Lack Associational Standing ...............18

        B.      The Guidance Is Not Final Agency Action Subject to Judicial Review ......22

        C.      Texas Cannot Evade the APA's Limitations on Judicial Review by Invoking Equitable, Non-Statutory *Ultra Vires* Causes of Action, Which Should Be Dismissed............24

II.     Plaintiffs Are Not Likely To Succeed on the Merits....................................25

        A.      The Guidance Is Entirely Consistent with EMTALA and Other Federal Law..........25

        B.      The Guidance Was Not Required To Undergo Notice and Comment ......32

C.   The Guidance Is Not Arbitrary or Capricious ...................................................34

D.   The Guidance Does Not Violate the Spending Clause .................................35

E.   The Guidance Does Not Violate the Tenth Amendment.............................38

F.   EMTALA Does Not Violate the Non-Delegation Doctrine.........................38

G.   CMDA's RFRA and Free Exercise Claims Lack Merit .................................39

III.   The Equities Tilt Decisively Against Injunctive Relief .................................................41

IV.   Any Relief Should be Appropriately Limited.................................................................42

CONCLUSION..................................................................................................................................43

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams Cnty. Water Ass'n v. City of Natchez,*
    No. 5:10-cv-199, 2013 WL 3762658 (S.D. Miss. July 16, 2013) .......................................... 13

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ........................................................................................................ 17

*Allina Health Servs. v. Price,*
    863 F.3d 937 (D.C. Cir. 2017) ....................................................................................... 33

*Am. Airlines, Inc. v. Herman,*
    176 F.3d 283 (5th Cir. 1999) ......................................................................................... 24

*Am. Med. Ass'n v. Stenehjem,*
    412 F. Supp. 3d 1134 (D.N.D. 2019) ............................................................................ 16

*Am. Sch. of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902) ......................................................................................................... 24

*Arizona v. Biden,*
    31 F.4th 469 (6th Cir. 2022) .......................................................................................... 43

*Arrington v. Wong,*
    237 F.3d 1066 (9th Cir. 2001) .................................................................................... 4, 26

*AT&T v. EEOC,*
    270 F.3d 973 (D.D.C. 2001) ......................................................................................... 23

*Austin v. U.S. Navy SEALs 1-26,*
    142 S. Ct. 1301 (2022) ................................................................................................... 40

*Azar v. Allina Health Services,*
    139 S. Ct. 1804 (2019) ................................................................................................... 33

*Baber v. Hosp. Corp. of Am.,*
    977 F.2d 872 (4th Cir. 1992) ......................................................................................... 30

*Battle ex rel. Battle v. Mem'l Hosp. at Gulfport,*
    228 F.3d 544 (5th Cir. 2000) ......................................................................................... 30

*Bennett v. Ky. Dep't of Educ.,*
    470 U.S. 656 (1985) .................................................................................................. 35, 36

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................................22

*Benning v. Georgia*,
   391 F.3d 1299 (11th Cir. 2004) .....................................................................................38

*Biden v. Missouri*,
   142 S. Ct. 647 (2022) ...........................................................................................4, 29, 31

*Biden v. Texas*,
   142 S. Ct. 2528 (2022) ...................................................................................................17

*Big Time Vapes, Inc. v. FDA*,
   963 F.3d 436 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2746 (2021) ..........................39

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020) .............................................................................................11, 26

*Burditt v. HHS*,
   934 F.2d 1362 (5th Cir. 1991) ................................................................................30, 36

*California v. United States*,
   No. 05-328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) .......................................27

*Cherkuri v. Shalala*,
   175 F.3d 446 (6th Cir. 1999) ...................................................................................12, 30

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ..........................................................................................10, 15, 16

*Corley v. United States*,
   556 U.S. 303 (2009) ........................................................................................................31

*Cornerstone Christian Sch. v. Univ. Interscholastic League*,
   563 F.3d 127 (5th Cir. 2009) ........................................................................................22

*Cummings v. Premier Rehab Keller, PLLC*,
   142 S. Ct. 1562 (2022) ....................................................................................................4

*Cutter v. Wilkinson*,
   423 F.3d 579 (6th Cir. 2005) ........................................................................................37

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
   138 S. Ct. 1061 (2018) ..................................................................................................29

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ..........................................................................................................9

*Dobbs v. Jackson Women's Health Organization,*
142 S. Ct. 2228 (2022).................................................................................1, 38

*Eberhardt v. City of L.A.,*
62 F.3d 1253 (9th Cir. 1995)..........................................................................30

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith,*
494 U.S. 872 (1990).......................................................................................41

*Exxon Chems. Am. v. Chao,*
298 F.3d 464 (5th Cir. 2002).....................................................................22, 24

*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021)...................................................................................34

*Gen. Fin. Corp. v. FTC,*
700 F.2d 366 (7th Cir. 1983)..........................................................................24

*Gill v. Whitford,*
138 S. Ct. 1916 (2018)...................................................................................43

*Glass v. Paxton,*
900 F.3d 233 (5th Cir. 2018)..........................................................................16

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006).......................................................................................21

*Guedes v. ATF,*
920 F.3d 1 (D.C. Cir. 2019)............................................................................33

*Harris v. McRae,*
448 U.S. 297 (1980)...................................................................................21, 22

*Harry v. Marchant,*
291 F.3d 767 (11th Cir. 2002)..........................................................................5

*Hoctor v. USDA,*
82 F.3d 165 (7th Cir. 1996)............................................................................32

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977)..................................................................................18, 21

*In re Baby K,*
16 F.3d 590 (4th Cir. 1994).....................................................................26, 36, 38

*In re Compl. of RLB Contracting, Inc.,*
773 F.3d 596 (5th Cir. 2014)............................................................................9

*In re Paxton,*
    No. 22-0527 (Tex. June 29, 2022) ........................................................... 2, 14

*J. W. Hampton, Jr. & Co. v. United States,*
    276 U.S. 394 (1928) ........................................................................................ 38

*Jones v. Wake Cnty. Hosp. Sys., Inc.,*
    786 F. Supp. 538 (E.D.N.C. 1991) ................................................................ 38

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ........................................................................... 9

*Kirby Corp. v. Pena,*
    109 F.3d 258 (5th Cir. 1997) ......................................................................... 24

*Lake Charles Diesel, Inc., v. Gen. Motors Corp.,*
    328 F.3d 192 (5th Cir. 2003) ........................................................................... 9

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ....................................................................................... 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................... 9, 10

*Luminant Generation Co. v. EPA,*
    757 F.3d 439 (5th Cir. 2014) ......................................................................... 23

*Machete Prods., LLC v. Page,*
    809 F.3d 281 (5th Cir. 2015) ........................................................................... 9

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ....................................................................................... 43

*Marshall v. E. Carroll Par. Hosp. Serv. Dist.,*
    134 F.3d 319 (5th Cir. 1998) ......................................................................... 30

*Massachusetts v. Mellon,*
    262 U.S. 477 (1923) .................................................................................. 13, 17

*McCorvey v. Hill,*
    385 F.3d 846 (5th Cir. 2004) ........................................................................... 2

*Mejia-Ruiz v. INS,*
    51 F.3d 358 (2d Cir. 1995) ............................................................................ 33

*Metro. Sch. Dist. of Wayne Twp. v. Davila,*
    969 F.2d 485 (7th Cir. 1992) ......................................................................... 32

*Miller v. Med. Ctr. of Sw. La.*,
    22 F.3d 626 (5th Cir. 1994) ......................................................................30

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ...............................................................................31

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................35

*Munaf v. Geren*,
    553 U.S. 674 (2008) ..................................................................................9

*Nat'l Federation of Independent Business ("NFIB") v. OSHA*,
    142 S. Ct. 661 (2022) .............................................................................29

*New York v. HHS*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ....................................................27

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................................... 35, 38

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ........................................................................... 37, 38

*Nken v. Holder*,
    556 U.S. 418 (2009) ...............................................................................41

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ...............................................................24

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981) ...................................................................................36

*Pennsylvania v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ...............................................................17

*Peoples Nat'l Bank v. Off. of Comptroller of Currency of the U.S.*,
    362 F.3d 333 (5th Cir. 2004) ..................................................................22

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ............................................................................ 32, 42

*Planned Parenthood Affiliates of Mich. v. Engler*,
    73 F.3d 634 (6th Cir. 1996) ....................................................................27

*Planned Parenthood of Tenn. & N. Miss. v. Slatery*,
    523 F. Supp. 3d 985 (M.D. Tenn. 2021) ................................................16

*Pomerantz v. Florida,*
  2022-014373-CA-01 (Fla. 11th Cir. Ct. Aug. 1, 2022) ...........................................................21

*Pros. & Patients for Customized Care v. Shalala,*
  56 F.3d 592 (5th Cir. 1995) .................................................................................. 32, 33

*Ramming v. United States,*
  281 F.3d 158 (5th Cir. 2001) ...................................................................................9

*Root v. New Liberty Hosp. Dist.,*
  209 F.3d 1068 (8th Cir. 2000) ...............................................................................38

*Rubin v. Islamic Republic of Iran,*
  138 S. Ct. 816 (2018) ............................................................................................27

*Ryder Truck Lines, Inc. v. United States,*
  716 F.2d 1369 (11th Cir. 1983) .............................................................................33

*Sanderson Farms, Inc. v. Nat'l Labor Rels. Bd.,*
  651 F. App'x 294 (5th Cir. 2016) ...........................................................................24

*Sch. of the Ozarks v. Biden,*
  --- F.4th ---, No. 21-2270, 2022 WL 2963474 (8th Cir. Jul. 27, 2022) ...............17

*Sepulvado v. Jindal,*
  729 F.3d 413 (5th Cir. 2013) ...................................................................................9

*Shell Offshore Inc. v. Babbitt,*
  238 F.3d 622 (5th Cir. 2001) ................................................................................32

*Sierra Club v. U.S. Dep't of Interior,*
  990 F.3d 909 (5th Cir. 2021) ................................................................................34

*Simopoulos v. Virginia,*
  462 U.S. 506 (1983) ..............................................................................................40

*Soc'y of Separationists, Inc. v. Herman,*
  959 F.2d 1283 (5th Cir. 1992) ..............................................................................21

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ........................................................................................ 35, 38

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ................................................................................... 10, 13, 20

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ..............................................................................................18

*Tagore v. United States,*
    735 F.3d 324 (5th Cir. 2013) ............................................................21

*Texas v. Biden,*
    554 F. Supp. 3d 818  (N.D. Tex. 2021) ...........................................17

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ...........................................................23

*Texas v. Interstate Com. Comm'n,*
    258 U.S. 158 (1922) ..........................................................................11

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015), *aff'd,* 579 U.S. 547 (2016 ...............32

*Thomas v. Review Bd. of Ind. Employment Sec. Div.,*
    450 U.S. 707 (1981) ..........................................................................41

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...............................................................41, 43

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    578 U.S. 590 (2016) ..........................................................................22

*United States v. Harris Methodist Fort Worth,*
    970 F.2d 94 (5th Cir. 1992) .............................................................31

*United States v. Idaho,*
    No. 22-cv-329 (D. Idaho 2022) ......................................................15

*United States v. Students Challenging Reg. Agency Procs. (SCRAP),*
    412 U.S. 669 (1973) ..........................................................................19

*Vickers v. Nash Gen. Hosp., Inc.,*
    78 F.3d 139 (4th Cir. 1996) .............................................................30

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ......................................................................29

*West Virginia v. HHS,*
    289 F.3d 281 (4th Cir. 2002) ...........................................................37

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ..........................................................................39

*Whole Women's Health v. Jackson,*
    142 S. Ct. 522 (2021) ........................................................................13

*Williamson v. Tucker,*
  645 F.2d 404 (5th Cir. 1981) ........................................................................................9

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .........................................................................................................9

**Statutes**

5 U.S.C. § 553 ...............................................................................................................31

5 U.S.C. § 703 ...............................................................................................................24

5 U.S.C. § 704 .........................................................................................................22, 24

10 U.S.C. § 1093 ...........................................................................................................27

20 U.S.C. § 1688 ...........................................................................................................27

22 U.S.C. § 5453 ...........................................................................................................27

22 U.S.C. § 7704 ...........................................................................................................27

25 U.S.C. § 1676 ...........................................................................................................27

42 U.S.C. § 238n ...........................................................................................................27

42 U.S.C. § 280h-5 ........................................................................................................27

42 U.S.C. § 300a-6 ........................................................................................................27

42 U.S.C. § 300a-7 ....................................................................................................7, 27

42 U.S.C. § 300a-8 ........................................................................................................27

42 U.S.C. § 300z-10 ......................................................................................................27

42 U.S.C. § 405 ...............................................................................................................7

42 U.S.C. § 1320a-7 ........................................................................................................6

42 U.S.C. § 1320a-7a ..................................................................................................6, 7

42 U.S.C. § 1395 .......................................................................................................4, 31

42 U.S.C. § 1395 *et seq.* ...............................................................................................3

42 U.S.C. § 1395aa .........................................................................................................6

42 U.S.C. § 1395cc ............................................................................................................*passim*

42 U.S.C. § 1395dd ...........................................................................................................*passim*

42 U.S.C. § 1395hh ...................................................................................................................33

42 U.S.C. § 1397 .......................................................................................................................27

42 U.S.C. § 2000bb-1 .................................................................................................20, 39, 40

42 U.S.C. § 2996f ......................................................................................................................27

42 U.S.C. § 12584 .....................................................................................................................27

42 U.S.C. § 18023 .....................................................................................................................26

Idaho Code § 18-622 ................................................................................................................15

## Regulations

42 C.F.R. Part 1005 .....................................................................................................................6

42 C.F.R. § 482.28 ....................................................................................................................31

42 C.F.R. § 482.62 ....................................................................................................................31

42 C.F.R. § 489.24 .................................................................................................4, 5, 6 , 25

42 C.F.R. § 489.5 ........................................................................................................................7

42 C.F.R. § 489.53 ......................................................................................................................6

42 C.F.R. § 489.90 ......................................................................................................................7

42 C.F.R. § 1005.2 ......................................................................................................................6

## Other Authorities

131 Cong. Rec. S13892 (daily ed. Oct. 23, 1985) ................................................................29

151 Cong. Rec. H177 (Jan. 25, 2005) ...................................................................................27

H.B. 1280, 87th Leg. (Tex. 2021) .................................................................................... 2, 15

H.R. 3128, 99th Cong., 1st Sess. (1985) ...............................................................................27

H.R. Rep. No. 99-241, Part 1 (1985), *reprinted in*, 1986 U.S.C.C.A.N. 579 .......................5

H.R. Rep. No. 99-241, Part 3(1985), *reprinted in*, 1986 U.S.C.C.A.N. 726 ............................................ 4, 5

Nondiscrimination Protections under the Church Amendments for Health Care Personnel,
   https://www.hhs.gov/sites/default/files/church-guidance.pdf ............................................................7

OCR Guidance ........................................................................................................................... 8, 34

Our Statement of Faith, https://cmda.org/mission-and-vision/ ..........................................................22

Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are
   Experiencing Pregnancy Loss, https://www.cms.gov/files/document/qso-21-22-hospital.pdf.....7

September 2021 Guidance ...............................................................................................................34

State Operations Manual, Appendix V - Interpetive Guidelines - Responsibilities of Medicare
   Participating Hospitals in Emergency Cases (rev'd July 19, 2019),
   https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/
   som107ap_v_emerg.pdf ...........................................................................................................6

## INTRODUCTION

Federal law requires certain hospitals receiving federal Medicare funds to offer treatment to individuals presenting with medical emergencies.  Under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, individuals must be provided "stabilizing treatment" when they seek treatment at a covered hospital for an "emergency medical condition."  Some patients who experience these medical emergencies are pregnant, and in some unfortunate situations face such serious risks to life or health that the necessary stabilizing treatment involves termination of the pregnancy.  In those circumstances, EMTALA requires that hospitals offer that stabilizing treatment to the patient, who can then decide whether to proceed.

EMTALA has long been understood to operate in this fashion, by providers and by the Centers for Medicare & Medicaid Services (CMS), which issued relevant guidance nearly a year ago, well before the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).  In the wake of *Dobbs*, CMS issued the Guidance challenged here "to remind hospitals of their existing obligation to comply with EMTALA," Guidance at 1.  The Guidance "does not contain new policy."  *Id.*  Rather, it simply restates what flows directly from the statutory text:  that when "a physician believes that a pregnant patient . . . is experiencing an emergency medical condition"— which "may" include, *e.g.*, ectopic pregnancy or severe preeclampsia—and believes "that abortion is the stabilizing treatment necessary to resolve that condition," then "the physician must provide that treatment," unless the patient refuses it upon informed consent.  *Id.* (emphasis omitted).

Plaintiffs here—the state of Texas and two organizations—contend that the Guidance is at odds with EMTALA, was improperly issued without notice and comment, is arbitrary and capricious, violates the Constitution, and runs afoul of the Religious Freedom Restoration Act (RFRA) and Free Exercise Clause.  Plaintiffs' arguments rest on a fundamental misunderstanding of the Guidance, which, contrary to their rhetoric, does not "force the performance" of any "elective abortions," Am. Compl. ¶ 71—much less constitute an "Abortion Mandate." *Id.* ¶ 1.  On the contrary, an an emergency room, by definition, would not provide elective abortions.  But there is no need for the Court to reach those issues, because Plaintiffs' motion for preliminary relief—and their entire Amended Complaint—

1

fails on threshold jurisdictional grounds, starting with a lack of standing.

In general, Texas posits a conflict between state law and EMTALA that harms its asserted interests—a sovereign interest in enforcing its legal code, a proprietary interest in collecting Medicare revenue at state-run hospitals, and a *parens patriae* interest in protecting its citizens from enforcement of federal law. And the Organizational Plaintiffs claim that this conflict threatens to force their members to choose between their religious convictions and potential enforcement action. But no Plaintiff has alleged—much less shown—that Texas law would create a conflict under any particular factual scenario, or that the Organizational Plaintiffs' members will ever face a conflict between their convictions and federal law. Nor do Plaintiffs allege that any EMTALA complaint has been filed against them, much less that any enforcement proceedings are underway.

In the aftermath of *Dobbs*, various States have adopted different abortion prohibitions with a variety of restrictions. The Fifth Circuit has held that Texas's pre-*Roe* statute was impliedly repealed, *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004), and whether it remains good law is a question currently pending before the Texas Supreme Court, *see In re Paxton*, No. 22-0527 (Tex. June 29, 2022), but in the meantime, Texas does not claim to be enforcing it. And Texas's so-called "trigger law," which has not yet taken effect, does not criminalize abortions where the patient "has a life-threatening physical condition . . . arising from a pregnancy that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function." H.B. 1280, 87th Leg. § 2 (Tex. 2021). The text of EMTALA requires stabilizing care where "the health of the individual is in serious jeopardy" or there is a risk of "serious impairment to bodily functions." 42 U.S.C. § 1395dd(e)(1)(A). Plaintiffs have identified no actual medical condition that falls into any gap between the text of the two statutes. Indeed, the Organizational Plaintiffs' members claim to have fully abided by their EMTALA obligations, *see, e.g.*, Hutzler Decl. ¶ 7, Pls.' App'x 30, and none identifies any particular instance where they declined to provide abortion care when necessary to stabilize an emergency medical condition. On the contrary, their central argument is that the Guidance would somehow "force the performance of elective abortions," Am. Compl. ¶ 71—a patent misreading of the Guidance that bears no resemblance to reality. Having failed to meet their burden to identify any

particular medical condition for which abortion care would be prohibited by Texas law but required by EMTALA, Plaintiffs fail to establish standing and fall well short of the showing of imminent, irreparable harm required to obtain injunctive relief.

Even if Plaintiffs could show standing, they fail to show that the Guidance is final agency action subject to judicial review in the first place—an independent threshold bar to their claims. Indeed, this is often the case with guidance documents that do not have the force of law, but simply set forth an agency's understanding of what the law is—a step properly understood to have the salutary effect of advising the public of the agency's views, not altering the requirements of the underlying statute.  Here, if CMS were ever to initiate an administrative enforcement proceeding, it would be based on an alleged violation of EMTALA, not the Guidance.

Plaintiffs' claims fare no better on the merits, should the Court reach them.  Far from being an "Abortion Mandate," the Guidance is entirely consistent with—and, in fact, flows directly from—EMTALA's text, and does not conflict with other law.  It is a quintessential interpretive rule that did not require notice and comment.  It is both reasonable and reasonably explained.  And it is fully consistent with the Constitution, as explained fully below.  But the Court need not address these issues, as it should dismiss this case at the outset for lack of jurisdiction.  At a minimum, though, it should deny Plaintiffs' request to enjoin a guidance document that has no imminent, concrete effect on them.

## BACKGROUND

## I.      The Emergency Medical Treatment and Labor Act (EMTALA)

Medicare is a federally funded program, administered by the Secretary of Health and Human Services (HHS), that generally pays health care providers for health care services under certain circumstances.  *See* 42 U.S.C. § 1395 *et seq.*  Participation in Medicare is voluntary, and each provider must submit an agreement to the Secretary promising to comply with certain conditions in return for the receipt of Medicare funding.  *See id.* § 1395cc.  Although Medicare generally does not contemplate federal employees "exercis[ing] any supervision or control over the practice of medicine or the manner

3

in which medical services are provided," 42 U.S.C. § 1395, that does not prevent the federal government from establishing and enforcing conditions of participation in Medicare, *see Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (per curiam), nor does it eliminate Congress's "broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022).

Congress enacted EMTALA in 1986, based on "a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R. Rep. No. 99-241, Part 3, at 5 (1985), *reprinted in* 1986 U.S.C.C.A.N. 726, 726; *see also Arrington v. Wong*, 237 F.3d 1066, 1073–74 (9th Cir. 2001) ("The overarching purpose of EMTALA is to ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care." (alterations and citations omitted)). EMTALA applies to every hospital that has an emergency department and participates in Medicare, *see* 42 U.S.C. § 1395dd(e)(2), regardless of whether any particular patient qualifies for Medicare. Congress has statutorily required that hospitals participating in Medicare agree to comply with EMTALA as a condition of receiving federal funding. *See id.* § 1395cc(a)(1)(I)(i).

Under EMTALA, when a patient presents to an emergency department and requests examination or treatment, the hospital must provide an appropriate medical screening examination "to determine whether or not an emergency medical condition" exists. *Id.* § 1395dd(a); *see also* 42 C.F.R. § 489.24(a)(1)(i). Congress defined an "emergency medical condition" as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
> > (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> > (ii) serious impairment to bodily functions, or
> > (iii) serious dysfunction of any bodily organ or part;
>
> (B) with respect to a pregnant woman who is having contractions—
> > (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
> > (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1).  If the "hospital determines that the individual has an emergency medical condition," it "must provide either" (A) "such further medical examination or treatment as may be required to stabilize the medical condition" or (B) "transfer to another medical facility" if appropriate. *Id.* § 1395dd(b)(1).  The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i).  Under EMTALA, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility."  42 U.S.C. § 1395dd(e)(3)(A).  "[T]ransfer" is defined to include discharge of a patient. *Id.* § 1395dd(e)(4).  The hospital may also "transfer" an individual to another facility for care not available at the presenting hospital, but only if the transfer meets certain requirements, *e.g.*, that the medical benefits of the transfer outweigh the risks.  *Id.* § 1395dd(c)(1)(A)(ii).  A hospital satisfies its obligations under EMTALA if, after being informed of the risks and benefits of treatment, the patient (or the patient's representative) does not consent to the treatment.  *Id.* § 1395dd(b)(2).

EMTALA also contains an express preemption provision, preserving state laws "except to the extent that the requirement directly conflicts with a requirement of this section."  *Id.* § 1395dd(f).  The intent of this provision was to preserve "stricter state laws," *i.e.*, state laws requiring emergency care *beyond* what EMTALA mandates.  H.R. Rep. No. 99-241, Part 1, at 4 (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 582; *see also* H.R. Rept. No. 99-241, Part 3, at 5 (1985) (expressing a desire to add "federal sanctions" as a supplement to state law duties "to provide necessary emergency care"); *Harry v. Marchant*, 291 F.3d 767, 773–74 (11th Cir. 2002).

## II.       EMTALA Enforcement

EMTALA enforcement is a complaint-driven process.  To "file an EMTALA complaint," a complainant should first "contact the appropriate state survey agency."[1]  Guidance at 8.  The state survey agency then reviews whether there are any "likely" compliance deficiencies.  If it finds likely deficiencies, it reports them to HHS, and the hospital has the opportunity to submit a corrective action plan to remedy those deficiencies.[2]  In considering such reports, HHS "shall request" that a "quality improvement organization" (QIO) staffed by medical experts "assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings."  42 U.S.C. § 1395dd(d)(3).  The QIO initially has five days to review a case and provide a report to CMS, which CMS uses to determine whether an EMTALA violation occurred. 42 C.F.R. §489.53(b)(1).  The QIO generally then has an additional 60 days to further review the case (including an opportunity for the hospital to meet with the QIO and present information), before HHS, through its Office of the Inspector General (OIG), considers whether to pursue an enforcement action seeking civil monetary penalties or physician exclusion.  *See id.*; 42 C.F.R. § 489.24(h)(2)(iv).

If HHS determines that a hospital "negligently" violated EMTALA, the OIG may seek civil monetary penalties, if appropriate.  *See* 42 U.S.C. § 1395dd(d)(1)(A) (incorporating 42 U.S.C. § 1320a-7a).  If OIG initiates an enforcement action, the hospital has the right to a hearing before an Administrative Law Judge (ALJ) and the right to appeal ALJ determinations.  *See* 42 C.F.R. § 1005.2 and 42 C.F.R. Part 1005 (governing procedures for administrative hearings).  Final determinations to impose sanctions are reviewable in the courts of appeals.  42 U.S.C. § 1320a-7a(e).  If a hospital "fails to comply substantially" with Medicare's conditions of participation, including EMTALA, CMS may also seek to terminate its participation in the program.  42 U.S.C. § 1395cc(b)(2)(A).  In that case, the hospital is likewise entitled to written notice and a hearing, *see* 42 C.F.R. § 489.53(d), a series of

---

[1] 42 U.S.C. § 1395aa(a) directs the Secretary to enter into agreements with state health agencies to determine compliance with Medicare conditions of participation, including EMTALA.
[2] State Operations Manual, Appendix V -Interpretive Guidelines - Responsibilities of Medicare Participating Hospitals in Emergency Cases at 15–16 (rev'd July 19, 2019), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_v_emerg.pdf.

administrative appeals, *see id.* § 498.5(c), and judicial review in federal district court, *see id.* § 498.90(a)(1); 42 U.S.C. § 1395cc(h) (incorporating 42 U.S.C. § 405(g)). For physicians, HHS may similarly seek to impose civil monetary penalties for "negligent[]" EMTALA violations and may seek "exclusion from participation" in Medicare for "gross and flagrant or . . . repeated" violations, with the same administrative and judicial review rights as hospitals assessed civil monetary penalties. 42 U.S.C. § 1395dd(d)(1)(B) (incorporating 42 U.S.C. § 1320a-7a).

## III. Prior EMTALA Guidance on Emergency Care for Pregnant Patients

The challenged Guidance is not the first time that CMS has reminded hospitals that their EMTALA obligations extend to pregnant patients, and in some circumstances may include pregnancy termination. In September 2021, the agency issued a guidance document concerning the "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss," https://www.cms.gov/files/document/qso-21-22-hospital.pdf, at 1. That guidance reminded hospitals that "[e]mergency medical conditions involving pregnant patients may include, but are not limited to:  ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features." *Id.* at 4. It also stated that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., dilation and curettage (D&C), removal of one or both fallopian tubes, anti-hypertensive therapy, etc.)." *Id.* And it noted that EMTALA "preempts any directly conflicting state law or mandate that might otherwise prohibit such treatment." *Id.*

At the same time, HHS's Office for Civil Rights (OCR) issued a guidance document concerning "Nondiscrimination Protections under the Church Amendments for Health Care Personnel," https://www.hhs.gov/sites/default/files/church-guidance.pdf, which prohibit covered entities from discriminating against any physician or health care worker "because he performed or assisted in the performance of a lawful sterilization procedure or abortion." 42 U.S.C. § 300a-7(c)(1). There, HHS stated that "[l]awful abortions under the Church Amendments also include abortions performed in order to stabilize a patient when required under [EMTALA]," noting that "[e]mergency

7

medical conditions involving pregnant patients may include, but are not limited to, ectopic pregnancy, miscarriage, or pre-eclampsia." OCR Guidance at 2.

## IV.   The Challenged Guidance

Ten months later, on July 11, 2022, CMS issued the challenged Guidance, also titled "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss." The Guidance begins with the following note: "This memorandum is being issued to remind hospitals of their existing obligation to comply with EMTALA and does not contain new policy." Guidance at 1. And it explains that its "purpose" is "to restate existing guidance for hospital staff and physicians regarding their obligations under [EMTALA] in light of new state laws prohibiting or restricting access to abortion." *Id.* at 2.

Much like its predecessor, the Guidance states that "[e]mergency medical conditions involving pregnant patients may include, but are not limited to, ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features," *id.* at 1, "or a patient with an incomplete medical abortion," *id.* at 6. It explains that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., methotrexate therapy, dilation and curettage (D&C), removal of one or both fallopian tubes, anti-hypertensive therapy, etc.)." *Id.* at 4. It notes that EMTALA "preempts any directly conflicting state law or mandate that might otherwise prohibit or prevent such treatment." *Id.* at 1. And it reiterates that "[i]f a physician believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician must provide that treatment." *Id.* at 1. The Guidance directs patients who wish to "file an EMTALA complaint" to "contact the appropriate state survey agency." *Id.* at 6.

## V.   This Case

Texas filed suit on July 14, 2022. ECF No. 1. Two weeks later, it amended its complaint, adding two additional Plaintiffs: the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) and the Christian Medical and Dental Associations (CMDA). ECF No.

18.   About a week later, the Plaintiffs moved for preliminary relief.  ECF Nos. 22 (Motion), 23 (Memorandum, or "Pls.' Mem.").

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The plaintiff must show (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (quoting *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013)).  The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Id.* (citation omitted); *see also, e.g.*, *Lake Charles Diesel, Inc., v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003).

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  To survive a Rule 12(b)(1) motion, a plaintiff bears the burden to establish a court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted).  "[I]n examining a Rule 12(b)(1) motion, a district court is empowered to find facts as necessary to determine whether it has jurisdiction." *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015).  Accordingly, "the district court may consider evidence outside the pleadings and resolve factual disputes." *In re Compl. of RLB Contracting, Inc.*, 773 F.3d 596, 601 (5th Cir. 2014); *see also Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (on a Rule 12(b)(1) motion, a district court is "free to weigh the evidence and satisfy itself … of its power to hear the case") (citation omitted).

**ARGUMENT**

## I.   THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

### A.   Plaintiffs Fail to Establish Standing, Let Alone Irreparable Harm

Plaintiffs' claims fail at the outset for a failure to point to any concrete injury caused by the Guidance that its invalidation would redress, *see Lujan*, 504 U.S. at 561—much less an imminent, irreparable harm supporting emergency injunctive relief.

As the parties "invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing" standing. *Id.* They "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Where a plaintiff seeks prospective relief, the "threatened injury must be *certainly impending* to constitute injury in fact"; "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis and citation omitted).

Texas claims injury on three bases. First, it argues that the Guidance inhibits its ability to enforce state law. But even if it had identified a concrete conflict between Texas law and EMTALA— and it has not—that conflict would be traceable not to the Guidance, but to EMTALA itself, and it would thus not be redressable by enjoining the Guidance. Second, Texas claims harm to state-run hospitals from potential exclusion from the Medicare program. But it has not identified any instance in which either of its two state-run hospitals has refused, or will refuse, to provide an abortion that EMTALA would require, let alone alleged that any enforcement process has begun—or, indeed, even that any complaint has been filed. And third, Texas claims an interest in protecting its citizens against the potential enforcement of federal law, but lacks *parens patriae* standing to do so.

AAPLOG's and CMDA's standing claims also fail, as neither group establishes that it may properly sue on behalf of its members. They do not show that any of their members have standing to sue in their own right, because their allegations—and the facts attested to by their member-declarants—also fall well short of demonstrating any cognizable injury that would be traceable to the Guidance or redressable by the relief sought. And CMDA—the only Plaintiff that asserts a RFRA or

Free Exercise claim—cannot raise such claims on behalf of its members because they necessarily depend on the particular religious practices of those individual members.

        **1.**      **Texas Identifies No Concrete Conflict with State Law that Invalidation of the Guidance Would Remedy**

Texas principally claims that the Guidance harms its "sovereign right to enforce its criminal laws" by "purport[ing] to preempt" them. Am. Compl. ¶ 59. But even assuming this purported injury is cognizable as something more than "an abstract question of legislative power," *Texas v. Interstate Com. Comm'n*, 258 U.S. 158, 162–63 (1922), Texas has failed to identify any particular respect in which Texas law would prohibit an abortion that EMTALA would require to be offered. In any event, it is *the statute*, not the challenged Guidance, that preempts any conflicting state law, so any sovereign injury is not traceable to the Guidance or redressable by the relief Plaintiffs expressly seek.

Under EMTALA, where a covered hospital determines that an individual presenting to its emergency department has an "emergency medical condition," it "must provide . . . such treatment as may be required to stabilize" that condition, unless the hospital meets certain conditions to transfer the patient. 42 U.S.C. § 1395dd(b)(1). The statute requires the hospital to determine what treatment "may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely" to result from a transfer or discharge. *Id.* § 1395dd(e)(3). EMTALA also expressly preempts any "state or local law requirement" that "directly conflicts with a requirement" of EMTALA. *Id.* § 1395dd(f). These provisions apply irrespective of the challenged Guidance and would apply even if the Guidance had never been issued.

EMTALA does not expressly reference abortion, as Plaintiffs recognize. *See* Am. Compl. ¶ 26. It also says nothing about any other medical procedure. But that is not because every medical procedure is excluded from EMTALA's ambit, as Texas's argument would suggest. *See Bostock v. Clayton Cnty*, 140 S. Ct. 1731, 1747 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."). Instead, far from asserting an "abortion mandate," the Guidance makes clear that EMTALA assigns *to the hospital and its physicians* the medical role of determining both whether an emergency medical condition exists, and what medical procedures "may

be necessary" to properly stabilize a patient with such a condition.  *See* Guidance at 4 ("The course of stabilizing treatment *is under the purview of the physician or qualified medical personnel*." (emphasis added)); *see also, e.g.*, *Cherkuri v. Shalala*, 175 F..3d 446, 449–50 (6th Cir. 1999) (EMTALA's definition of "'stabilization' establishes an 'objective' standard of 'reasonableness' based on the situation at hand," and requires the physician to make a "fast on-the-spot risk analysis").  EMTALA's requirements— conditional on these medical determinations—apply equally to *all* types of stabilizing care for emergency medical conditions that the hospital determines to be reasonably necessary; that is, no reasonably necessary treatments are excluded, including pregnancy termination.  *See* 42 U.S.C. § 1395dd.

Put simply, if a hospital determines that an emergency medical condition exists, and that Procedure X is necessary to stabilize a patient with that condition, then EMTALA—entirely of its own force, and without any need for agency guidance—requires the hospital to offer Procedure X.  And, in turn, if Procedure X is prohibited under state law, then that prohibition "directly conflicts with a requirement" of EMTALA, and the state law is accordingly preempted.  *Id.* § 1395dd(f).  This applies not only to abortion, but to *any* medical procedure determined to be reasonably necessary to stabilize an emergency medical condition.  Where Procedure X is intubation, EMTALA mandates intubation (unless the patient has refused, upon informed consent); where Procedure X is pregnancy termination, EMTALA requires that care (again, unless the patient is informed of the risks and benefits and chooses to forgo the treatment).  This is all the Guidance says—it merely reminds hospitals of one important (and, in light of *Dobbs*, timely) example of EMTALA's generally applicable rule, which applies regardless of the Guidance.

For this reason, Plaintiffs lack standing to challenge the Guidance on Texas's state law preemption theory: Whether Texas criminal law is preempted by EMTALA has nothing to do with the challenged Guidance, and everything to do with whether an otherwise-prohibited abortion is determined by a hospital to be necessary stabilizing treatment for a patient's emergency medical condition.  If so, EMTALA preempts the state statute on its face, with or without the Guidance.  *See* 42 U.S.C. § 1395dd(f).  Accordingly, any preemption injury suffered by Texas is traceable only to the

operation of EMTALA itself—which Plaintiffs do not challenge—and not to the Guidance.  *See Spokeo*, 578 U.S. at 338 (an injury must be "fairly traceable to *the challenged* conduct of the defendant") (emphasis added).

By the same token, an injunction invalidating the Guidance and prohibiting Defendants from "enforcing" it would not redress any such injury, because the Guidance is neither the source of any harm nor the source of HHS's enforcement authority.  Plaintiffs ask the Court to "[h]old unlawful and set aside the Abortion Mandate," Am. Compl. at 30 (Prayer for Relief ¶ i)—which they define as the Guidance and an accompanying letter from the Secretary, Pls.' Mem. 2–3—and to "[i]ssue preliminary and permanent injunctions prohibiting Defendants from enforcing" it, Am. Compl. at 31 (Prayer for Relief ¶ iii).  But such an injunction would not only fail to redress any injury, it would be all but meaningless, because Defendants do not "enforce" the Guidance and its accompanying letter, which do not have the force of law—they enforce the statute, and courts may not "enjoin" an agency's view of the law.  *See Whole Women's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) ("Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions.  But under traditional equitable principles, no court may . . . purport to enjoin challenged 'laws themselves.'"); *Massachusetts v. Mellon*, 262 U.S. 477, 488–89 (1923) (courts may not issue injunctions based "merely [on allegations] that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional," an "authority which plainly we do not possess"); *Adams Cnty. Water Ass'n v. City of Natchez*, No. 5:10-cv-199, 2013 WL 3762658 at *2 n.3 (S.D. Miss. July 16, 2013) ("[t]he [c]ourt cannot enjoin the [d]efendants from maintaining what amounts to a legal position on the interpretation . . . which may or may not be implicated in the future").  In other words, even if this Court were to enter Plaintiffs' requested injunction, EMTALA would still require a provider who determines an abortion to be necessary stabilizing treatment for an emergency medical condition to provide that care, and any conflicting state law would remain preempted.  *Id.*  Indeed, Plaintiffs ignore that the statute is independently enforceable through private suits for damages, 42 U.S.C. § 1395dd(d)(2), on which an injunction against the Guidance would have no effect whatsoever.

13

The understanding of EMTALA set out in the Guidance is also not new.  In prior guidance issued nearly a year ago, CMS likewise reminded hospitals that, under EMTALA, "[e]mergency medical conditions involving pregnancy include, but are not limited to: ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features," and that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., dilation and curettage (D&C))." *Id.* at 4.  Concurrent HHS Office for Civil Rights guidance noted that the Medicare statute contemplates "abortions performed in order to stabilize a patient when required under [EMTALA]." *Supra* Background, Part III.  And providers in the field have long understood abortions to be necessary stabilizing treatment for certain emergency medical conditions; providers in Texas and elsewhere have also understood EMTALA to require pregnancy termination in certain circumstances.  *See* Carpenter Decl., ¶¶ 8–15, Ex. A (explaining circumstances when abortion is necessary stabilizing treatment for emergency medical condition and that the Guidance "comports with my understanding of EMTALA's requirements"); Peaceman Decl., ¶¶ 6–10, Ex. B (describing clinical presentations in which EMTALA requires termination of pregnancy to avoid death or serious impairment of bodily functions); Haider Decl., ¶¶ 5–13, Ex. C (same); Nordlund Decl., ¶¶ 6–13, Ex. D (describing EMTALA's requirements for first- and second-trimester pregnant women experiencing emergency medical conditions, affirming the Guidance "is consistent with my longstanding understanding of EMTALA's requirements" and "no part of [the Guidance] is novel or different from what my experience and training indicates that EMTALA requires").

There is another reason why Texas cannot show injury from the Guidance: It has not even demonstrated a conflict between Texas law and EMTALA itself.  Texas claims standing based on two state laws criminalizing abortions, both of which include certain emergency exceptions.  The first, a set of 1925 statutes that were inoperative while *Roe* remained good law, criminalized abortions except those performed under "medical advice for the purpose of saving the life of the mother."  Am. Compl. ¶ 57 (citation omitted).  The Fifth Circuit has held that these statutes were impliedly repealed, *McCorvey*, 385 F.3d at 849, and whether they remain good law is a question currently pending before the Texas Supreme Court, *see In re Paxton*, No. 22-0527 (Tex. June 29, 2022), but in the meantime, Texas does

14

not claim to be enforcing them.  The second asserted authority, a statute that has yet to become operative, does not criminalize abortions where the patient "has a life-threatening physical condition . . . arising from a pregnancy that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function."  H.B. 1280 § 2(b)(2).

The mere invocation of these laws is insufficient for Texas to demonstrate an injury, much less irreparable harm.  It is Texas's burden to establish injury, but it points to no particular medical circumstance that falls into any gap between Texas law and EMTALA—for example, a circumstance in which an abortion would be required under EMTALA to avoid "serious impairment to bodily functions," 42 U.S.C. § 1395dd(e)(1)(A), but would be prohibited by Texas law because it fell outside the Texas exception where there is a "serious risk of substantial impairment of a major bodily function," H.B. 1280, § 2.  This case is thus quite unlike *United States v. Idaho*, No. 22-cv-329 (D. Idaho), where the state law at issue bars virtually all abortions, with physicians able to escape criminal liability only by proving an affirmative defense that the care was "necessary to prevent the death of the pregnant woman," Idaho Code § 18-622(3)(a)(ii)—a law that quite obviously conflicts with EMTALA.

In sum, even if Texas could identify a scenario where state law and the Guidance conflicted— that is, one where its law would require a doctor to withhold pregnancy termination while a pregnant patient suffered an emergency condition that the procedure would stabilize—the source of any sovereign injury to Texas would be EMTALA, not the Guidance, and invalidating the Guidance would not redress it.  And, in any event, Texas has shown no such conflict.  Texas may not rely on the abstract notion of a potential conflict with state law to show standing where such a potential conflict would not even be attributable to the challenged agency action at issue.

### 2.    Texas Identifies No Imminent Risk to State Hospital Funding

Texas also claims potential future injury to federal funding for state-run hospitals.  But this theory is entirely speculative, not the "certainly impending" harm needed "to constitute injury in fact," *Clapper*, 568 U.S. at 409, much less an irreparable one requiring emergency relief.

Texas contends that its hospitals face possible civil monetary penalties, and that they could potentially be disenrolled from Medicare (and perhaps other federal health programs) for repeated EMTALA violations. But it offers no facts to support the plausibility or imminence of those fears. It identifies no state hospital or physician who has refused to provide EMTALA-required abortion care; no investigation or enforcement proceeding against a Texas hospital on this basis; and not even so much as a single EMTALA complaint. Further, no monetary penalty or disenrollment sanction could be assessed before a lengthy chain of prerequisites were completed, including: (1) the filing of a complaint, (2) investigation by a state survey agency; (3) potential voluntary compliance; (4) referral to a QIO for expert review, and an opportunity to be heard; (5) determination of a violation and referral to HHS OIG; (6) written notice and an administrative hearing; (7) an administrative appeal; and (8) judicial review of the agency's final decision. *See supra* Background, Part II (describing procedures). Not one of these steps is alleged to have occurred here, so no injury is likely or imminent, and Texas's abstract fear of possible enforcement action at some indeterminate point in the future does not confer standing. *Clapper*, 568 U.S. at 409; *see also, e.g.*, *Glass v. Paxton*, 900 F.3d 233, 239–42 (5th Cir. 2018) (standing cannot be grounded in a decision to self-censor based on subjective apprehension of future event not shown to be imminent).[3] And again, the question in such a proceeding would be what the

---

[3] Plaintiffs allege that they risk "after-the-fact liability" if a patient refuses to allow them to "reverse the abortion and stabilize both the mother and unborn child." Am. Compl. ¶ 47. As described extensively in the Declaration of Sadia Hader, so-called abortion reversals, that is, the administration of progesterone in an attempt to reverse an incomplete abortion, are *never* proper treatment for an emergency medical condition, given the absence of evidence that an ongoing abortion (whether spontaneous or the result of medication such as Mifepristone) can be reversed and the significant risks of adverse outcomes attached to such procedures. Haider Decl. ¶ 18 (attesting that the "use of progesterone during an ongoing or inevitable abortion with uncontrolled bleeding is ethically irresponsible, dangerous, and is not a generally accepted or evidence-based treatment"). But regardless, a patient's refusal to undertake treatment would not amount to an EMTALA violation, because EMTALA liability does not attach where a patient refuses to consent after being informed of potential risks and benefits of treatment. *Id.* § 1395dd(b)(2); *see also Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134, 1150–51 (D.N.D. 2019) (describing "abortion reversal" theory as "devoid of scientific support," "an unproven medical and scientific theory," and "a very controversial and medically-uncertain procedure"); *Planned Parenthood of Tenn. & N. Miss. v. Slatery*, 523 F. Supp. 3d 985, 1003 (M.D. Tenn. 2021) (recognizing that research supporting abortion reversal "has numerous flaws," and

statute itself means, not what HHS said in the challenged guidance document. *See Sch. of the Ozarks v. Biden*, --- F.4th ---, No. 21-2270, 2022 WL 2963474, at *6 (8th Cir. Jul. 27, 2022) ("Even if HUD were enjoined from enforcing its internal directive, the agency would still be required . . . [to] consider the meaning of" its governing statutes).

### 3.    Texas Cannot Assert *Parens Patriae* Standing Against the Federal Government

Finally, Texas lacks *parens patriae* standing to sue the federal government, because states may not sue the United States on behalf of their citizens. *See* Am. Compl. ¶ 64; *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government"); *cf. Texas v. Biden*, 554 F. Supp. 3d 818, 841 (N.D. Tex. 2021) (Kacsmaryk, J.) (contrasting a permissible suit in which a State asserts its *own* rights under federal law with one in which a State is impermissibly "attempting to protect its citizens from the operation of [the federal law]"), *rev'd and remanded on other grounds sub nom. Biden v. Texas*, 142 S. Ct. 2528 (2022).  Similarly, Texas cannot claim harm on behalf of Texas doctors at risk of revocation or suspension of their licenses under Texas law. *See* Am. Compl. ¶ 63.  This is because "it is the United States, and not the state, which represents [citizens] as *parens patriae*"; thus, a state has no legitimate interest in protecting its citizens from the federal government. *Massachusetts v. Mellon*, 262 U.S. 447, 485–86, (1923).  A contrary rule would usurp the sovereign interest of the federal government and threaten the "general supremacy of federal law." *Pennsylvania v. Kleppe*, 533 F.2d 668, 677 (D.C. Cir. 1976).  Because Texas has no interest in the rights of its individual citizens in this suit, it has no standing on this basis either.

---

finding that "requiring a physician to discuss his theory as part of an informed consent discussion with a patient elevates the theory to a level of scientific certainty it has not achieved to date").

4.    **AAPLOG and CMDA Both Lack Associational Standing**

For their part, AAPLOG and CMDA sue not in their own right, but rather "on behalf of [their] members." Am. Compl. ¶¶ 3–4. They fail to establish associational standing to do so, for three reasons.

First, neither group makes any attempt to show that it has "the indicia of membership in an organization" that would allow its members to "express their collective views and protect their collective interests." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977). These indicia include an associational structure that allows members to finance the association, elect and serve on its board, and direct its operations, *see id.*—allegations that are entirely missing here. *Cf., e.g.*, Am. Compl. ¶ 3–4 (stating only general facts about each organization).

Second, neither group shows that "its members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. Associational standing cannot be established by "accepting the organization's self-description of the activities of its members" and determining that "there is a statistical probability that some of those members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Here, neither organization demonstrates any likely or imminent EMTALA enforcement action against any of its members, let alone one traceable to the challenged Guidance or redressable by the requested relief.

AAPLOG alleges that its members oppose only "*elective* abortion," or abortions "for *no medical reason*," Am. Compl. ¶¶ 3, 73 (emphasis added)—which, as the Guidance makes clear, are beyond the scope of EMTALA. *Compare* Harrison Decl., Pls.' App'x 16–21 (discussing AAPLOG members' objection to *elective* abortions only), *with* Guidance at 4–5 ("[a] hospital's *EMTALA obligation ends* when a physician . . . has made a decision . . . [t]hat no emergency medical condition exists" (emphasis added)). Indeed, an emergency department, by definition, would not provide elective abortions. *See* Carpenter Decl. ¶ 17 ("emergency rooms do not perform 'elective abortions' where there is no medical necessity" and "the EMTALA Guidance" would not "require an abortion where there is no medical necessity, because … there would be no emergency medical condition"); Peaceman Decl. ¶ 10 (if a "woman presents to an emergency room and requests an elective abortion, meaning a pregnancy

18

termination when no emergency condition exists, EMTALA" does not require this care and, in his experience, "emergency rooms currently do not provide this treatment option to patients, and there is no reason to believe that they would need to in the future"); Nordlund Decl. ¶ 9 (similar). As for CMDA, its allegations are even more cryptic: Its members "affirm the historical prohibition against abortion" for "Biblical, biological, social, medical, and ethical" reasons, but CMDA leaves ambiguous what that means about its members' medical practices and whether their members would ever refuse to provide a pregnancy termination where necessary to stabilize an emergency situation. Am. Compl. ¶ 75. Both organizations thus fall far short of demonstrating any concrete, imminent injury-in-fact.

Indeed, both organizations' member-declarants undermine any claim to an imminent risk of injury. Dr. Sean Hutzler, an AAPLOG member in Texas, declares that he has "treated many women with complications arising during pregnancy" in situations "subject to EMTALA," and that when he does face such situations, he has "complied with EMTALA" without issue. Hutzler Decl. ¶¶ 4, 6–7, Pls.' App'x 30. His only purported injury is his "concern[]" that the Guidance "*could* be enforced to require involvement in abortions inconsistent with" his views, without any elaboration about the circumstances under which he thinks that possible. *Id.* ¶ 8 (emphasis added). Similarly, Dr. Michael Valley, an AAPLOG member in Minnesota, declares that he "regularly treat[s] pregnant women who come to the emergency room in situations subject to EMTALA," and that he, too, complies with EMTALA in such situations. Valley Decl. ¶¶ 4–5, 7–9, Pls.' App'x 32–33. He is "concerned" about what the Guidance "could" mean for his practice, and nothing more. *Id.* ¶ 9, Pls.' App'x 33. And Dr. Steven Foley, a CMDA member from Indiana, similarly declares that he is "concerned" about what the Guidance "could" mean, but claims no further basis for any injury. Foley Decl. ¶¶ 4, 8, Pls.' App'x 35–36. Yet Plaintiffs must demonstrate "that [they] ha[ve] been or will in fact be perceptibly harmed by the challenged agency action, not that [they] can *imagine* circumstances in which [they] could be affected by the agency's action." *United States v. Students Challenging Reg. Agency Procs. (SCRAP),* 412 U.S. 669, 688–89 (1973). Here, it is hard to imagine any articulations of injury *less* concrete than those raised by these member-declarants.

19

These purported harms are also divorced from the actual content of the Guidance, and thus lack traceability "to the challenged conduct" and redressability by the requested relief. *Spokeo*, 578 U.S. at 338. Plaintiffs contend that the Guidance's recognition that "incomplete medical abortion" *may* amount to an emergency medical condition, Guidance at 5–6, amounts to an "Abortion Mandate" requiring them to complete *any* incomplete medical abortion. *See, e.g.*, Am. Compl. ¶ 45 ("the EMTALA Guidance attempts to force hospitals and physicians to complete medical abortions . . . that began elsewhere, even illegally"); *id.* ¶ 69 (the Guidance "requires performing essentially an elective abortion"). But those allegations mischaracterize the Guidance, and the circumstances in which abortion care would be medically necessary. Both spontaneous abortions (*i.e.*, miscarriages) and incomplete medication abortions may, in some circumstances, present as emergency medical conditions that require stabilizing care, such as where a patient has severe bleeding and is at risk of hemorrhaging. *See* Carpenter Decl. ¶ 18 ("an emergency medical condition may exist if the woman is experiencing heavy or uncontrolled bleeding, which places her at risk of hemorrhage and, if left untreated, organ failure, or … a potentially life-threatening septic infection," and in those instances "[c]ompleting the termination of pregnancy … would be medically necessary stabilizing treatment and would not be considered an 'elective' abortion," although "failure of abortion-inducing medication, such as mifepristone, would not qualify as an emergency absent other symptoms"); Peaceman Decl. ¶ 11 (agreeing that intrauterine pregnancy is not itself an emergency requiring intervention but describing situations where "symptoms such as hemorrhage, which threatens the health or life of the patient," would constitute an emergency necessitating intervention regardless of whether it occurs spontaneously or from medication and would be "no longer elective or based on a desire to terminate the pregnancy, but based on medical necessity to prevent death or serious bodily dysfunction"). But nothing in the Guidance suggests that incomplete medical abortion without such complications is an emergency medical condition, or that EMTALA requires abortion care in non-emergency situations. On the contrary, the Guidance clearly and repeatedly states that only abortions determined by a health care provider to be necessary stabilizing treatment for an emergency medical condition are required

under EMTALA.  *See* Guidance at 1.  Plaintiffs' allegations to the contrary are flatly contradicted by the Guidance itself and cannot provide a basis for relief.

Third, CMDA's RFRA and Free Exercise claims—which are not joined by AAPLOG, *see* Am. Compl. ¶¶ 145-55—"require[] the participation of individual members," *Hunt*, 432 U.S. at 343, and cannot be brought in a representative capacity.  RFRA requires the Court to identify the contours of "*a person's*" sincere religious belief to determine whether it is substantially burdened and, if so, to decide whether the "application of the burden *to the person*" is justified.  42 U.S.C. § 2000bb-1(a)–(b) (emphasis added); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (RFRA contemplates "an inquiry more focused than [a] categorical approach" because it requires "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."); *accord Tagore v. United States*, 735 F.3d 324, 331 (5th Cir. 2013) ("A 'categorical approach' is insufficient.").  A Free Exercise claim similarly requires a plaintiff to "show the coercive effect of the enactment as it *operates against him* in the practice of his religion." *Harris v. McRae*, 448 U.S. 297 (1980) (emphasis added).  Thus, "[i]t is often difficult for religious organizations to assert free exercise claims on behalf of their members because the religious beliefs and practices of the membership differ," *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992), and such claims "ordinarily require[] individual participation," *McRae*, 448 U.S. at 321.  That is all the more true here, where CMDA admits a diversity of view within its membership.  *See, e.g.*, Am. Compl. ¶ 75 (some of CMDA's members objections to abortion are "Biblical," but others are "biological, social, medical, and ethical").[4]  "It is thus clear that the participation of [CMDA's]

---

[4] CMDA appears carefully to avoid alleging that all of its members share the same beliefs with respect to abortion care.  For example, the Amended Complaint alleges that "*CMDA*"—*i.e.*, *not* all of its members—"is opposed to the practice of abortion as contrary to Scripture, respect for the sanctity of human life, and traditional, historical, and Judeo-Christian medical ethics."  *See* Am. Compl. ¶ 4. Particular individuals' understandings of Scripture and Judeo-Christian medical ethics vary.  *See, e.g.*, *Pomerantz v. Florida*, Compl., 2022-014373-CA-01 (Fla. 11th Cir. Ct. Aug. 1, 2022) (claiming that Florida's abortion prohibition violates plaintiffs' religious beliefs in violation of Florida's RFRA statute).  Indeed, CMDA's Statement of Faith, posted on CMDA's website that may be accessed through the link cited in the Amended Complaint, *see* Am. Compl. at 17 n.21, appears to recognize this diversity of viewpoints among its membership by beginning with a parenthetical acknowledging

individual members . . . is essential to a proper understanding and resolution of their" RFRA and Free Exercise claims, such that CMDA lacks standing to bring those claims on its members' behalf.  *See McRae*, 448 U.S. at 321; *see also Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009) (court cannot "resol[ve] . . . the individualized element of coercion" without the participation of individual members).

Plaintiffs thus fail to meet their burden to establish standing, and the Court lacks jurisdiction over their claims.  And at a minimum, they have failed to show an imminent, irreparable harm warranting emergency injunctive relief.

### B.     The Guidance Is Not Final Agency Action Subject to Judicial Review

The Administrative Procedure Act (APA) gives courts jurisdiction to review *final* agency action, providing that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review."  5 U.S.C. § 704.  Agency action is "final" when it both (1) marks "the consummation of the agency's decisionmaking process" and (2) determines a party's "rights or obligations."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 596–600 (2016).  An agency action that "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" is not final for purposes of this requirement.  *Peoples Nat'l Bank v. Off. of Comptroller of Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004) (citation omitted).  And "[i]f there is no 'final agency action,' a federal court lacks subject matter jurisdiction."  *Id.* at 336 (citation omitted).

Plaintiffs' APA claims—and their *ultra vires* claims, discussed below—fail both prongs of this test.  First, the Guidance does not mark the "consummation" of any decisionmaking process: it simply restates the preexisting and long-understood requirements of the statute, and no administrative enforcement process has even begun.  *Cf., e.g.*, *Exxon Chems. Am. v. Chao*, 298 F.3d 464, 467 (5th Cir.

---

the diversity of members' religious outlooks.  *See* Our Statement of Faith, https://cmda.org/mission-and-vision/ ("each of us holds fast to additional beliefs important to our relationship with God").  The statement itself does not touch on any specific religious views regarding abortion.  *See id.*

2002) (an agency action is "not the consummation of the agency's decision-making process" where it does not "definitively resolv[e]" a party's case); *see also* Nordlund Decl. ¶ 17 (Guidance's language "is consistent with my longstanding understanding of EMTALA's requirements" and "no part of [it] is novel or different from what my experience and training indicates that EMTALA requires").  Any future enforcement proceeding would be based on an allegation that the statute was violated, not that the Guidance was.  Second, the Guidance itself determines no rights or obligations, and no "legal consequences" flow from it.  Rather, as discussed, the Guidance simply "remind[s] hospitals of their existing obligation to comply with EMTALA," and "does not contain new policy."  Guidance at 1.  There is no final agency action "when an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party."  *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 n.7 (5th Cir. 2014) (citing *AT&T v. EEOC*, 270 F.3d 973, 975 (D.D.C. 2001)).  Here, the Guidance has no independent legal force at all—it merely reflects the existing requirements of the statute, which itself would not cause any adverse effect except to the extent EMTALA were actually violated and an enforcement action pursued.  The Guidance therefore "has force only to the extent the agency can persuade a court to the same conclusion" in the context of an actual enforcement proceeding, which, as discussed, Texas has not even alleged has begun.  *AT&T*, 270 F.3d 97 at 976.

The Guidance therefore stands in contrast to other guidance documents that courts in this circuit have found to be final agency actions.  For example, in *Texas v. EEOC*, 933 F.3d 433, 443 (5th Cir. 2019), the Fifth Circuit held that an EEOC guidance document concerning the consideration of prior criminal convictions in hiring decisions constituted final agency action where the agency conceded that the guidance bound EEOC staff "to an analytical method in conducting Title VII investigations and directs their decisions about which employers to refer for employment actions."  *Id.*  Here, no such obligations are present.  Indeed, like the statute, the Guidance places the determination of whether an abortion is necessary stabilizing care in the hands of the providing physicians—it does not purport to obligate that determination in any instance, nor create any analytical method to determine when abortions may be required by EMTALA.  It is not final agency action subject to judicial review.

23

C.     **Texas Cannot Evade the APA's Limitations on Judicial Review by Invoking Equitable, Non-Statutory *Ultra Vires* Causes of Action, Which Should Be Dismissed**

Several of Plaintiffs' claims fail to identify any cause of action other than "*ultra vires*" review. *See* Am. Compl. at 21, 27–28 (Counts I, VI, and VII).  Claims of agency action in excess of statutory or constitutional authority are properly pled under the APA, not as *ultra vires* claims.  *See e.g.*, *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) ("You may not bypass the specific method that Congress has provided for reviewing adverse agency action . . . .") (citing 5 U.S.C. §§ 703, 704).  *Ultra vires* review is a "rarely invocable," "narrow exception" to the APA's final agency action requirements that permits judicial intervention for only the most "egregious error[s]" where a party is "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its rights."  *Am. Airlines, Inc. v. Hermann*, 176 F.3d 283, 293–94 (5th Cir. 1999); *see also Leedom v. Kyne*, 358 U.S. 184 (1958); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).  Indeed, seeking *ultra vires* review under *Kyne* "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.).

To support such a claim, allegations that an agency has acted in excess of statutory authority may not "simply involve a dispute over statutory interpretation."  *See Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997); *Exxon*, 298 F.3d at 469 (rejecting jurisdiction based on the *Kyne* exception where the plaintiff "can obtain meaningful judicial review" upon exhausting administrative proceedings).  And courts may not engage in *ultra vires* review to "police" the "purity" of hypothetical agency actions "long before the administrative process is over."  *Sanderson Farms, Inc. v. Nat'l Labor Rels. Bd.*, 651 F. App'x 294, 298 (5th Cir. 2016).  Instead, under clear Fifth Circuit precedent, the Court should dismiss Plaintiff's *ultra vires* claims for lack of subject matter jurisdiction.

## II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### A.    The Guidance Is Entirely Consistent with EMTALA and Other Federal Law

Plaintiffs' *ultra vires* and statutory-authority claims overlap and fail on the merits for the same basic reason: The Guidance is entirely consistent with EMTALA and other federal law. As explained, the Guidance merely restates what flows directly from EMTALA's text, *i.e.*, that when "a physician believes that a pregnant patient . . . is experiencing an emergency medication condition and that abortion is the stabilizing treatment necessary to resolve that condition," then "the physician must provide that treatment." Guidance at 1. Texas's repeated mischaracterization of the Guidance as imposing an "Abortion Mandate" that requires hospital emergency rooms to provide elective abortions does not make it true.

Under EMTALA, hospitals that receive Medicare funds are generally required (barring an appropriate transfer to another medical facility) to offer and provide "stabilizing treatment" to all patients who present to emergency departments while experiencing an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). For such patients, hospitals are required to provide "further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b)(1)(A); *see also* 42 C.F.R. § 489.24(a)(1)(i)-(ii). Congress explicitly contemplated that pregnant patients would be among those presenting to an emergency department experiencing an "emergency medical condition." *Id.* § 1395dd(e)(1)(A)(i), (B). A number of conditions can arise during, or can be exacerbated by, pregnancy that may constitute "emergency medical conditions." For some patients, a physician will determine that the stabilizing treatment for the patient's emergency condition is termination of the pregnancy. Carpenter Decl. ¶¶ 8–15; Peaceman Decl. ¶¶ 5–10; Saider Decl. ¶¶ 7–13; Nordlund Decl. ¶¶ 9–14.

For each of these emergency medical conditions, where a physician determines that abortion is the proper stabilizing treatment, EMTALA's plain text requires that that treatment be offered and provided upon informed consent. 42 U.S.C. § 1395dd(b)(1)(A) (requiring provision of "such treatment as may be required to stabilize the medical condition"); *see also* 42 C.F.R. § 489.24(a)(1)(ii) ("If an emergency medical condition is determined to exist," the hospital must "provide any necessary

stabilizing treatment[.]").  The only reasonable interpretation of EMTALA's text is therefore exactly what the Guidance says—that it requires hospitals to offer stabilizing treatment when medically necessary.  *See* Guidance at 1.

Nothing in EMTALA creates a different rule for circumstances in which the treatment results in termination of a pregnancy.  As discussed, the statute's text does not exempt any particular treatment (abortion or otherwise) from the ambit of stabilizing treatment.  *See Bostock*, 140 S. Ct. at 1747 ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *In re Baby K*, 16 F.3d 590, 596 (4th Cir. 1994) (finding no "statutory language or legislative history [in EMTALA] evincing a Congressional intent to create an exception to the duty to provide stabilizing treatment").  And any contrary interpretation—*i.e.*, that a hospital need not perform an abortion even when medically necessary to prevent serious adverse health outcomes or death—would undermine EMTALA's overall purpose of ensuring "that patients . . . receive adequate emergency medical care." *Arrington*, 237 F.3d at 1073–74 (citation omitted).

Plaintiffs' contention that EMTALA does not encompass abortions is foreclosed by the specific Affordable Care Act (ACA) provision addressing abortion.  *See* 42 U.S.C. § 18023.  The ACA allows States to prohibit abortion coverage in certain health plans, *id.* § 18023(a)(1), but the same provision contains a cross-reference to EMTALA and makes explicit that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA.')" *Id.* § 18023(d).  Congress therefore left no doubt that EMTALA encompasses abortion services and that a State may not override that requirement.

Plaintiffs' contention that the Guidance is at odds with the Weldon Amendment, *see* Am. Compl. ¶ 50, is similarly mistaken.  That Amendment is a frequently enacted appropriations provision that prohibits discrimination against certain entities that do not perform abortions.  Its sponsor, when confronted with a concern that "women will die because they will not have access to an abortion needed to save the life of the mother," expressly referenced EMTALA in addressing that concern: "Hyde-Weldon does nothing of the sort.  It ensures that in situations where a mother's life is in danger

26

a health provider must act to save the mother's life.  In fact, Congress passed [EMTALA] forbidding critical-care health facilities to abandon patients in medical emergencies, and requires them to provide treatment to stabilize the medical condition of such patients—particularly pregnant women."  151 Cong. Rec. H177 (Jan. 25, 2005) (statement of Rep. Weldon).

Equally unpersuasive are Plaintiffs' arguments that the Guidance violates the Hyde, Coats-Snowe, and Church Amendments.  Pls.' Mem. 10–11; Am. Compl. ¶¶ 51–52, 114–15.  Plaintiffs assert, without authority, that "[t]here is no evidence Congress intended to override" these provisions with EMTALA.  Pls.' Mem. 11.  But the opposite is true: "there is no evidence that Congress intended, *sub silentio*, for any of the Conscience Provisions to override EMTALA, a separate statute."  *New York v. HHS*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019).  As noted in *New York*, "[o]n the contrary, there is affirmative evidence that the sponsors of each of the Church, Coats-Snowe, and Weldon Amendments did *not* intend for these to require providers, in an emergency, to be obliged to accommodate an objecting employee."  *Id.*  Other courts have similarly held.  *See California v. United States*, No. 05-328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008); *see also Planned Parenthood Affiliates of Mich. v. Engler*, 73 F.3d 634, 636 (6th Cir. 1996) ("nothing in the Hyde Amendment purports to change a state's obligations with respect to those abortions for which federal funding is available.").

Notably, the very same legislation through which Congress considered EMTALA included a separate program that *did* expressly carve out abortion.  *Compare* H.R. 3128, 99th Cong., 1st Sess., § 124 (language that became EMTALA), *with id.* § 302(b)(2)(B) (expressly excluding abortion from a different program's authorized activities).  These provisions are further proof that when Congress intends to create special rules for abortion—or to exclude abortion care from otherwise-applicable rules—it does so expressly.[5]  "Had Congress likewise intended" to exempt abortions from EMTALA, "it knew how to say so."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018).  Thus, both

---

[5] Examples of other abortion-specific provisions include 10 U.S.C. § 1093; 20 U.S.C. § 1688; 22 U.S.C. §§ 5453(b), 7704(e)(4); 25 U.S.C. § 1676; 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10, 1397ee(c)(7), 2996f(b)(8), and 12584a(a)(9).

EMTALA's text and the surrounding statutory scheme confirm that EMTALA includes termination of the pregnancy as a potential stabilizing treatment.

To be sure, as Plaintiffs note, *see* Pls.' Mem. 9, EMTALA separately provides that a pregnant person may have an "emergency medical condition" in circumstances in which "the health of [the] . . . unborn child . . . [is] in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A)(i). That provision ensures that a hospital's EMTALA obligations extend to a scenario where the "unborn child's" health (and not the pregnant patient's health) is threatened. But nothing in the statutory text indicates that Congress intended to limit the EMTALA-mandated care to pregnant patients, or to require a provider to prioritize the fetus's health over the life or health of its mother, as Plaintiffs appear to suggest. *See, e.g.*, Am. Compl. ¶ 47. Instead, when a pregnant patient has an emergency medical condition and a physician concludes that stabilizing treatment would require termination of the pregnancy, EMTALA's text leaves that balancing to the pregnant patient—who may decide, after weighing the risks and benefits, whether to accept or refuse the treatment. *See* 42 U.S.C. § 1395dd(b)(2) ("the individual" with an emergency medical condition may "refuse[] to consent to the . . . treatment"). There is thus no conflict between EMTALA's provision respecting a pregnant patient and an "unborn child."

The statutory context further refutes Plaintiffs' apparent contention that EMTALA's reference to "unborn child" *forecloses* abortion as a stabilizing treatment. Pls.' Mem. 9–10. That interpretation would lead to the untenable conclusion that EMTALA requires doctors to stand by as pregnant patients suffer predictable strokes from untreated preeclampsia, develop life-threatening septic infections from preterm rupture of membranes (*i.e.*, water breaking before viability), or experience organ failure from untreated hemorrhaging. Carpenter Decl. ¶¶ 8–15; Peaceman Decl. ¶¶ 5–10; Saider Decl. ¶¶ 7–13; Nordlund Decl. ¶¶ 9–14. It also would mean that, every time a hospital emergency room terminated a pregnancy to treat an emergency medical condition, the hospital committed an EMTALA violation—contrary to the Congressional understanding reflected above. Moreover, that interpretation would mean that Congress, when enacting EMTALA in 1986, intended to prohibit hospitals from performing only those abortions necessary to prevent a threat to the

pregnant patient's life or health. "Congress does not hide elephants in mouseholes," *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1071–72 (2018), and the notion that Congress intended EMTALA to forbid necessary medical care is fundamentally at odds with the statute's text, as well as its aim of guaranteeing—not prohibiting—emergency medical care. *See, e.g.*, 131 Cong. Rec. S13892 ("We cannot stand idly by and watch those Americans who lack the resources be shunted away from immediate and appropriate emergency care whenever and wherever it is needed.") (statement of Sen. Durenberger).

Plaintiffs' passing references to the major questions doctrine, Pls.' Mem. 12–13, 14–15, 19, are likewise unavailing. That doctrine is a departure from standard principles of statutory interpretation reserved for "certain extraordinary cases." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). There is no indication that this is such a case. Unlike *West Virginia*, which invalidated an EPA plan to require power plants to shift from coal to renewables, reducing gross domestic product by at least a trillion dollars within two decades, *id.* at 2604, or *Nat'l Federation of Independent Business ("NFIB") v. OSHA*, 142 S. Ct. 661 (2022) (per curiam), which struck down an OSHA order requiring "84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing," *id.* at 665, here Plaintiffs challenge no "radical or fundamental change to a statutory scheme," *West Virginia*, 142 S. Ct. at 2607. Instead, they challenge a Guidance document that does not have the force of law and that changes nothing about the underlying statute at all. The Guidance concerns only a narrow subset of "Patients who are Pregnant or are Experiencing Pregnancy Loss." Guidance at 1. It imposes no "novel" or "unprecedented" policies, *West Virginia*, 142 S. Ct. at 2605, 2612, but rather is fully consistent with EMTALA itself and prior HHS guidance, *see supra* Background, Part III. And it can hardly be said that issuing Medicare guidance falls outside of CMS's wheelhouse, given that "healthcare facilities that wish to participate in Medicare and Medicaid have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare." *Biden v. Missouri*, 142 S. Ct. at 652. In short, this is simply not a "major questions case." *West Virginia*, 142 S. Ct. at 2610.

Similarly mistaken is Plaintiffs' claim that EMTALA is purely an "anti-dumping" statute that merely requires hospitals to "stabilize indigent patients with the same care afforded to other patients."

Pls.' Mem. 3–4.  In fact, the cases Plaintiffs rely on interpreted EMTALA's *screening* requirement, not its *stabilization* requirement.  The screening requirement requires an "appropriate medical screening examination *within the capability of the hospital's emergency department*" to determine whether an emergency medical condition exists.  42 U.S.C. § 1395dd(a) (emphasis added).  Courts have thus interpreted this provision to require covered hospitals to screen all patients who present at an emergency room in the same fashion, consistent with the hospital's capabilities.  *See Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) ("Accordingly, an EMTALA 'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms."); *see also Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000) (similar); *Eberhardt v. City of L.A.*, 62 F.3d 1253, 1257 (9th Cir. 1995) (similar); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879 (4th Cir. 1992) (similar).

A different analysis applies to the stabilization requirement.  There, once an emergency medical condition is identified, a hospital must "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability" that the condition will not deteriorate upon transfer or discharge.  42 U.S.C. § 1395dd(e)(3)(A).  This means that hospitals must provide "treatment that medical experts agree would prevent the threatening and severe consequence of" deterioration before transfer or discharge, not merely whatever care they would (or would not) provide to any patient.  *Burditt v. HHS*, 934 F.2d 1362, 1369 (5th Cir. 1991); *Miller v. Med. Ctr. of Sw. La.*, 22 F.3d 626, 628 (5th Cir. 1994) (EMTALA stabilizing care means "*sufficient* treatment to stabilize the patient" (emphasis added)).  This requirement "establishes an 'objective' standard of 'reasonableness' based on the situation at hand," and requires the physician to make a "fast on-the-spot risk analysis" that will differ from patient to patient.  *Cherkuri*, 175 F.3d at 449–50; *see also Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996) (a hospital that "actually perceive[s] the seriousness of the medical condition and nevertheless fail to act to stabilize it" has violated EMTALA).

By mistakenly importing the screening requirement standard into the requirement to provide stabilizing care for an emergency medical condition, Plaintiffs imagine Congress to have authorized a

statutory framework where *any* patient presenting at an emergency room with a specific emergency medical condition could be refused stabilizing treatment or an appropriate transfer, so long as *all* such patients are so refused.  But this would have the perverse effect of *increasing* patient dumping and would all but read the definition of "to stabilize"—which comprises reasonably necessary treatment—out of the statute, in violation of well-established principles of statutory construction.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant").  The Court should reject that invitation.

Finally, Plaintiffs err in suggesting that the Guidance conflicts with 42 U.S.C. § 1395, which provides that CMS may not "exercise any supervision or control over the practice of medicine or the manner in which medical services are provided."  Pls.' Mem. 14.  For one thing, Congress itself required that hospitals comply with EMTALA as a condition of Medicare participation.  *See* 42 U.S.C. § 1395cc(a)(1)(I).  Thus, whatever § 1395's general rule means for regulations enacted administratively, Congress clearly did not think that requiring compliance with EMTALA constituted impermissible "supervision or control over the practice of medicine" under § 1395.  *Cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general[.]").  Moreover, it is quite common for Medicare's conditions of participation to require the provision of certain types of care, *see Biden v. Missouri*, 142 S. Ct. at 654; *see also, e.g.*, 42 C.F.R. § 482.62(e) (requiring the provision of sufficient psychological services to meet patient needs); *id.* § 482.28(b)(1) (requiring that patient nutritional needs be met in accordance with recognized dietary practices).  And nothing in the Guidance purports to interfere with a physician's clinical judgment; on the contrary, it specifies that the "determination of an emergency medical condition is the responsibility of the examining physician," and defers to what the "physician believes . . . is the stabilizing treatment necessary to resolve that condition."  Guidance at 1.  The Guidance thus stands in stark contrast to other instances where the Fifth Circuit has found violations of § 1395.  *See, e.g., United States v. Harris Methodist Fort Worth*, 970 F.2d 94 (5th Cir. 1992) (finding that HHS Title VI

investigations may not be conducted in such a way that would unduly interfere with the hospital's peer review process for staff privileges).

### B.    The Guidance Was Not Required to Undergo Notice and Comment

Plaintiffs likewise erroneously contend that the Guidance is a "substantive" rule that was improperly issued without notice and comment. Am. Compl. ¶ 119. Substantive rules are often also known as "legislative" rules because they impose binding obligations and have the "force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). As explained above, the Guidance imposes no such obligations. *See supra* Part I.A.1, I.B. Assuming it is final agency action at all, the Guidance, by contrast, is a quintessential "interpretive" rule that sets forth an agency's interpretation of a statute, and that is exempt from the APA's notice and comment requirements. 5 U.S.C. § 553(b)(A).

"[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez*, 575 U.S. at 97 (quotation omitted); *see also Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) ("[I]nterpretive rules are statements as to what the administrative officer thinks the statute or regulation means.") (citation omitted). An agency that enforces "less than crystalline" statutes must interpret them, "and it does the public a favor if it announces the interpretation in advance of enforcement, whether the announcement takes the form of a rule or of a policy statement, which the [APA] assimilates to an interpretive rule." *Hoctor v. USDA*, 82 F.3d 165, 167 (7th Cir. 1996).

In distinguishing "substantive rules from nonsubstantive rules," the key issue is whether the rule constitutes a "binding norm"—*i.e.*, whether it has a "binding effect on agency discretion or severely restricts it." *See Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); *see also Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (same), *aff'd*, 579 U.S. 547 (2016). In examining whether a rule is sufficiently binding, "the starting point is 'the agency's characterization of the rule,'" which, although not dispositive, is afforded "deference." *Shalala*, 56 F.3d at 596 (quoting *Metro. Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 489 (7th Cir. 1992)). "As long as the agency

remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm." *Shalala*, 56 F.3d at 596–97 (quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983)).

Here, the Guidance does not, as Plaintiffs contend, create any "new legal obligations," Pls.' Mem. 13–14, or "binding norms," because it does not purport to determine when abortions are the appropriate stabilizing treatment for emergency medical conditions. Instead, it merely notes that abortions are not *excluded* from the scope of treatments covered by EMTALA and are therefore required by the statute where physicians determine that they are the appropriate stabilizing care. *See* Guidance at 1. That is, the Guidance merely restates "what [the] statute has always meant," *Guedes v. ATF*, 920 F.3d 1, 19 (D.C. Cir. 2019), and "so closely track[s] the relevant statutory provisions as to make [its content] virtually self-evident," *Mejia-Ruiz v. INS*, 51 F.3d 358, 364 (2d Cir. 1995).

For similar reasons, notice and comment was not required under the Medicare Act, as the Guidance is not a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services." 42 U.S.C. § 1395hh(a)(2). For the same reason, there was no need for it to be "promulgated by the Secretary by regulation." *Id.*; *cf.* Am. Compl. ¶ 120. Indeed, even if the Guidance could be considered a standalone "requirement" or "statement of policy"—a dubious notion, given EMTALA's generally applicable mandate to provide stabilizing treatment for emergency medical conditions—it certainly does not "establish" or "change" any such requirement or policy. The Guidance merely reminds hospitals that abortion care, like numerous other medical treatments, may be the proper stabilizing treatment for certain emergency medical conditions, consistent with the agency's 2021 guidance and as established by the text of EMTALA itself. This case thus bears no resemblance to *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019), where the Supreme Court found that a modification to a Medicare reimbursement formula required notice and comment because it was a "requirement" that "establishes or changes" a "substantive legal standard" governing "payment for services." *Id.* at 1810 (quoting 42 U.S.C. § 1395hh(a)(2)). That was so because the new calculation "*commanded*" fiscal intermediaries to use the new calculation and represented a change to the baseline pre-modification practice. *Allina Health Servs.*

*v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017), *aff'd sub nom. Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).  Here, by contrast, the Guidance makes no change, and the only command comes from EMTALA itself.  Thus, notice and comment was not required under either the APA or the Medicare Act.

### C.  The Guidance is Not Arbitrary or Capricious

Plaintiffs also fail to show that the Guidance is arbitrary and capricious.  *See* Am. Compl. ¶¶ 62–66.  Review of this claim is "narrow and highly deferential*." Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (citation omitted).  The agency's action is presumed valid, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation omitted).  In short, the arbitrary-and-capricious standard simply "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Here, it plainly was.

Plaintiffs' argument centers on the same mistaken premise that permeates their entire theory of the case—namely, that the Guidance amounts to an "Abortion Mandate" that reflects an insufficiently explained "change in position." Pls.' Mem. 17; Am. Compl. ¶ 129.  For the many reasons already discussed, *see, e.g., supra* at 20, this is a mischaracterization.  Nearly a year before the challenged Guidance was issued, and well before *Dobbs*, HHS explained in prior guidance that certain conditions, including ectopic pregnancy and pre-eclampsia, could be emergency medical conditions requiring abortion care to stabilize.  *See* September 2021 Guidance; *see also* OCR Guidance.  And doctors have long understood abortions to be necessary stabilizing care for such conditions.  *E.g.*, Haider Decl. ¶¶ 6–13; Nordlund Decl. ¶¶ 15–17.  Indeed, as long ago as 2011, in the context of a rule interpreting federal conscience laws, HHS acknowledged that EMTALA may require abortion care in appropriate circumstances.  76 Fed. Reg. 9,968, 9,973 (Feb. 23, 2011).  Plaintiffs' argument that the agency failed to address reliance interests fails for the same reason: the Guidance does not depart from a prior position that could have created such interests.  Pls.' Mem. 17–18.  There was also no need, under the APA, to discuss Plaintiffs' mistaken arguments about the phrase "unborn child," the conscience provisions, or alternative approaches, *cf.* Pls.' Mem. 17–18.

34

Nor was the agency's rationale for the Guidance insufficiently explained: as the Guidance notes, it was issued "to remind hospitals" of their EMTALA obligations "in light of new state laws prohibiting or restricting access to abortion" in the wake of *Dobbs*, which has undeniably created confusion and uncertainty that HHS has a strong interest in clarifying. Guidance at 1–2. While Plaintiffs fault the agency for not preemptively addressing their mistaken legal theories, Pls.' Mem. at 17, there is no requirement that an agency address "every . . . conceivable" argument, *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) (citation omitted), particularly where the statute is clear. And their suggestion that the agency's explanation "fail[s] to provide even [a] minimum level of analysis," *id.*, is unfounded. The agency's reasoning is plain on the face of the 6-page Guidance, which tracks the relevant statutory and regulatory provisions, as discussed above. And even if the Guidance were less clear, on arbitrary and capricious review, a court must uphold agency action so long as "the agency's path may be reasonably discerned." *State Farm*, 463 U.S. at 43 (citation omitted). That standard is more than met here.

### D.   The Guidance Does Not Violate the Spending Clause

Texas does not dispute that, under the Spending Clause, Congress may "fix the terms on which it shall disburse federal money to the States," *New York v. United States*, 505 U.S. 144, 158 (1992), and may "condition[] receipt of federal moneys upon compliance . . . with federal statutory and administrative directives," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). It claims, however, that the Guidance violates restrictions on the spending power by imposing a "retroactive condition" on its decision to participate in the Medicare program, Pls.' Mem. 20, and that the mere possibility that the state could be terminated from the program if its hospitals fail to abide by the conditions of participation, including EMTALA, is "unconstitutionally coercive," *id.* at 21. Neither argument has merit.

To begin, Texas's claim of unfair "surpris[e]" by the Guidance, *id.* at 20, rings hollow, given that the Guidance largely reiterates guidance that CMS issued in September 2021, almost a year earlier, giving the state ample time to reconsider its participation in Medicare. Indeed, the sole declaration that Texas submits from a state-run hospital does *not* contend that the Guidance imposes new

requirements requiring any change to its emergency-care practices.  *See* Bentley Decl., Pls.' App'x 38–39.  Regardless, Texas's state-run hospitals have long been on notice that they must comply with EMTALA, which has always required treatment necessary to stabilize an emergency medical condition, abortion included.  The mere "possibility that application of [a condition] might be unclear in [some] contexts" does not render it unenforceable under the Spending Clause.  *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–66, 673 (1985) (where statute makes clear that conditions apply to receipt of federal funds, Congress need not "specifically identif[y] and proscrib[e]" each action that will violate its terms).

Moreover, unlike in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981) (cited at Pls.' Mem. 20–21), where the statute left unclear whether by accepting federal funds states incurred any obligations *at all*, the Medicare program quite clearly conditions receipt of federal funds on compliance with its provisions, including EMTALA.  *See* 42 U.S.C. § 1395cc(a)(1)(I) (expressly requiring compliance with EMTALA, 42 U.S.C. § 1395dd).  Further, EMTALA clearly requires that, when a patient presents to a covered hospital's emergency department with an emergency medical condition, hospitals are required to provide whatever treatment "may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely[.]"  *Id.* § 1395dd(e)(3).  And no qualifications or exceptions for particular care appear in the statute—indeed, courts have repeatedly declined to read exceptions into EMTALA's mandate.  *See, e.g.*, *Burditt v. HHS*, 934 F.2d 1362, 1375 (5th Cir. 1991) ("[N]othing in EMTALA admits the existence of a good-faith exception."); *Baby K*, 16 F.3d at 597 ("EMTALA does not provide an exception for stabilizing treatment physicians may deem medically or ethically inappropriate.").  And—once again—doctors, including those practicing in Texas, Carpenter Decl. ¶ 15, have long understood "necessary stabilizing treatment" to include pregnancy termination in certain emergency circumstances.

When Congress makes clear that a state's acceptance of federal funds requires agreement to certain conditions, the parameters of those conditions can permissibly be set out in agency interpretations, guidance, or regulations.  For example, in *Bennett*, the Supreme Court upheld a statutory scheme—Title I of the Elementary and Secondary Education Act of 1965—where "the

36

Federal Government simply could not prospectively resolve every possible ambiguity concerning particular applications of the [statute's] requirements." 470 U.S. at 669. The Court emphasized that "[t]he fact that Title I was an ongoing, cooperative program meant that grant recipients had an opportunity to seek clarification of the program requirements," *id.*, and that "if the State was uncertain" as to its obligations, "it could have sought clarification" from the agency. *Id.* at 672. Here, EMTALA's terms are perfectly clear on their face—stabilizing treatment must be offered to a patient with an emergency medical condition. It is an undeniable medical fact that abortions are sometimes the stabilizing treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition" occurs before transfer or discharge. 42 U.S.C. § 1395dd(e)(3); *see also* Carpenter Decl. ¶¶ 6–15. "Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the [S]tates that funding is conditioned upon compliance with certain standards." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005).

Texas's coercion claim also fails. Although in rare cases "the financial inducement offered by Congress" may be "so coercive as to pass the point at which 'pressure'" to participate in a federal spending program "'turns into compulsion,'" *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012), this is not such a case. While Texas argues that its state-run hospitals could be forced to choose between performing EMTALA-mandated abortion care or facing the loss of billions in Medicare, Medicaid, and CHIP funding, Pls.' Mem. 20–21, the possibility that CMS may "impose a [lesser] penalty that is proportionate to the breach . . . saves the [Guidance] from Tenth Amendment challenge." *West Virginia v. HHS*, 289 F.3d 281, 292–93 (4th Cir. 2002). Moreover, if Texas-run hospitals do not wish to provide the EMTALA care that Congress required, they have a third option: to withdraw from Medicare alone. Although Texas claims that it receives $30 billion per year in Medicaid funds and that hospitals throughout the state collect another $16 billion in Medicare revenues, Pls.' Mem. 21, Plaintiffs' brief is studiously silent about the amount of *Medicare* revenues that Texas's only two *state-run* hospitals receive per year. But their declaration from the General Counsel of those hospitals reveals that, in fiscal year 2022, they have collected just $148 million in federal Medicare and Medicaid funding together. Bentley Decl. ¶ 7. And even that overstates the relevant figure, as it is only *Medicare*

funding that Texas's state-run hospitals would lose if they opted out of the program.  But regardless, that amount is orders of magnitude smaller than the numbers Texas cites—far from the sort of "gun to the head," *NFIB*, 567 U.S. at 581, that could raise coercion concerns.[6]

### E.     The Guidance Does Not Violate the Tenth Amendment

Plaintiffs' Tenth Amendment appears to rest on the mistaken notion that, after *Dobbs*, *only* the states may regulate abortion, because it is a matter of "health and safety" that has historically been of local concern.  Compl. ¶¶ 78–79.  But as the Supreme Court has explained, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."  *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Benning v. Georgia*, 391 F.3d 1299, 1308 (11th Cir. 2004) (where an "enactment . . . is within an enumerated power of Congress . . . the Tenth Amendment does not apply"); *see Dobbs*, 142 S. Ct. at 2305 (Kavanaugh, J., concurring) ("The Constitution . . . leaves the issue for the people and their elected representatives to resolve through the democratic process in the States *or Congress*." (emphasis added)).  Thus, the only question is whether EMTALA is a valid exercise of Congress's Article I spending power, which it unquestionably is.  *See, e.g.*, *Jones*, 786 F. Supp. at 547 (EMTALA is a valid exercise of the Spending Clause, thus posing no Tenth Amendment problem); see also *South Dakota*, 483 U.S. at 210 (a "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants").

### F.     EMTALA Does Not Violate the Non-Delegation Doctrine

Plaintiffs' non-delegation claim is meritless.  So long as Congress provides "an intelligible principle to which" the agency "is directed to conform, such legislative action is not a forbidden

---

[6] Plaintiffs cite no support for their mistaken contention, Pls.' Mem. 21, that "the Spending Power . . . can only *induce* States to change their own laws," but cannot "preempt State law."  *See, e.g.*, *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000) ("Missouri's sovereign immunity statute is in direct conflict with [EMTALA].  The supremacy clause . . . therefore dictates that Missouri's sovereign immunity statute must yield."); *Baby K*, 16 F.3d at 597 ("state action must give way to federal legislation where a valid 'act of Congress, fairly interpreted, is in actual conflict with the law of the state.");  *Jones v. Wake Cnty. Hosp. Sys., Inc.*, 786 F. Supp. 538, 547 (E.D.N.C. 1991) (upholding EMTALA as a valid exercise of the Spending Clause).

delegation of legislative power." *J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). EMTALA easily clears that low bar. The Supreme Court has not invalidated a statute on nondelegation grounds since 1935, and in the meantime, it has repeatedly upheld broader and less specific delegations than the one here, including one to "protect the public health." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475–76 (2001). EMTALA's directive that hospitals that participate in Medicare be required to "stabilize" individuals experiencing "emergency medical conditions," 42 U.S.C. § 1395dd(b)(1), with those terms carefully defined, *id.* § 1395dd(e)(1), (3), and enforcement authority assigned to CMS, *id.* § 1395dd(d), amply satisfies this requirement. *See, e.g., Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 447 (5th Cir. 2020) (rejecting nondelegation challenge under existing Supreme Court precedent, because it is not the province of the lower courts to "reexamine or revive the nondelegation doctrine"), *cert. denied*, 141 S. Ct. 2746 (2021).

### G.   CMDA's RFRA and Free Exercise Claims Lack Merit

CMDA's RFRA claim likewise fails. RFRA provides that the federal government "shall not substantially burden a person's exercise of religion" unless it "demonstrates that application of the burden to the person" "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). CMDA's claim founders at each step.

First, its assertion of a substantial burden hinges on the fundamental misconception that the Guidance requires physicians to perform "elective abortions," Pls.' Mem. 23. As discussed, that is decidedly not what the Guidance requires. It notes that, where an abortion is the stabilizing treatment "necessary to resolve" an emergency medical condition, the physician must offer that treatment. Guidance at 1. These are decidedly not "elective abortions"—as explained by several of Defendants' declarants, including Dr. Carpenter, ¶ 17, hospital emergency departments do not provide pregnancy termination outside the context of a medical emergency, and a patient requesting such a procedure in a non-emergency situation would be turned away. Plaintiffs' contrary understanding forms a faulty foundation around which their RFRA argument collapses.

Second, CMDA has not shown that performing abortions in the limited circumstances described in the Guidance would "substantially burden" *any* person's religious exercise, let alone that of its members. *See* 42 U.S.C. § 2000bb-1(a). Their declarations, *see* Pls.' Mem. 22 & n.34, do not identify any particular person who claims a burden on his religious exercise from the Guidance. The CMDA declarant testifies about the position of the organization, not its members; but it is only the members that are subject to EMTALA. Barrows Decl. ¶¶ 7, 10, Pls.' App'x 24. And the AAPLOG declarant—on whom Plaintiffs mistakenly rely, given that their RFRA claim is pled only as to CMDA, *see* Am. Compl. ¶¶ 45–55—provides only hearsay about the supposed beliefs of its unidentified, undifferentiated members, Harrison Decl. ¶ 7, Pls.' App'x 17, and indicates that those members oppose only "elective" abortions. The three individuals' declarations—which are substantively identical—also are deficient. To start, they offer scant detail about the declarants' actual religious beliefs. Each declarant asserts only that he "share[s] the views" of his respective membership association and (as to Drs. Hutzler and Valley only) of the Catholic Church concerning "abortion and the medical treatment that is appropriate for women and their unborn children." Hutzler Decl. ¶ 5 Pls.' App'x 30; Valley Decl. ¶ 6, Pls.' App'x 33; Foley Decl. ¶ 5, Pls.' App'x 33. Critically, not one of the three declarants states—or even implies—that it would violate his religious beliefs to perform an abortion in a situation where it is deemed necessary to stabilize an emergency medical condition, as specified by the Guidance. Their vague speculation that the Guidance "could" be enforced in a way that is inconsistent with their unspecified beliefs falls far short of proving a substantial burden on religious exercise, particularly where Plaintiffs misunderstand the Guidance to require "elective" abortions.

But even if CMDA had demonstrated a substantial burden on religious exercise, it has not shown that the Guidance violates RFRA as applied to any Plaintiff physician. *See* 42 U.S.C. § 2000bb-1(b). The Guidance does not purport to displace RFRA or to state that RFRA does not apply in this context. In any actual controversy about whether a physician's EMTALA duties substantially burden the physician's religious beliefs, a court could determine that there were less-restrictive means of advancing the compelling interest in ensuring the provision of critical stabilizing care for pregnant

40

patients with emergency conditions that jeopardize their health or life.  42 U.S.C. § 1395dd(b); *see also Austin v. U.S. Navy SEALs 1-26*, 142 S. Ct. 1301, 1305 (2022) (mem.) (Alito, J., dissenting) (government has a "compelling interest in minimizing any serious health risk"); *Simopoulos v. Virginia*, 462 U.S. 506, 511 (1983) (government has a "compelling interest in maternal health").  But there is no basis to enjoin this Guidance simply because some application of EMTALA could conceivably conflict with RFRA in certain factual contexts.  Indeed, the sole CMDA member-declarant does not assert that he would never provide ETMALA-required abortion care.  And, notably, even if CMDA were to succeed on its RFRA claim, it could not obtain the broad injunction against any enforcement of the Guidance it seeks, because RFRA claims require individualized analysis, as discussed above.  See *supra* Part I.A.4 (discussing associational standing).

Finally, though unmentioned in Plaintiffs' motion for preliminary relief, their Amended Complaint also brings a claim under the Free Exercise Clause.  Am. Compl. ¶¶ 145–55.  That claim also fails.  Because the Guidance is neutral and generally applicable, it need not be justified by a compelling interest to satisfy the Free Exercise Clause.  *See Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872 (1990).  And the Guidance satisfies rational basis review because it is at least "rationally related" to the "legitimate . . . interest" of stabilizing pregnant patients with an emergency medical condition.  *Id.*; *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (noting that the Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny").  Thus, CMDA's Free Exercise claim would fare no better than its RFRA one, even if it had been pressed in Plaintiffs' motion.

## III.   THE EQUITIES TILT DECISIVELY AGAINST INJUNCTIVE RELIEF

The remaining requirements for issuance of a preliminary injunction—the balance of harms and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—also tilt sharply against the issuance of injunctive relief.

As discussed, the relief that Plaintiffs seek—invalidation of the Guidance and an injunction against its "enforcement"—would not remedy any concrete injury, much less irreparable harm.  *See*

*supra* Part I.A.1.  The Guidance simply apprises the public of CMS's views about the meaning of the statute—no more, no less.  If CMS were ever to initiate administrative enforcement proceedings against Plaintiffs, they would be based on an alleged violation not of the Guidance, but of the statute itself, which Plaintiffs have elected not to challenge.  And the statute is separately enforceable through private suits for damages, 42 U.S.C. § 1395dd(d)(2)(A)–(B), on which the requested relief would have no effect.

On the other side of the scale, the requested injunction would quite plainly harm Defendants and disserve the public interest.  It would directly interfere with the agency's ability "to advise the public of [its] construction of the statutes and rules which it administers," *Perez*, 575 U.S. at 92—a common function of administrative agencies that has long been considered beneficial.  And rather than create clarity, it would sow confusion—depriving the public of the agency's views about the statute's meaning, and leaving regulated parties less sure about the circumstances under which the agency would consider taking enforcement action, in the event an EMTALA complaint were ever filed against them.  And to the extent that Plaintiffs mean to suggest that the Court should not only enjoin the Guidance, but also issue an order purporting to preclude Defendants from relying on the legal understanding set forth in the Guidance in any administrative enforcement proceedings—relief they do not expressly request, and that would be outside the Court's authority, *see supra* at 13—the harm would be that much clearer, as such an injunction would not only intrude on the Article II power, but increase the risk that pregnant patients would be denied the life-and-heath-saving care that Congress required in EMTALA.

Thus, on balance, the equities and public interest weigh decidedly against the issuance of injunctive relief.

## IV.    ANY RELIEF SHOULD BE APPROPRIATELY LIMITED

If the Court disagrees with Defendants' arguments, any relief should be no broader than necessary to remedy any irreparable harm demonstrated by specific Plaintiffs.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to

provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  Here, any injunctive relief should be limited, at most, to facilities owned and operated by Texas, and any members of AAPLOG and CMDA who have shown irreparable harm. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," *Gill*, 138 S. Ct. at 1933–34 (citation omitted), and Plaintiffs have no cognizable interest in an injunction that would reach beyond the parties before the Court.  *See also Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) ("universal injunctions are legally and historically dubious"); *Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022) (Sutton, C.J, concurring) (recognizing that nationwide injunctions likely exceed the remedial powers of federal courts).

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs' motion for a temporary restraining order and preliminary injunction, and grant Defendants' Motion to Dismiss.

Dated:  August 15, 2022                           Respectfully Submitted,

                                                  BRIAN M. BOYNTON
                                                  Principal Deputy Assistant Attorney General

                                                  BRIAN D. NETTER
                                                  Deputy Assistant Attorney General

                                                  JENNIFER D. RICKETTS
                                                  Director, Federal Programs Branch

                                                  ERIC B. BECKENHAUER
                                                  Assistant Branch Director

                                                  */s/  Christopher R. Healy*                    .
                                                  CHRISTOPHER R. HEALY
                                                  ALEXANDER N. ELY
                                                  KATE TALMOR
                                                  Trial Attorneys
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street NW, Washington, DC 20005
                                                  Tel: (202) 514-8095; Fax: (202) 616-8470

Christopher.Healy@usdoj.gov
alexander.n.ely@usdoj.gov
kate.talmor@usdoj.gov

*Counsel for Defendants*