# Defendants' Appendix

| Exhibit | Description | Page Nos. |
|---------|-------------|-----------|
| A | Dr. Carpenter Declaration | 1-12 |
| B | Dr. Peaceman Declaration | 13-20 |
| C | Dr. Haider Declaration | 21-29 |
| D | Dr. Nordlund Declaration | 30-38 |

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his Official Capacity as Secretary, Department of Health of Human Services, et al., <br><br> Defendants. | Civil Action No. 5:22-cv-00185-H |

<u>DECLARATION OF ROBERT JAMES CARPENTER, JR, MD, JD</u>

I, Robert James Carpenter Jr, declare under penalty of perjury as follows:

1. I am a board-certified obstetrician gynecologist (OB/GYN) and sub specially trained maternal fetal medicine (MFM) physician who practices in Houston, Harris County, Texas. I specialize or have specialized in, among other aspects of care, management of complicated pregnancies and emergency assessment and management of pregnant women. I have hospital privileges at Houston Methodist Hospital, Texas Children's Hospital's Pavilion for Women, Baylor St. Luke's Medical Center (BSLMC), Ben Taub General Hospital, and Woman's Hospital of Texas. All these hospitals other than BSLMC have active labor and delivery services and treat women with serious complications of pregnancy in the general emergency room or in the obstetrical evaluation suite. Depending upon gestational age, a patient may be directed to the general ER or directly to the labor and delivery

observation/ emergency management area. Unless otherwise stated, the facts set forth herein are based on my own personal knowledge or facts I have learned in the course of my practice and related duties.

2. I graduated from Baylor College of Medicine in Houston, Texas (BCM) in May 1973 and subsequently completed my residency in general obstetrics and gynecology at the Baylor University affiliated hospitals in June 1977. I subsequently completed a two-year fellowship in maternal fetal medicine at the Baylor Affiliated hospitals with additional specialized training in obstetrical ultrasound at Yale University in the fall of 1977. I am board certified in both general obstetrics and gynecology and in the subspecialty of maternal fetal medicine by the American Board of Obstetrics and Gynecology.

3. I have practiced in Houston, Texas at the hospitals listed above since 1979, following completion of my fellowship in maternal fetal medicine. I have served on multiple hospital committees and positions of leadership within these various hospitals.

4. I have been actively involved in resident and fellow training over most of these last 43 years and am knowledgeable of training requirements in preparation of OB/GYN residents in the practice of obstetrics. I actively teach OB/GYN residents and medical students within one or more of these hospitals.

5. Over the course of my 44 years of obstetrical practice, following completion of my OB/GYN residency I have treated thousands of pregnant women, delivered thousands of healthy and sick fetuses, done in utero fetal therapy on countless babies at risk for intrauterine fetal death or other adverse outcomes, and actively

consulted with patients concerning both normal and abnormal pregnancies complicated by maternal medical disorders including insulin-dependent diabetes, maternal cardiac disease, various forms of maternal renal disease, including those related to advanced renal dysfunction from chronic hypertensive disorders, lupus erythematosus and other collagen vascular diseases, and many other medical disorders.

6. I am familiar with the standard of medical care expected for a reasonable obstetrician with training like that of residents throughout the United States who subsequently practice obstetrics and gynecology. I am familiar with the standards that should be applied to those patients who present to either the general emergency room or to the specialized labor and delivery obstetrical observation area who have complications of pregnancy including, but not limited to, threatened abortion, imminent abortion, septic abortion, or preterm premature rupture of membranes (PPROM) both prior to and following fetal viability. Included in that assessment are the respective tests that should be performed to determine whether a potential life-threatening infection is present or, with respect to hypertensive disorders of pregnancy and severe cardiac disease, whether serious maternal organ dysfunction or permanent injury may result from delayed care. I also am familiar with the federal law known as EMTALA and the obligations it places on physicians practicing in hospitals participating in Medicare. I am aware that EMTALA requires that "If any individual … comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—(A) with the staff and facilities available at the hospital, for

such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility" in accordance with certain requirements set forth in the statute. A hospital may not discharge or otherwise transfer a person with a medical condition who has not been stabilized unless the individual requests a transfer or a physician certifies that the benefits of a transfer to another medical facility outweighs the increased risks to the patient.

7. I am aware that EMTALA defines "emergency medical condition" as "(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part; or (B) with respect to a pregnant woman who is having contractions—(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child." I also am aware that EMTALA defines "to stabilize" to mean "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility."

8. During my medical career, I have treated patients experiencing a variety of complications that fall within EMTALA's definition of "emergency medical

condition." In some circumstances, the necessary treatment to stabilize an emergency medical condition is termination of the pregnancy.

9. For example, prior to 22-24 completed weeks of pregnancy, there are cases where one or more specific medical complications of pregnancy may occur which require initiation of labor and/or termination of the pregnancy to preserve the life or health of the mother. Medical ethics (as well as EMTALA, for covered patients with emergency medical conditions) require physicians to follow detailed informed consent provisions and shared decision-making by the mother and/or other appropriate family members. These interventions with termination of pregnancy are not performed as an elective procedure because of non-desire of the pregnancy; in fact, none of the hospitals in which I practice provide any elective abortions where there is no medical necessity. Instead, the pregnancy terminations provided are a direct result of maternal medical complications which may cause severe maternal infection or deterioration of maternal status because of worsening medical diseases that commonly afflict the pregnant woman.

10. One of the most common circumstances that occurs in the Houston area, as elsewhere, is premature rupture of membranes (PPROM), which is when the amniotic sac surrounding the embryo or fetus ruptures at a pre-viable gestational age, and the uterus or embryo/fetus can become infected. That condition warrants immediate medical intervention, requiring physicians to discuss options with the patient or family member, regarding continuation/expectant management of the pregnancy versus immediate or almost immediate induction of labor because an infection can progress to sepsis wherein multiple body organs and functions can

fail, including the heart and lungs. A septic infection can progress quickly, and a physician cannot know with reasonable certainty if or when the sepsis will result in organ failure or death without immediate treatment. Septic infection is an emergency under EMTALA because it places the patient's life and health in jeopardy or can cause serious impairment; if left untreated, it can cause cardiac arrest or kidney failure. If a patient does not respond promptly to antibiotics to control the infection, then removal of the source of the infection is needed— meaning that necessary treatment could include immediate evacuation of the uterus, resulting in fetal demise. In this circumstance I would consider termination to be the necessary stabilizing treatment under EMTALA because, without this care, death or severe bodily dysfunction is the reasonably probable outcome.

11. Having dealt with, stabilized, and terminated pregnancies for many such patients over my 45 years of obstetrical practice as an OB/GYN and subspecialist in maternal fetal medicine, one cannot reliably predict the acuteness or timing of deterioration of an individual patient who presents with PPROM. Some patients present with evidence of serious infections on initial evaluation, and other patients who initially present with more mild infections worsen significantly, or progress to sepsis, within the first 24-36 hours after they arrive at the hospital. In some circumstances, immediate termination of pregnancy is required directly from the emergency room. Such events can include instances of incomplete abortion with sepsis, including when parts of the products of conception have passed through, or remain present within the vagina.

12. As another example, I treated a patient who presented at 17 weeks gestation with maternal blood pressure of 230/120 and fetal triploidy syndrome, which is a chromosomal abnormality where two sperm fertilize an egg resulting in 69 versus the normal 46 chromosomes we each carry, a condition that usually causes miscarriage early in pregnancy, and when the pregnancy continues, often causes preeclampsia. This patient had an emergency medical condition because of the severe preeclampsia she was experiencing and the condition, if allowed to continue, would likely have led to intracranial hemorrhage, congestive heart failure, liver failure, or other severe problems such as HELLP (Hemolysis, Elevated Liver enzymes and Low Platelets) syndrome, with its attendant complications. In this instance, the patient faced death or severe disability if she did not receive prompt treatment. I determined that termination of the pregnancy was the necessary stabilizing treatment to prevent death or severe disability.

13. In my medical career I have encountered many patients who presented with hypertensive emergencies, including pre-eclampsia. Pre-eclampsia is when new onset of high blood pressure and elevated protein levels in the urine develop in a pregnant patient, usually midway through the pregnancy. This condition can quickly progress to eclampsia, with the onset of seizures, and a physician cannot know with reasonable certainty when that progression to life-threatening seizures will occur in all cases, especially when blood pressure cannot be controlled. Pre-eclampsia and eclampsia are emergency medical conditions because they place the patient's life in danger or can cause serious impairment of bodily functions. Without treatment, these conditions are nearly certain to deteriorate, and can lead

to coma, kidney failure, stroke, or cardiac arrest. The only curative treatment for pre-eclampsia or eclampsia is delivery of the fetus, although in many cases, the pregnant patient may respond to medications to control blood pressure and mitigate these risks. However, when high blood pressure and/or seizures cannot be controlled, termination of the pregnancy is medically necessary because, without termination, death or severe dysfunction of the pregnant patient is the reasonably probable outcome.

14. In all these circumstances, as mentioned previously, appropriate informed consent and shared decision-making are mandated by both legal and medical ethical precepts, and EMTALA in appropriate circumstances. In many of these circumstances, the parents are as heartbroken at the potential for loss of the pregnancy as they are about the potential loss of maternal life. Having had patients die from one or more of these circumstances over these multiple decades, the clinical situation generates a realistic expectation that maternal death can and does occur, and that prompt/immediate medical intervention is required in these serious maternal conditions to comply with both medical ethical obligations and EMTALA obligations.

15. I have reviewed HHS's recent guidance entitled "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss," issued on July 11, 2022. I agree with the guidance that the "determination of an emergency medical condition is the responsibility of the examining physician or other qualified medical personnel" and that, in some instances, "abortion is the stabilizing treatment necessary to resolve that condition." Furthermore, I have

always understood EMTALA to require, in certain situations, termination of pregnancy as the stabilizing treatment necessary to address an emergency. The EMTALA guidance comports with my understanding of EMTALA's requirements.

16. I have reviewed the declarations submitted by the state, from doctors afraid that the EMTALA guidance will force them to provide "elective abortions," which they define as "the purposeful killing of the unborn in the termination of a pregnancy for no medical reason." See Harrison Decl. ¶ 18. They suggest that the Guidance would force a responsible OB/GYN to do what under Texas law would be a criminal procedure when an indicated medical procedure was not required.

17. This suggestion by the two medical groups who are co-litigants in this matter represent a situation which is far from the truth. In my experience, emergency rooms do not perform "elective abortions" where there is no medical necessity. I also do not believe the EMTALA Guidance would require an abortion where there is no medical necessity, because in that instance there would be no emergency medical condition. Instead, OB/GYNs across Texas seeing patients with such pregnancy complications will take into consideration the totality of the patient's presenting problems, physical and laboratory examination, and apply proper medical care to those patients, which in some instances will require termination of pregnancy, but only where medically necessary.

18. In a circumstance where a woman presents with an "incomplete abortion" (the medical term for what is commonly called a miscarriage, but may occur spontaneously or as a result of ingesting medication), an emergency medical condition may exist if the woman is experiencing heavy or uncontrolled bleeding,

which places her at risk of hemorrhage and, if left untreated, organ failure, or if the products of conception fail to pass, this could lead to a potentially life-threatening septic infection. I agree with Plaintiffs' declarants that intrauterine pregnancy is not, in and of itself, an emergency medical condition, but that does not mean that an incomplete abortion may not cause an emergency medical condition that requires appropriate intervention. Although failure of abortion-inducing medication, such as mifepristone, would not qualify as an emergency absent other symptoms, if a woman presents to an emergency department with heavy or uncontrolled bleeding, signs of developing infection, or certain other complications, those conditions would require medical care regardless of whether her condition resulted from a natural spontaneous abortion or because she previously ingested medication. Furthermore, the clinical symptoms of complications resulting from spontaneous abortion and medication-induced abortion are indistinguishable, the treating physician would not know whether the abortion was "self-induced" or natural unless the patient disclosed this information. Even if the physician knew the patient had ingested medication, it would be medically unethical and inappropriate to withhold care where an emergency does exist on the grounds that the woman had attempted a self-induced abortion. Completing the termination of pregnancy where an emergency medical condition, such as risk of hemorrhage or septic infection, exists would be medically necessary stabilizing treatment and would not be considered an "elective" abortion.

I declare under penalty of perjury under the laws of the State of Texas and of the United States of America that the foregoing is to the best of my knowledge true and correct.

Executed this 15th day of August 2022, in Houston, Harris County, Texas

Date    15-August-2022

_Robert J. Carpenter Jr._

Robert J. Carpenter, Jr. MD JD

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

STATE OF TEXAS *et al.*,

       Plaintiffs,

v.

XAVIER BECERRA, in his Official Capacity
as Secretary, Department of Health of Human
Services, et al.,

       Defendants.

Civil Action No. 5:22-cv-00185-H

## DECLARATION OF ALAN PEACEMAN, M.D.

I, Alan Peaceman, M.D., declare that the following statements are true and correct to the best of my knowledge and belief, and that they are based on my personal knowledge as well as information made known to me in the course of my medical practice. If called to testify as a witness in this matter, I could testify competently thereto.

1.      I am a board-certified Obstetrician-Gynecologist ("Ob-Gyn") physician and attending physician at Northwestern Memorial Hospital's Prentice Women's Hospital in Chicago, Illinois. I am also board-certified in the subspecialty of Maternal Fetal Medicine, the branch of Obstetrics that deals with high risk pregnancies. In my day to day practice, I participate in both inpatient and outpatient management of complicated pregnancies, which includes the emergency assessment and management of pregnant women. Northwestern's Prentice Women's Hospital is one of the highest volume maternity hospitals in the country, receiving referrals of patients with pregnancy complications from all over the Chicago area.

2.      I graduated from Baylor College of Medicine in Houston, Texas in 1981, and completed my residency in Obstetrics and Gynecology at the Medical College of Virginia in 1985. I then

completed a fellowship in Maternal Fetal Medicine at the University of Texas Health Science Center in Houston in 1989. Upon completion of this fellowship, I joined the faculty of the Northwestern University Feinberg School of Medicine in Chicago, where I have worked for the last 33 years, now holding the rank of Professor of Obstetrics and Gynecology.

3.      During my time at Northwestern, I have been active in teaching obstetrics to residents, fellows, and medical students. I have been an author on over 200 peer reviewed publications, including 13 published in the New England Journal of Medicine. I have lectured frequently on topics in high risk obstetrics both around the United States and internationally, and have been an oral examiner for physicians seeking board certification in Maternal Fetal Medicine for over 20 years. For the Prentice Women's Hospital, I have served as Chief of Maternal Fetal Medicine and also Chief of Obstetrics. In these roles I have been instrumental in developing protocols for patient management and programs for patient safety for the obstetric service which delivers over 10,000 patients each year. I have personally participated in the deliveries of over 3000 babies throughout my career. My patient care has included the frequent care of patients with emergencies which threaten the wellbeing of the mother and/or the fetus.

4.      I am aware that the EMTALA statute requires that providers treat and stabilize any patient who presents with an emergency medical condition. I am aware that EMTALA defines an emergency medical condition as: "(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or serious dysfunction of any bodily organ or part."

5.      I am aware that EMTALA defines "to stabilize" to mean "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility."

6.      As a practicing obstetrician and expert in the care of high-risk conditions, I know that pregnant patients experience a number of complications which fall within the definition of an emergency medical condition.  In situations such as those described below, absence of immediate treatment could reasonably be expected to result in placing the health of the mother in serious jeopardy.  When these situations arise, delay in treatment (which could include termination of the pregnancy) could be expected to increase the risk of serious impairment of maternal bodily functions or serious dysfunction of a bodily organ or part.

7.      Preeclampsia is a condition unique to pregnancy where the patient begins to experience elevated blood pressure, swelling, and protein leak from the kidneys.  Preeclampsia occurs in 5-8% of pregnancies, and is more common in women with underlying high blood pressure, diabetes, twins, first pregnancy, obesity, and older age.  Approximately 25% of patients experience severe features with their preeclampsia, which could include very elevated blood pressure and the risk of stroke, seizures, fluid in the lungs, kidney failure, liver dysfunction, and bleeding. Preeclampsia with severe features is an emergency medical condition under EMTALA. In some cases a patient's symptoms may respond to medications reasonably well to allow the pregnancy to progress to potential viability, but in many cases medication will fail to sufficiently mitigate the serious risk of death or bodily harm that would result if the preeclampsia progresses. The only way to reverse preeclampsia is to deliver the fetus, ending the pregnancy.  When these severe features are seen before fetal viability, the necessary stabilizing treatment to decrease the

risk to the health of the mother would be pregnancy termination. If termination of the pregnancy is not undertaken in a timely fashion, the patient's condition will continue to worsen, and will eventually evolve into organ failure, renal failure, stroke or other brain complications, and eventually maternal death. I understand, and have long understood, EMTALA to require necessary stabilizing treatment including termination of pregnancy in these instances. Worldwide, 10-15 percent of direct maternal deaths are associated with preeclampsia. At our institution, we see 1-2 patients a month who develop preeclampsia with severe features before fetal viability.

8. Premature rupture of membranes (PROM) is a situation where the membranes surrounding the fetus in the uterus ruptures before labor starts. The Society for Maternal Fetal Medicine defines previable PROM as an instance of PROM between 20-25 weeks gestation, occurring in 0.4% of pregnancies. When PROM occurs, amniotic fluid that surrounds the fetus is lost and the rate of complications increases significantly. Frequently seen complications include the development of infection in the fetus and the uterus, and placental abruption where a portion of the placenta comes loose from the uterine wall. When a patient presents with PROM and one or more of these complications, that patient has an emergency medical condition under EMTALA because the patient faces a risk of serious bodily impairment, dysfunction, or even death. I understand, and have long understood, EMTALA to require care in these circumstances, including termination of pregnancy. At our hospital, we see 2-4 patients each month with PROM at a gestational age before the time where a fetus could survive if born alive. If left undelivered, it is likely that the patient will develop one of these serious complications. If infection sets in and the fetus is not delivered, the mother will develop sepsis which could lead to cardiac and pulmonary failure, and eventually death. With placental abruption, the patient will begin to bleed. This

bleeding places the mother's health in serious jeopardy, and will continue until the fetus and placenta are removed from the uterus. Even if the pregnancy continues past the gestational age where some fetuses can survive, neonatal death from pulmonary hypoplasia (underdeveloped lungs) is very common as the amniotic fluid needed for lung development between 18-22 weeks gestation has been lost. The necessary stabilizing treatment under EMTALA for patients with PROM prior to fetal viability will often be pregnancy termination to protect the mother from the risk of serious bodily impairment or death that could occur from one of the above complications.

9.      Miscarriage in the first trimester is a common phenomenon, occurring in 15-20% of all recognized pregnancies, and in medical terminology is referred to as a spontaneous abortion. It can happen to any woman, unrelated to risk factors. Often, the first sign of impending miscarriage is the onset of vaginal bleeding. At this stage the condition is called a threatened abortion if ultrasound reveals that the fetus still has a heartbeat and is alive. In the process of a miscarriage, the next stage is referred to as an inevitable abortion. Here the fetus in still in the uterus and may still have a heartbeat, but the uterine cervix has begun to dilate. As the process continues, some fetal tissue will begin to pass through the cervix and is considered an incomplete abortion until the entire fetus and placental tissue are expelled from the uterus.

In some situations, the process is prolonged and the patient may present emergently to the hospital with bleeding. If examination reveals that the cervix is already dilated, the pregnancy has no realistic chance of continuing in this inevitable phase, even if a heartbeat can still be detected. With significant bleeding the patient is at risk for serious complications including excessive blood loss and need for transfusion. In such a case, the treating physician may conclude that removal of the fetal tissue will be necessary to stop the bleeding to stabilize the patient. Under those circumstances, I understand the EMTALA statute to require the treating

physician to remove the pregnancy from the uterus in this situation in order to stabilize the patient and protect her health.

10.     As stated previously, the EMTALA statute requires that providers provide necessary stabilizing treatment (or, under appropriate circumstances, transfer to a facility able to provide the necessary treatment) to any patient who presents with an emergency medical condition. If a woman presents to an emergency room and requests an elective abortion, meaning a pregnancy termination when no emergency condition exists, EMTALA does not require a treating physician to provide this service. In my experience, emergency rooms currently do not provide this treatment option to patients, and there is no reason to believe that they would need to in the future.

11.     I have reviewed the declarations submitted by the American Association of Pro-Life Obstetricians and Gynecologists and Christian Medical and Dental Association members in this suit, expressing their fears that HHS's recent Guidance on EMTALA will force providers to complete "elective abortions" where a woman has attempted, but not completed, a self-managed abortion. I agree with these declarants that intrauterine pregnancy, by itself, is not an emergency medical condition. But if a patient presents with symptoms of a miscarriage, the provider would not be able to distinguish between an ongoing natural, spontaneous miscarriage and instances where a woman has attempted to self-induce abortion by ingesting medication unless she chose to disclose that information. In this situation, an evaluation should be performed regardless whether she previously took medication such as mifepristone, with or without misoprostol. The failure of those medications to terminate a pregnancy is not, in and of itself and without other symptoms, an emergency medical condition. But if the patient is exhibiting symptoms such as hemorrhage, which threatens the health or life of the patient, that patient would be presenting

with an emergency medical condition. Under EMTALA, the provider would be required to stabilize the patient experiencing an emergency medical condition, even if it were to require evacuating the uterus with a fetal heart beat still present. In this situation, providing this care is no longer elective or based on a desire to terminate the pregnancy, but based on medical necessity to prevent death or serious bodily dysfunction. However, if the self-induced abortion has not completed and there is no such medical emergency, my understanding of the EMTALA statute is that the provider would not be required to end the pregnancy by any means.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of August, 2022 in Chicago, Illinois.

Alan M. Peaceman, MD

20

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS;
AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS & GYNECOLOGISTS; and
CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,

Plaintiffs,

v.                                                          Civil Action No. 5:22-CV-00185

XAVIER BECERRA, in his official capacity
as Secretary of Health and Human Services;
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; CENTERS
FOR MEDICARE & MEDICAID SERVICES (CMS);
KAREN L. TRITZ, in her official capacity as Director
of the Survey and Operations Group for CMS;
DAVID R. WRIGHT, in his official capacity as
Director of the Quality Safety and Oversight
Group for CMS,

Defendants.

---

## DECLARATION OF SADIA HAIDER, MD

I, Sadia Hader, declare under penalty of perjury that the following statements are true and correct

to the best of my knowledge and belief, and that they are based on my personal knowledge as well as

information learned through my work and professional activities.

1. I am a board-certified Obstetrician-Gynecologist ("Ob-Gyn") physician and currently serve as an
   Associate Professor of Obstetrics and Gynecology at Rush Medical College, Rush University in
   Illinois.  I make this declaration solely in my personal capacity.

2. I earned my medical degree from the University of Chicago Pritzker School of Medicine in 2001
   and a Master's in Public Health from Harvard University in Maternal and Child Health the same
   year.  I interned at the Beth Israel Deaconess Medical Center in Obstetrics and Gynecology from

2001 to 2002 and completed my residency in Obstetrics and Gynecology at the same hospital from 2002 to 2005. From 2005 to 2007, I completed a clinical/research fellowship at the University of California, San Francisco in clinical epidemiology and a fellowship in family planning.

3. Before undertaking my current position, I served as a clinical instructor of obstetrics, gynecology, and reproductive sciences at Harvard Medical School from 2002 to 2006, as an instructor of obstetrics, gynecology, and reproductive sciences at the University of California, San Francisco from 2005 to 2007, as an assistant professor of obstetrics, gynecology, and reproductive biology at Harvard Medical School from 2007 to 2011, as an assistant professor (tenure-track) of obstetrics and gynecology at the University of Illinois at Chicago from 2011 to 2017, as a clinical faculty member at the University of Illinois School of Public Health, Maternal and Child Health from 2014 to 2017, and as an associate professor in the Department of Obstetrics and Gynecology at the University of Chicago from 2017 to 2021.

4. I am the President-Elect of the Society of Family Planning Board of Directors, a member of the American Board of Obstetrics and Gynecology Complex Family Planning Division, and a member of the American College of Obstetricians and Gynecologists. I have written dozens of journal articles and made numerous oral presentations regarding obstetrics and gynecology, family planning, and pregnancy.

5. Based on my experience as a medical practitioner, my academic research, and my professional activities, I know that pregnant patients experience a number of medical conditions that, in the absence of immediate medical attention would place the patient's health in serious jeopardy or result in serious impairment or damage to their bodily functions or organs. I also know that the appropriate stabilizing treatment for these conditions often, and in some cases always, involves the evacuation of the uterus, and/or termination of a pregnancy.

6. In the medical context, the term "abortion" refers to the removal for any reason of pregnancy tissue or an embryo or fetus from the uterus. Abortions can be spontaneous (as in a miscarriage or

early pregnancy loss), inevitable (as in a premature rupture of membranes or an incomplete abortion) and induced (as in medication or procedural abortion), but in all cases, a uterus is evacuated or emptied, and products of conception are removed.

7. Abortion care is and has been provided as a stabilizing treatment in situations where pregnant patients present in an emergency situation, and doctors have long understood that EMTALA has provided the framework for providing this care for doctors in an emergency setting (whether that is the emergency department, a labor and delivery ward, or another location in which a pregnant patient may present for emergency care) for decades.   Doctors do understand—and have understood—that EMTALA requires providing care that sometimes results in the termination of a pregnancy.   In many cases, a patient's health is under significant known threat, but it is impossible to predict with certainty whether or when a particular patient will die or suffer serious bodily injury without stabilizing treatment.

8. Based on my experience as a medical practitioner, and as a researcher, I am aware that pregnant patients experience a number of medical emergencies that doctors understand to fall with the definition of "emergency medical condition" under EMTALA.   Each of these conditions, as evidenced by various constellations of signs and symptoms, can be expected, without appropriate stabilizing treatment, to result in serious risk to a patient's health, bodily functions and/or organs. In each of these conditions, the appropriate stabilizing treatment that is necessary to prevent harm to the pregnant person's health, bodily functions and/or organs, may be treatment that is covered by the term "abortion."   Doctors understand that EMTALA requires providing such care in cases where it is necessary to stabilize the patient whether or not a patient is at imminent risk of death, because the failure to provide such care can and does lead to death or serious bodily injury in a significant percentage of patients.   Given the unpredictable and multifactorial nature of clinical outcomes, it is difficult, and potentially dangerous, to try to predict which patients will be among that percentage and when or how quickly the patient will get worse.

9. For example, a pregnant patient may present to an emergency room with severe headache and markedly elevated blood pressure and be diagnosed with preeclampsia with severe features. Pre-eclampsia, characterized by high blood pressure accompanied by high levels of protein in the urine or signs of stress on other organs, can develop rapidly in a pregnant patient, and usually occurs midway through the pregnancy. Without proper treatment, pre-eclampsia can progress to eclampsia (the presence of seizures) and potentially stroke, especially with patients whose blood pressure cannot be controlled. A physician cannot discern with reasonable medical certainty when patients suffering from pre-eclampsia will deteriorate and experience seizures. However, without treatment for pre-eclampsia/eclampsia, a patient is nearly certain to deteriorate, including the development of coma, kidney failure, stroke and cardiac arrest.

10. The only treatment for pre-eclampsia or eclampsia is delivery of the fetus and placenta. In some cases, a patient will respond reasonably well to medications to control blood pressure, reducing their chances of severe organ damage, seizures, and stroke, thus allowing the pregnancy to continue for a period of time. However, the only intervention that will ultimately lead to resolution of pre-eclampsia or eclampsia is delivery, which may involve termination of the pregnancy to avoid death or severe bodily dysfunction, depending on the gestational age. A physician may not be able to establish or know, with certainty, that termination of the pregnancy is necessary to prevent the immediate death of the mother. But without providing the accepted, evidence-based, medically-sound treatment for these emergency conditions, a patient's life and health is seriously jeopardized. It is my understanding that EMTALA does not permit a physician to withhold this potentially lifesaving care until a patient's death is imminent or otherwise to await severe decompensation before intervening.

11. As a second example, a pregnant person may present with a life-threatening infection of the uterine contents. This can occur when there is a preterm premature rupture of membranes (PPROM), which can lead to an infection in the uterus or embryo or fetus (termed "chorioamnionitis"). Without appropriate treatment, chorioamnionitis can progress to sepsis,

resulting in multi-organ failure and eventual death.  Sepsis can proceed quickly, and no physician can know with reasonable medical certainty if or when a patient will get worse without appropriate, immediate treatment. In a patient with chorioamnionitis, the removal of the source of infection is the only appropriate treatment, which can result in embryonic or fetal demise.

12. In another potential scenario, a patient with a pre-viable pregnancy may present to an emergency department, or be admitted through the labor and delivery ward, with chest pain and severe shortness of breath, requiring supplemental oxygen to keep their blood oxygen levels within a safe range.  These symptoms can be caused by pulmonary hypertension and can lead to cardiovascular collapse.  Severe heart and lung failure caused by pulmonary hypertension or a pulmonary embolism is an emergency medical condition because, if left untreated, the patient's condition will deteriorate and a patient's life will be placed in danger.  Similarly, a patient may present with cardiovascular arrest or myocardial infarction.  In some cases, appropriate stabilizing treatment may involve treatment with medications to maintain blood pressure.  But in some circumstances, a patient may continue to deteriorate, and a physician may determine, based on their medical training, experience and judgment, that the immediate termination of the pregnancy is medically necessary to improve a patient's response to treatment and to avoid death or impairment of bodily organs such as the lungs, heart and kidneys.

13. In another common scenario, a patient may present to an emergency department or be admitted to a labor and delivery ward with vaginal bleeding.  Vaginal bleeding can be caused by multiple sources, including: (i) placental abruption; (ii) an ongoing spontaneous abortion; or (iii) an incomplete medication abortion where products of conception still remain in the uterus.

14. Placental abruption occurs when the placenta partially or totally separates from the inner wall of the uterus.  Placental abruption with uncontrolled bleeding can lead to shock, organ dysfunction such as kidney failure, and cardiac arrest.  Placental abruption is diagnosed in an emergency setting primarily through a physical examination and monitoring; ultrasound may be potentially helpful to determine the location of the bleeding.  If the bleeding cannot be controlled, a

physician may decide, based on their medical training, experience and judgment, that the necessary stabilizing treatment includes removal of the embryo or fetus, or the uterus as a whole. In either of these situations, the pregnancy is terminated. Absent the appropriate, medically-accepted and evidence-based treatment, a patient will deteriorate and death or severe bodily harm is a reasonably probable outcome.

15. Uncontrolled bleeding can also be caused by an ongoing spontaneous or a medication-induced abortion. In these cases, embryonic or fetal cardiac activity may still be detectible. If the bleeding cannot be controlled, a physician may decide, based on their medical training, experience and judgment and consistent with appropriate treatment guidelines,[1] that the necessary stabilizing treatment includes removal of the embryo or fetus. These situations, often termed inevitable abortions, when accompanied by uncontrolled bleeding, are commonly treated via uterine aspiration (which is the same procedure as that used for the majority of abortions other than medication abortions) or dilation & curettage. Absent that treatment, a patient may deteriorate and death or severe bodily harm is a reasonably probable outcome.

16. I have reviewed the declarations submitted by members of the American Academy of Pro-Life Obstetricians and Gynecologists (AAPLOG) and the Christian Medical and Dental Association (CMDA) in this case, including the assertion that "Intrauterine pregnancy itself is not an acute condition requiring any immediate intervention under EMTALA, and thus does not fit the criteria for EMTALA intervention. Intrauterine pregnancy is a normal bodily function." See Harrison Decl. ¶ 17.

17. I agree that intrauterine pregnancy *itself* is not an emergency medical condition. In addition, a case where medication has been ingested to induce an abortion but has failed to produce that outcome would not necessarily be an emergency medical condition, absent complications. However, where a patient presents to an emergency department with threatened or inevitable

---

[1] https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2018/11/early-pregnancy-loss

abortion including severe complications, such as moderate to severe vaginal bleeding, that may constitute an emergency medical condition under EMTALA, regardless whether the emergency occurred spontaneously or as a result of ingestion of medication. In fact, the clinical presentation of these symptoms would be indistinguishable and the treating physician would not know whether the precipitating event was ingestion of medication or spontaneous abortion, unless the patient disclosed this to the physician. Where a patient is experiencing moderate to severe bleeding, there is a threat of hemorrhaging which could place the life or health of the patient in serious jeopardy, or risk serious impairment to bodily functions or parts, and in these circumstances an abortion may be medically necessary regardless of whether the patient previously ingested abortion-inducing medication. But that care would be required to treat an emergency medical condition and thus would not be considered elective because the care is being provided as a matter of medical necessity.

18. I am familiar with what has been described as "abortion reversal," in which a patient who previously ingested an abortion-inducing medication is given the hormone progesterone in an attempt to "reverse" the abortion in process. Based on all available peer-reviewed literature, in no circumstances is it medically-appropriate to treat a pregnant patient that presents in the process of a spontaneous or medication abortion with progesterone in order to "reverse" or stop the abortion process.  This practice is not based on science, lacks any evidentiary support, and does not meet clinical standards.  In fact, there are no scientifically sound studies that support the use of progesterone to stop or reverse an ongoing spontaneous or medication abortion.  The only study of the use of progesterone in ongoing abortions that did follow established scientific protocols in a controlled, institutional review board (IRB)-approved setting was ended early due to safety concerns about an increased risk of hemorrhage among participants.  The American College of Obstetricians and Gynecologists (ACOG) explicitly does not support prescribing progesterone to

stop a medication abortion.[2]  The scientific evidence that does exist indicates the use of progesterone increases the risk of hemorrhage in patients in the process of a medication abortion. The use of progesterone during an ongoing or inevitable abortion with uncontrolled bleeding is ethically irresponsible, dangerous, and is not a generally accepted or evidence-based treatment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2022

Sadia Haider MD, MPH

---

[2] https://www.acog.org/advocacy/facts-are-important/medication-abortion-reversal-is-not-supported-by-science

29

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br>         Plaintiffs, <br><br>    v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al.*, <br><br>         Defendants. | Civil Action No. 5:22-cv-00185-H |

## <u>DECLARATION OF DR. DIANA B. NORDLUND, DO, JD, FACEP</u>

I, Diana B. Nordlund, make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under the penalty of perjury the following is true and correct to the best of my knowledge and belief:

1.     I am a board-certified emergency medicine physician practicing emergency medicine with Emergency Care Specialists, PC in Grand Rapids, Michigan. In that capacity, I treat patients—including pregnant patients—on an emergency basis in five separate facilities, including: (1) Spectrum Health Butterworth Hospital, a level 1 trauma center, (2) Spectrum Health Zeeland Community Hospital, which has a 19-bed emergency department and an in-house obstetrics service, and (3) Spectrum Health Blodgett Hospital, which has a 27-bed emergency department and no obstetrics service. As a practicing emergency medicine attending physician for over 12 years, I am familiar with the requirements of the Emergency Medical Treatment and Labor Act (EMTALA). I submit this declaration in support of the Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter. Unless otherwise noted, the

1

facts set forth herein are true of my own personal knowledge, and if called as a witness to testify in this matter, I could and would testify competently thereto.

2.      I graduated from the Kirksville College of Osteopathic Medicine at A.T. Still University of Health Sciences as a doctor of osteopathic medicine in 2006. I subsequently completed my residency in Emergency Medicine at Metro Health Hospital (now U of M West) in 2010. I am board certified in Emergency Medicine by the American Osteopathic Board of Emergency Physicians.

3.      I also graduated *magna cum laude* from Cooley Law School (now Western Michigan University's Cooley Law School) in 2012. I am a member of the State Bar of Michigan and practice law with Nordlund Hulverson PLLC.

4.      After completion of residency, I practiced emergency medicine with Emergency Physicians Medical Group, PC, (now a subsidiary of Envision) from 2010-2013 at Lakeland HealthCare in St. Joseph, Michigan. From 2013-2017, I practiced emergency medicine with Emergency Medical Associates, PLLC (now dissolved) at the Sparrow Health System. Beginning in 2017 and continuing to present day, I practice emergency medicine as noted above, with Emergency Care Specialists, PC, at the Spectrum Health System.

5.      I currently serve as the Corporate Compliance Officer of Emergency Care Specialists, PC. I am a clinical faculty member of Michigan State University College of Human Medicine in East Lansing, Michigan and Central Michigan University in Mount Pleasant, Michigan. I am a fellow of the American College of Emergency Physicians and current President of the Michigan College of Emergency Physicians.

2

## The Practice of Emergency Medicine Under EMTALA

6.      As an emergency medicine physician, I understand that I have a legal obligation under EMTALA to screen patients who present to the Emergency Department of a qualifying hospital (including all of those at which I work) and request treatment, have treatment requested upon their behalf (if they do not have the legal capacity to request treatment for themselves), or are unconscious/otherwise unable to request for themselves and appear to be or are reasonably likely to be experiencing an emergency medical condition.  42 U.S.C. § 1395dd(a).  I understand that federal law defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, **(ii)** serious impairment to bodily functions, or **(iii)** serious dysfunction of any bodily organ or part."  *Id.* § 1395dd(e)(1)(A).  With respect to a pregnant woman experiencing contractions, an emergency medical condition can also exist where "there is inadequate time to effect a safe transfer to another hospital before delivery," or "transfer may pose a threat to the health or safety of the woman or the unborn child."  *Id.* § 1395dd(e)(1)(B).

7.      I also understand that if I determine that the patient has an emergency medical condition, I must either provide stabilizing treatment to the patient, defined as "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility," *id.* § 1395dd(e)(3)(A), or transfer the patient to an appropriate medical facility in accordance with certain procedures, *id.* § 1395dd(b), (c). I also understand that "transfer," within the meaning of EMTALA, includes discharge from the facility.

3

8.      The tenets of EMTALA are fundamental to the practice of Emergency Medicine. In my experience, the determination of whether or not an emergency medical condition exists, the nature of the appropriate stabilizing medical treatment, and what constitutes an appropriate transfer are based on the specific circumstances of a patient's presentation; the wealth and breadth of medical education, training, and the current available medical literature; the available resources at the Emergency Department to which the patient presents; and the physician's medical judgment as it is rendered at the patient's bedside in that Emergency Department. In general, emergency physicians most commonly become familiar with EMTALA during residency and receive additional working knowledge via their employer and/or continuing medical education after residency. For example, employers often include EMTALA education and training as part of the on-boarding process for new physicians, a process that I personally assist with in my own physician group. Additionally, many physicians seek further education by attending lectures on the topic at educational conferences; I personally have delivered such lectures at both the state and national level.

**Termination of Pregnancy Can Be the Medically Necessary Stabilizing Treatment**

9.      In my practice of emergency medicine, I do not intentionally terminate any pregnancy unless termination of the pregnancy is the medically appropriate care indicated to stabilize an emergency medical condition. It is my understanding that EMTALA does not require me to terminate any pregnancy except when it is part of the medical care needed to stabilize an emergency medical condition, nor does it require me to provide further care once it has been established that an emergency medical condition does not in fact exist. Additionally, based on my twelve years of experience as an attending Emergency Medicine physician, preceding four years as an Emergency Medicine resident and intern, additional preceding four years as a medical

4

student, participation in ongoing Emergency Medicine education, and my interaction with colleagues at the local, state, and national level, I understand that Emergency Medicine physicians do not administer abortifacients for non-pathological pregnancy conditions where there is no medical necessity for termination (i.e., "elective abortions," where the intent is solely to end an unwanted pregnancy). Furthermore, based on the same foundation, it is my understanding that there are no grounds upon which an Emergency Medicine physician could be compelled to do so.

10.     There are situations, however, where termination of pregnancy is the necessary stabilizing treatment required by EMTALA.

11.     One such situation that I see in my emergency medicine practice is an incomplete abortion. An incomplete abortion is defined a partial loss of the products of conception prior to 20 weeks gestation.  Vaginal bleeding and abdominal/pelvic pain in early pregnancy is a common complaint in the Emergency Department and EMTALA mandates screening for an emergency medical condition and any indicated stabilizing treatment if an emergency medical condition is identified. Because an incomplete abortion can result in serious complications such as uterine infection, sepsis, hemorrhage, hemorrhagic shock, loss of fertility, uterine rupture, and even death, appropriate management is key. This is based on clinical judgment in the context of the individual patient; in many cases, management may be expectant with close follow up, repeat laboratory work, and strict return precautions. In other cases, however, due to comorbid conditions and/or the presenting clinical scenario, pharmacologic or procedural intervention may be indicated. This is a bedside clinical determination made on a case-by-case basis.  Thus, the medically indicated treatment and federally mandated stabilization of the emergency medical condition of an incomplete miscarriage—even where a fetal heartbeat is still present—may require administration of a mifepristone/misoprostol regimen and/or other necessary care as determined by the gestational

5

age, concomitant conditions, clinical stability, and other presenting aspects of the clinical scenario, in order to prevent a risk of death or serious bodily dysfunction of the pregnant patient.

12.     An example of how this may present in a clinical scenario is:  a 37-year old female with two prior pregnancies and two prior uncomplicated vaginal deliveries presents at 9 weeks gestation by accurate dates after a near-syncopal (fainting) episode after having experienced worsening vaginal bleeding for three days associated with dizziness, nausea, and pelvic pain. Pelvic examination reveals an open cervical os with active heavy bleeding; pelvic ultrasound reveals findings consistent with a 6-week pregnancy with echogenic material in the cervical canal. The patient is moderately tachycardic (fast heart rate), orthostatic (low blood pressure) with position changes, and has a hemoglobin of 8.9 g/dL. Due to the severity of symptoms, ongoing severe bleeding, and symptomatic blood loss anemia, the obstetrician on call is consulted. In consultation with obstetrics and with informed consent at the bedside, it is determined that a risk of hemorrhage or related severe complications poses an imminent risk to the life of the patient or risk of serious bodily dysfunction and the patient is admitted to the obstetrics service for urgent procedural intervention, dilation and curettage.

13.     As an emergency medicine physician, the majority of the pregnant patients presenting with pregnancy-related complaints whom I see and treat are in their first and early second trimester of pregnancy.  However, particularly when working at facilities without an Obstetrics Department, I provide medical screening examinations for pregnant patients at all stages of pregnancy.  When there are pregnancy-related emergency medical conditions in these patients, I stabilize these patients to the best of my ability given the resources available at that institution and then transfer those patients to the care of obstetricians and, if indicated, maternal-fetal medicine physicians, who then provide stabilizing care as their clinical judgment dictates.  Even

when the identified emergency medical condition is not primarily pregnancy related, the fact that the patient has a late second- or third-trimester pregnancy will often require transfer to an institution with obstetrics services due to the concomitant pregnancy.

14.     As an emergency medicine physician-in-training, I was taught the maxim that 'the first step of taking care of baby is taking care of mom,' meaning that in order for a pregnancy at any stage to have the best chance of survival, the pregnant patient must first be stabilized. This maxim has been reinforced throughout my ongoing practice and continuing education as an emergency medicine physician.

**Emergency Medicine Doctors Have Long Understood That Stabilizing Care Can Include Termination of Pregnancy**

15.     Since completing my emergency medicine residency in 2010, I have understood that EMTALA could require me to terminate a pregnancy to treat an emergency medical condition. This is based on my cumulative education, training, and experience with the management of pregnancy related conditions as well as familiarity with EMTALA mandates.

16.     I have reviewed statements published by the American College of Emergency Physicians (ACEP) as well as published ACEP articles pertaining to this topic since the *Dobbs v. Jackson* decision was published. These statements and articles have confirmed my pre-existing understanding of my obligations as an emergency medicine physician under EMTALA, particularly as it pertains to the medically indicated termination of pregnancy to stabilize an emergency medical condition.

17.     I have also reviewed the guidance issued by the Centers for Medicare and Medicaid Services, which Plaintiffs are challenging in this case.   That guidance's statement that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., methotrexate

therapy, dilation and curettage (D&C), removal of one or both fallopian tubes, anti-hypertensive therapy, etc.)" is consistent with my longstanding understanding of EMTALA's requirements. Put another way, no part of that statement is novel or different from what my experience and training indicates that EMTALA requires.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2022

Diana B. Nordlund, DO, JD, FACEP

8