FILED

**August 16, 2022**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

STATE OF TEXAS, et al.

*Plaintiffs*,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, et al.,

*Defendants*.

No. 5:22-CV-185

**BRIEF FOR THE STATES OF CALIFORNIA, NEW YORK, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, WASHINGTON, AND WASHINGTON, D.C. AS AMICI CURIAE IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

ROB BONTA
  *Attorney General*
  *State of California*
RENU R. GEORGE
  *Senior Assistant Attorney General*
KARLI EISENBERG
  *Supervising Deputy Attorney General*
DAVID HOUSKA
BRENDA AYON VERDUZCO
HAYLEY PENAN
  *Deputy Attorneys General*
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-7785

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
**LAURA ETLINGER***
  *Assistant Solicitor General*
  *of Counsel*
N.Y. State Bar No. 2725190
The Capitol
Albany, NY 12224
(518) 776-2028
(518) 915-7723 (fax)
Laura.Etlinger@ag.ny.gov
*Admission pro hac vice pending

*(Counsel listing continues on signature pages.)*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION AND INTERESTS OF AMICI......................................................... 1

ARGUMENT ................................................................................................................ 3

   I.   EMTALA Has Long Been Interpreted to Require the Treatment of Pregnancy-Related Conditions That Need Emergency Abortion Care................................... 3

   II.   For Years, States Have Understood That Abortion Care Is Part of Emergency Care. ........................................................................................................................ 9

   III.   Failure to Provide Emergency Abortion Care When Required Causes Serious Harms to Patients and Leads to Spillover Effects in Other States................... 12

       A.   Prohibiting Physicians From Providing Emergency Abortion Care Egregious Harms Pregnant Patients. ........................................................................... 12

       B.   Prohibiting Physicians from Providing Emergency Abortion Care Harms Other States.............................................................................................. 16

CONCLUSION............................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Battle ex rel Battle v. Memorial Hosp. at Gulfport*,
  228 F.3d 544 (5th Cir. 2000) ....................................................................................5

*Bryan v. Rectors & Visitors of the Univ. of Va.*,
  95 F.3d 349 (4th Cir. 1996) ......................................................................................7

*Burditt v. U.S. Dep't of Health & Hum. Servs.*,
  934 F.2d 1362 (5th Cir. 1991) ................................................................................5, 8

*Cleland v. Bronson Health Care Grp., Inc.*,
  917 F.2d 266 (6th Cir. 1990) ....................................................................................7

*Defense Distributed v. United States Dept. of State*,
  838 F.3d 451 (5th Cir. 2016) ..................................................................................12

*Dobbs v. Jackson Women's Health Organization*,
  142 S. Ct. 2228 (2022) ............................................................................................15

*Hammond v St. Francis Med. Ctr., Inc.*,
  No. 3:06-cv-101, 2010 U.S. Dist. LEXIS 117734 (W.D. La. Nov. 4, 2010) ...........6

*In re Baby "K"*,
  16 F.3d 590 (4th Cir. 1994) ......................................................................................7

*June Med. Servs. LLC v. Kliebert*,
  250 F. Supp. 3d 27 (M.D. La. 2017) ........................................................................7

*McDougal v. Lafourche Hosp. Serv. Dist. No. 3*,
  No. 92-cv-2006, 1993 U.S. Dist. LEXIS 7381 (E.D. LA. May 24, 1993) ..............6

*Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*,
  524 F.3d 54 (1st Cir. 2008) .......................................................................................6

*Morin v. Eastern Me. Med. Ctr.*,
  779 F. Supp. 2d 166 (D. Me. 2011) ..........................................................................6

*New York v. United States Dep't of Health & Hum. Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ......................................................................7

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  951 F. Supp. 2d 891 (W.D. Tex. 2013) .....................................................................7

ii

**Cases**                                                                                    **Page(s)**

*Planned Parenthood of Wis., Inc. v. Van Hollen,*
    738 F.3d 786 (7th Cir. 2013) ...................................................................................7

*Ritten v. Lapeer Reg'l Med. Ctr.,*
    611 F. Supp. 2d 696 (E.D. Mich. 2009)...................................................................6

*Roberts v. Galen of Va., Inc.,*
    525 U.S. 249 (1999)..................................................................................................8

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)....................................................................................................12

**Laws & Regulations**

Emergency Medical Treatment and Labor Act, , 42 U.S.C.
    § 1395dd.....................................................................................................................1
    § 1395dd(a) ................................................................................................................3
    § 1395dd(b) ............................................................................................................3-4
    § 1395dd(c) ............................................................................................................3-4
    § 1395dd(e) ............................................................................................................3-4

42 C.F.R. § 489.24(d) ......................................................................................................3

*Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in
    Treating Individuals With Emergency Medical Conditions,* 68 Fed. Reg. 53,222 (Sept.
    9, 2003) ......................................................................................................................5

*Regulation for the Enforcement of Federal Health Care Provider Conscience Protection
    Laws,* 76 Fed. Reg. 9,968 (Feb. 23, 2011) ..............................................................5

**Miscellaneous Authorities**

American Coll. of Obstetricians & Gynecologists (ACOG), *Facts Are Important:
    Abortion Is Healthcare* (2022), https://www.acog.org/advocacy/facts-are-
    important/abortion-is-healthcare........................................................................9

American Coll. of Obstetricians & Gynecologists, *Facts Are Important: Understanding
    Ectopic Pregnancy* (2022), https://www.acog.org/advocacy/facts-are-
    important/understanding-ectopic-pregnancy ...................................................13

Arey, Whitney. et al., *A Preview of the Dangerous Future of Abortion Bans-Texas Senate
    Bill 8,* 387 New England J. of Med. 388 (2022),
    https://www.nejm.org/doi/full/10.1056/NEJMp2207423........................................14

**Miscellaneous Authorities**                                              **Page(s)**

Bendix, Aria, *How Life-Threatening Must a Pregnancy Be to End It Legally?*, NBC
    News (June 30, 2022), https://www.nbcnews.com/health/health-news/abortion-ban-
    exceptions-life-threatening-pregnancy-rcna36026 ......................................................... 14-15

Bloom, Matt, & Bente Berkland, *Wait Times at Colorado Clinics Hit Two Weeks as Out-
    of-State Patients Strain System*, KSUT (July 28, 2022), https://www.ksut.org/health-
    science/2022-07-28/wait-times-at-colorado-abortion-clinics-hit-2-weeks-as-out-of-
    state-patients-strain-system .................................................................................17

Bohan, Stephen, *Americans Deserve Better Than 'Destination Hallway' in Emergency
    Departments and Hospital Wards*, STAT News (Aug. 1, 2022),
    https://www.statnews.com/2022/08/01/americans-deserve-better-than-destination-
    hallway-emergency-department/ ..........................................................................18

Chamberlain, Geoffrey, & Philip Steer, *ABC of Labour Care: Obstetric Emergencies,*
    318 BMJ 1342 (1999) ...........................................................................................4

Freedman, Lori R., et al., *When There's a Heartbeat: Miscarriage Management in
    Catholic-Owned Hospitals*, 98 Am. J. Pub. Health 1774 (2008),
    https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2007.126730?download=true........14

Friedmann, Sarah, *What a Medical Emergency for an Abortion Actually Means,
    According to OB/GYNs*, Bustle (June 6, 2019), https://www.bustle.com/p/what-a-
    medical-emergency-for-abortion-actually-means-according-to-obgyns-17929296 ...............13

Goodman, J. David, & Azeen Ghorayshi, *Women Face Risks as Doctors Struggle With
    Medical Exceptions on Abortion*, N.Y. Times (July 20, 2022),
    https://www.nytimes.com/2022/07/20/us/abortion-save-mothers-life.html ..........................16

Klibanoff, Eleanor, *Doctors Report Compromising Care out of Fear of Texas Abortion
    Law*, Texas Trib. (June 23, 2022), https://www.texastribune.org/2022/06/23/texas-
    abortion-law-doctors-delay-care/ ........................................................................14

Lourgos, Angie Leventis, *Abortions in Illinois for Out of State Patients Have
    Skyrocketed*, Chi. Trib. (Aug. 4, 2022),
    https://www.detroitnews.com/story/news/nation/2022/08/04/abortions-state-
    illinois/50564151/ ................................................................................................17

Memorandum from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp.,
    CMS, to State Survey Agency Dirs. (Sept. 17, 2021),
    https://www.cms.gov/files/document/qso-21-22-hospital.pdf...................................5

Nadel, Eric, & Janet Talbot-Stern, *Obstetric and Gynecologic Emergencies*, 15
    Emergency Med. Clinics of N. Am. 389 (1997)....................................................4

**Miscellaneous Authorities**                                                            **Page(s)**

Nambiar, Anjali, et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, Am. J. Obstetrics & Gynecology (forthcoming 2022), https://www.ajog.org/action/showPdf?pii=S0002-9378%2822%2900536-1 ...........................15

Reed, Tina, *Defining "Life-Threatening" Can Be Tricky in Abortion Law Exceptions*, Axios (June 28, 2022), https://www.axios.com/2022/06/28/abortion-ban-exceptions-women-medical-emergencies ...................................................................................14

Reuters, *Fact Check – Termination of Pregnancy Can Be Necessary to Save a Woman's Life, Experts Say* (Dec. 27, 2021), https://www.reuters.com/article/factcheck-abortion-false/fact-check-termination-of-pregnancy-can-be-necessary-to-save-a-womans-life-experts-say-idUSL1N2TC0VD .................................................10, 13

Richards, Nathan S., *Judicial Resolution of EMTALA Screening Claims at Summary Judgment*, 87 N.Y.U.L. Rev. 591 (2012)................................................................3

Sellers, Frances Stead, & Fenit Nirappil, *Confusion Post-*Roe *Spurs Delays, Denials for Some Lifesaving Pregnancy Care*, Wash. Post (July 16, 2022), https://www.washingtonpost.com/health/2022/07/16/abortion-miscarriage-ectopic-pregnancy-care/................................................................................. 15-16

Smith, Mikaela H., et al., *Abortion Travel Within the United States: An Observational Study of Cross-State Movement to Obtain Abortion Care in 2017*, 10 The Lancet - Reg'l Health: Americas art. 100214 (Mar. 3, 2022), https://www.thelancet.com/journals/lanam/article/PIIS2667-193X(22)00031-X/fulltext ..........................................................................................17

U.S. Dep't of Health & Hum. Servs. & Dep't of Just., *Health Care Fraud and Abuse Control Program Annual Report for Fiscal Year 2019* (2020), https://oig.hhs.gov/publications/docs/hcfac/FY2019-hcfac.pdf ...............................6

U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., *Semi-Annual Report to Congress: April 1 - September 30, 2015* (2015), https://oig.hhs.gov/reports-and-publications/archives/semiannual/2015/sar-fall15.pdf ...........................................6

U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., *Semi-Annual Report to Congress: April 1, 2007 - September 30, 2007* (2007), https://oig.hhs.gov/publications/docs/semiannual/2007/SemiannualFinal2007.pdf.................6

U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., *Semi-Annual Report to Congress: October 1, 1999 - March 30, 2000* (2000), https://oig.hhs.gov/publications/docs/semiannual/2000/00ssemi.pdf.......................6

**Miscellaneous Authorities**                                                    **Page(s)**

Washington State Dep't of Health, *Hospital Reproductive Health Services for Ferry
    County Memorial Hospital* (Aug. 29, 2019),
    https://doh.wa.gov/sites/default/files/legacy/Documents/2300/HospPolicies/FerryCou
    ntyRHSF.pdf ...........................................................................................................11

Washington State Dep't of Health, *Hospital Reproductive Health Services for Lourdes
    Hospital* (Sept. 3, 2019),
    https://doh.wa.gov/sites/default/files/legacy/Documents/2300/HospPolicies/LourdesR
    HSF.PDF ..................................................................................................................11

Washington State Dep't of Health, *Hospital Reproductive Health Services for Virginia
    Mason Memorial Hospital* (Aug. 30, 2019),
    https://doh.wa.gov/sites/default/files/legacy/Documents/2300/HospPolicies/Virginia
    MasonMemorialRHSF.pdf.......................................................................................11

White, Kari, et al., Tex. Pol'y Evaluation Project, *Out-of-State Travel for Abortion
    Following Implementation of Texas Senate Bill 8* (Mar. 2022),
    https://sites.utexas.edu/txpep/files/2022/03/TxPEP-out-of-state-SB8.pdf ............................17

Wolf, Lisa A., et al., *Triage Decisions Involving Pregnancy-Capable Patients:
    Educational Deficits and Emergency Nurses' Perceptions of Risk*, 52 J. Continuing
    Educ. Nursing 21 (2021)...........................................................................................4

Zibulewsky, Joseph, *The Emergency Medical Treatment and Active Labor Act
    (EMTALA): What It Is and What It Means for Physicians,* 14 Baylor Univ. Med. Ctr.
    Proc. 339 (2001)........................................................................................................3

## INTRODUCTION AND INTERESTS OF AMICI

Amici States of California, New York, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, and Washington, D.C. submit this brief in support of the federal government's opposition to plaintiffs' request for preliminary injunctive relief. Plaintiffs, the State of Texas and anti-abortion organizations with physician members, challenge recent guidance from the Centers for Medicare and Medicaid Services (CMS) and a letter from the U.S. Department of Health and Human Services (HHS) (together, CMS guidance) that restate hospitals' obligation under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, to provide abortion services when needed to stabilize a patient experiencing an emergency medical condition. Plaintiffs seeks a temporary restraining order and preliminary injunction against the enforcement of the CMS guidance in Texas and as against members of the plaintiff anti-abortion organizations.

Amici have a substantial interest in this case. As health care providers to millions of residents, amici are both subject to EMTALA and serve as regulators of health care: amici own and operate public hospital systems, employ individual health care personnel, and license and regulate the many other health care providers that operate within our jurisdictions. Amici thus have a strong interest in clear guidance regarding their obligations under EMTALA. Amici also have a strong interest in protecting the rights of their residents who may need emergency medical care while present as students, workers, or visitors in Texas and other States that may attempt to prohibit emergency abortion care contrary to EMTALA's requirements. In addition, if patients in Texas are denied necessary emergency abortion care, they may travel to nearby States (including amici New Mexico and Colorado) to receive the emergency care they need. These States would thus

experience additional pressures on their already overwhelmed hospital systems, especially in rural and underserved areas that would be most significantly affected.

EMTALA, enacted in 1986, has long been a crucial tool in ensuring that all individuals who come to an emergency hospital department are afforded an appropriate medical screening to determine whether they have an emergency medical condition and that patients are not transferred or discharged until they receive medical treatment to stabilize any such condition. Amici submit this brief to highlight that EMTALA has long been interpreted to include emergency medical conditions involving or affecting pregnancy for which necessary stabilizing treatment may include abortion care. That straightforward interpretation of EMTALA, repeated in the recent CMS guidance, derives from the statute's text and ensures that individuals with pregnancy-related emergency medical conditions receive the care they need to prevent death or serious impairment.

Amici's experience as health care providers confirms that emergency abortion care is necessary to avoid serious harmful outcomes (including death) in numerous situations such as when a patient presents with an ectopic pregnancy, severe preeclampsia, complications from abortion including self-induced abortion, and other medical conditions for which immediate medical attention is needed. Amici States have long understood that abortion care is part of emergency care and their experience establishes that the failure to provide stabilizing abortion care when needed to address emergency medical conditions will cause serious patient harms and have spillover effects in other States. These harms weigh against granting any injunctive relief as it would engender confusion or alter the existing obligations under EMTALA.

## ARGUMENT

I.   **EMTALA HAS LONG BEEN INTERPRETED TO REQUIRE THE TREATMENT OF PREGNANCY-RELATED CONDITIONS THAT NEED EMERGENCY ABORTION CARE.**

EMTALA applies to any hospital that operates an emergency department and participates in Medicare—criteria that are met by virtually every hospital in the United States.[1] Under EMTALA, if "any individual" presents at a hospital's emergency department for examination or treatment, the hospital must provide an appropriate medical screening to determine whether an emergency medical condition exists. 42 U.S.C. § 1395dd(a). If the screening indicates the patient has an emergency medical condition, the hospital cannot transfer or discharge the patient until it provides "treatment as may be required to stabilize the medical condition," unless the transfer is specifically authorized by the statute. *Id.* § 1395dd(b)-(c). The hospital may also admit the patient as an inpatient in good faith to stabilize the emergency medical condition. 42 C.F.R. § 489.24(d)(2)(i). An "emergency medical condition" is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in" (i) placing the health of the individual in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. 42 U.S.C. § 1395dd(e)(1)(A). Stabilizing the patient involves providing "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during

---

[1] *See* Joseph Zibulewsky, *The Emergency Medical Treatment and Active Labor Act (EMTALA): What It Is and What It Means for Physicians,* 14 Baylor Univ. Med. Ctr. Proc. 339, 340 (2001); Nathan S. Richards, *Judicial Resolution of EMTALA Screening Claims at Summary Judgment*, 87 N.Y.U.L. Rev. 591, 601 & n.52 (2012).

the transfer of the individual." *Id.* § 1395dd(e)(3)(A). Nothing in EMTALA excludes any conditions or categories of medical care or treatment from the statute's requirements.

Individuals may present at the emergency department with various emergency medical conditions relating to pregnancy that do not involve active labor (which is separately addressed in the statute, *see Id.* § 1395dd(e)(1)(B)).[2] Such conditions may include ectopic pregnancy, traumatic placental abruption (separation), hemorrhages, pre-labor rupture of membranes, placenta previa, amniotic fluid embolism, intrauterine fetal death, and hypertension.[3] EMTALA's obligations would be triggered if the individual presenting with these conditions is experiencing acute symptoms such that if immediate treatment is not provided, the medical condition would reasonably be expected to result in serious jeopardy to the individual's health, serious impairment to bodily functions, or serious dysfunction of any bodily organ. *See id.* § 1395dd(e)(1)(A). And in such circumstances, EMTALA mandates that the individual cannot be transferred or discharged until required stabilizing treatment is provided, unless the patient seeks transfer or discharge or, under the circumstances, the medical benefits of transfer of the not yet stabilized individual outweigh the risks. *See id.* § 1395dd(b)-(c). Required stabilizing treatment is that which "'would

---

[2] Contrary to plaintiff's argument (Pls.' Br. 5, 9-10), the fact that EMTALA defines emergency medical condition to include a pregnant patient in labor when there is inadequate time to effect a transfer before delivery or when the transfer otherwise poses a threat to the health of the patient or fetus, *see* 42 U.S.C. § 1395dd(e)(1)(B), does not mean that Congress intended stabilizing treatment to exclude abortion care. EMTALA makes clear that this part of the definition of emergency medical condition applies to situations where delivery of the child is the desired health outcome and does not risk the life or health of the pregnant person. *See id.* § 1395dd(e)(3)(A)-(B) (defining "to stabilize" and "stabilized" in reference to such patients as delivery).

[3] *See* Geoffrey Chamberlain & Philip Steer, *ABC of Labour Care: Obstetric Emergencies,* 318 BMJ 1342, 1342-45 (1999); Eric Nadel & Janet Talbot-Stern, *Obstetric and Gynecologic Emergencies*, 15 Emergency Med. Clinics of N. Am. 389,  389-97 (1997); Lisa A. Wolf et al., *Triage Decisions Involving Pregnancy-Capable Patients: Educational Deficits and Emergency Nurses' Perceptions of Risk*, 52 J. Continuing Educ. Nursing 21, 21-29 (2021).

4

prevent the threatening and severe consequence of' the patient's emergency medical condition while in transit." *Battle ex rel Battle v. Memorial Hosp. at Gulfport*, 228 F.3d 544, 559 (5th Cir. 2000) (quoting *Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991)).

For decades, the federal government and courts throughout the country have interpreted EMTALA to require treatment for emergency conditions relating to pregnancy that do not involve active labor and have concluded that stabilizing treatment may include emergency abortion care when necessary to treat an emergency condition. For example, in 2003, CMS clarified that a hospital's labor and delivery department may qualify as a regulated "emergency department."[4] A decade ago, in 2011, HHS acknowledged that EMTALA may require abortion care in appropriate circumstances in a rule implementing federal conscience-refusal laws that might otherwise allow a physician to refuse to perform an abortion.[5] And in September 2021, CMS issued guidance restating that emergency medical conditions include pregnancy-related conditions and describing required stabilizing treatment as including abortion care when medically indicated.[6]CMS and HHS's Office of Inspector General has also brought enforcement actions against hospitals for EMTALA violations involving pregnancy-related emergency medical conditions. *See Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1367-76 (5th Cir. 1991) (affirming

---

[4] *Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions*, 68 Fed. Reg. 53,222, 53,228, 53,229 (Sept. 9, 2003) (discussing new regulatory definition of "dedicated emergency department").

[5] *See Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws*, 76 Fed. Reg. 9,968, 9,973 (Feb. 23, 2011).

[6] *See* Memorandum from Dirs., Quality, Safety & Oversight Grp. & Survey & Operations Grp., CMS, to State Survey Agency Dirs. (Sept. 17, 2021) (internet). (For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on August 15, 2022.).

enforcement action against hospital where pregnant individual presented with extreme hypertension).[7]

Courts throughout the country have consistently found pregnancy-related emergency conditions not involving active labor to fall within the scope of EMTALA. *See, e.g.*, *Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 55-62 (1st Cir. 2008) (ectopic pregnancy); *Morin v. Eastern Me. Med. Ctr.*, 779 F. Supp. 2d 166, 168-69, 185 (D. Me. 2011) (woman 16 weeks pregnant having contractions without fetal heartbeat); *see also McDougal v. Lafourche Hosp. Serv. Dist. No. 3*, No. 92-cv-2006, 1993 U.S. Dist. LEXIS 7381, at *1 (E.D. LA. May 24, 1993) (pregnant patient presented with vaginal bleeding). Indeed, a pregnant patient may present at the hospital needing emergency care unrelated to, but affecting, the pregnancy. *Hammond v St. Francis Med. Ctr., Inc.*, No. 3:06-cv-101, 2010 U.S. Dist. LEXIS 117734, at *2-3, *7-8 (W.D. La. Nov. 4, 2010) (describing such facts and dismissing EMTALA claim for lack of jurisdiction).

Courts have also consistently interpreted EMTALA as requiring abortion services when needed to stabilize an emergency medical condition. *See Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 712-18 (E.D. Mich. 2009) (applying EMTALA's anti-retaliation provision to doctor who refused to transfer patient whose condition was not stable and who may have needed

---

[7] *See also* HHS & Dep't of Just., *Health Care Fraud and Abuse Control Program Annual Report for Fiscal Year 2019*, at 45 (2020) (underline) (describing enforcement action involving pregnant individual suffering from preeclampsia); HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress: April 1 – September 30, 2015*, at 37 (2015) (internet) (same, pregnant individual having symptoms of abdominal and lower back pain); HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress: April 1, 2007 – September 30, 2007*, at 26 (2007) (internet) (same, symptoms of vaginal bleeding, cramps, and decreased fetal movement); HHS, Off. of Inspector Gen., *Semi-Annual Report to Congress: October 1, 1999 – March 30, 2000*, at 32-33 (2000) (internet) (same, symptom of sharp abdominal pain).

abortion); *see also New York v. United States Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019) (holding that federal rule that allowed physicians to refuse to perform or assist with abortion was not in accordance with law as it would "create[], via regulation, a conscience exception to EMTALA's statutory mandate"), *appeal filed*, No. 20-41 (2d Cir. Jan. 3, 2020). Numerous courts have held that patients of physicians who perform abortions must be admitted to the emergency room under EMTALA regardless of whether the treating physician has admitting privileges at the hospital. *See, e.g.*, *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 787-88 (7th Cir. 2013); *June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 64 (M.D. La. 2017), *rev'd on other grounds sub nom.*, *June Med. Servs. LLC v. Gee*, 905 F.3d 787 (5th Cir. 2018), *rev'd sub nom., June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103 (2020); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 899-900 (W.D. Tex. 2013), *rev'd on other grounds*, 748 F.3d 583 (5th Cir. 2014). Under the reasoning of these decisions, if a patient presented at the emergency room with an incomplete abortion, EMTALA would require that the patient receive stabilizing emergency abortion care. *See June Med. Servs.*, 250 F. Supp. 3d at 62, 64.

Finally, courts have long interpreted EMTALA as protecting patients from "being turned away from emergency rooms for non-medical reasons." *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). Thus, "courts have declined to read exceptions into EMTALA's mandate," including exceptions allowing transfers based on a physician's religious, moral, or ethical refusal to provide specified stabilizing treatment. *New York*, 414 F. Supp. 3d at 537 (collecting cases); *see In re Baby "K"*, 16 F.3d 590, 597 (4th Cir. 1994); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 272 (6th Cir. 1990) (observing that EMTALA's plain text prohibits a hospital from refusing treatment based on "political or cultural opposition").

Consequently, liability for the failure to provide stabilizing treatment is not dependent on the physician's or hospital's motive. *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999); *see Burditt*, 934 F.2d at 1373 (same, failure to effect proper transfer).

On July 11, 2022, CMS (an agency within the Department of Health and Human Services (HHS)) issued the guidance challenged here in the form of a memorandum addressed to state agency directors, to reiterate EMTALA's obligations regarding patients who are pregnant or experiencing pregnancy loss. (Pls.' App. 2-7.) The CMS guidance restates EMTALA's requirement that determinations regarding whether an individual has an emergency medical condition and, if so, what stabilizing treatment is needed before transfer or discharge are medical determinations for which the treating physician is responsible. (Pls.' App. 2, 5.) The guidance also notes that numerous pregnancy-related conditions may constitute emergency medical conditions under EMTALA, including ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features. (Pls.' App. 2, 5.) And the guidance reminds hospitals and physicians that if the treating physician determines that abortion services are the appropriate stabilizing medical treatment for an emergency medical condition, EMTALA requires that the physician provide that treatment if the hospital has the capacity for such treatment. (Pls.' App. 5.) Such stabilizing medical treatment must be provided before the patient's condition declines. (Pls.' App. 5.) Contrary to plaintiffs' argument (Pls.' Br. 1, 3), the conclusion of the July 2022 CMS guidance that emergency abortion services may be required under EMTALA is not "novel" or "unprecedented." Rather, the guidance simply restates statutory requirements under EMTALA, which has long and consistently been interpreted by the federal government, courts, and others to impose the obligations identified in the guidance.

## II.   FOR YEARS, STATES HAVE UNDERSTOOD THAT ABORTION CARE IS PART OF EMERGENCY CARE.

Hospitals in Amici States understand that providing abortion care to stabilize an emergency medical condition is an essential part of their obligation to provide stabilizing care under EMTALA. Hospitals in amici States regularly provide abortion care to stabilize many emergency medical conditions, including severe pregnancy complications, complications of early pregnancy loss or miscarriage, pre-labor rupture of membranes, ectopic pregnancy, emergent hypertensive disorders such as preeclampsia with severe features, and incomplete abortion. Often, pregnant patients face unforeseeable emergency medical conditions and need abortion care to protect their life and prevent severe and disabling injury to their health, regardless of whether they wanted and intended the pregnancy. As the American College of Obstetricians and Gynecologists has explained, pregnancy complications "may be so severe that abortion is the only measure to preserve a woman's health or save her life."[8]

Accordingly, abortion care has regularly been provided by hospitals in amici States to stabilize emergency medical conditions. In New York in 2019, 3,000 abortions were performed for patients presenting at the emergency department, with 1,010 abortion procedures performed within the emergency department and 1,820 abortion procedures performed for persons during an inpatient stay after presenting to the emergency department. Illinois's state Medicaid program reported that out of slightly more than 23,000 pregnancies, there were 532 emergency situations involving significant heart conditions, 477 respiratory conditions (not including mild conditions), 35 kidney disorders, 33 ectopic pregnancies, 221 missed abortions (miscarriages), 68 incomplete spontaneous abortions, 91 cases of hemorrhaging, 40 cases of issues with the placenta, and 32

---

[8] Am. Coll. of Obstetricians & Gynecologists (ACOG), *Facts Are Important: Abortion Is Healthcare* (2022) (underline).

cases of sickle cell anemia.[9] Data from the Nevada Medicaid program, which covers only abortions to protect the pregnant patient's life or in cases of rape or incest, indicates that the program has paid for an average of 523 covered abortions per year from 2019 to 2021, totaling 1,540 abortions.

Provider accounts likewise demonstrate that abortion is a regular and critical part of emergency healthcare. A physician at Oregon's public academic health center, Oregon Health & Science University, described often receiving transfers that require urgent or emergent pregnancy termination, including pregnant patients presenting with hemorrhage due to placentas previa and placental abruptions, peri-viable premature rupture of membranes with sepsis, peri-viable severe decompensating pre-eclampsia, acute leukemia, c-section scar ectopic pregnancies, cornual ectopic pregnancies, and hemorrhaging miscarriage, among other conditions. The Illinois Department of Public Health's Office of Women's Health and Family Services reported that a provider treated a 30-year-old in the emergency room who was 15 weeks pregnant, had significant bleeding, ruptured membranes, and a dilated cervix, but the fetus still had cardiac activity. The patient had lost one-third of her blood volume, and her vital signs were deteriorating. The hospital provided the necessary surgery to end the pregnancy. In another case, an Illinois provider treated a 32-year-old patient with placenta previa (where the placenta covers the cervix) who was 20 weeks pregnant and came to the hospital with vaginal bleeding and cervical dilation. Her bleeding increased rapidly and she developed low blood pressure, needing a blood transfusion and a uterine evacuation (i.e., abortion) to stabilize her condition. Another Illinois patient who was 22 weeks pregnant was brought to the hospital after having a seizure and was found to have elevated blood pressure, preeclampsia, and HELLP (hemolysis, elevated liver enzymes, and low platelet count)

---

[9] All of these conditions can necessitate abortion care as stabilizing treatment. *See, e.g.*, Reuters, *Fact Check – Termination of Pregnancy Can Be Necessary to Save a Woman's Life, Experts Say* (Dec. 27, 2021) (internet).

syndrome, a life-threatening pregnancy complication. Despite multiple medications to control her blood pressure, her liver function was rapidly deteriorating, necessitating a surgical termination of the pregnancy. Other patients received emergency abortion care to treat severe preeclampsia with very elevated blood pressure that could not be controlled with medication and that presented the risk of stroke, evidence of growing internal hematoma in a patient with a history of second trimester placental abruption, and previable preeclampsia with severe features that caused a seizure.

Providers at a state-owned hospital in New Jersey similarly reported the regular use of terminating a pregnancy in emergency settings to treat septic abortion (any type of miscarriage where the uterus is infected or at risk of infection), ectopic pregnancies, preeclampsia with severe features, and molar pregnancy (nonviable abnormally fertilized egg that can act like a malignancy and is at high risk of metastasizing) for which no other treatment is available. And in Washington, hospitals regularly provide abortion care to stabilize many emergency medical conditions. Indeed, some hospitals that do not regularly provide abortion care in non-emergency settings explicitly state that treatment of emergency conditions that would be required under EMTALA are permitted.[10]

---

[10] *See, e.g.*, Wash. State Dep't of Health, *Hospital Reproductive Health Services for Ferry County Memorial Hospital*, at pp. 1-2 (Aug. 29, 2019) (internet) (hospital does not provide abortions in non-emergency settings, but "[t]reatment of miscarriages and ectopic pregnancy would fall under the EMTALA protocols"); Wash. State Dep't of Health, *Hospital Reproductive Health Services for Lourdes Hospital*, at p. 1 (Sept. 3, 2019) (internet) (hospital does not provide abortions in non-emergency settings, but "[o]perations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman (patient) are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child"); Wash. State Dep't of Health, *Hospital Reproductive Health Services for Virginia Mason Memorial Hospital*, at pp. 1-2 (Aug. 30, 2019) (internet) (provides surgical abortions to treat pregnancy complications or in pregnancies involving a congenital abnormality).

III.    **FAILURE TO PROVIDE EMERGENCY ABORTION CARE WHEN REQUIRED CAUSES SERIOUS HARMS TO PATIENTS AND LEADS TO SPILLOVER EFFECTS IN OTHER STATES.**

A preliminary injunction is an extraordinary remedy that should not be granted unless all of the required factors are met, including that the threatened injury outweighs the threatened harm if an injunction is granted and that granting the preliminary injunction will not disserve the public interest. *Defense Distributed v. United States Dept. of State*, 838 F.3d 451, 456-57 (5th Cir. 2016). The court "should pay particular regard for the public consequences" in exercising its discretion to grant an injunction. *Winter v. Natural Res. Def. Council, Inc.*,, 555 U.S. 7, 24 (2008) (quotation marks omitted). Here, as Amici's experience demonstrates, any injunction against enforcement of the requirements identified in the CMS guidance in Texas and for members of the plaintiff anti-abortion organizations will endanger the health of patients in Texas and elsewhere, further pressure the already overwhelmed capacity of hospitals in neighboring States, and harm the public health. The equities and public interest thus weigh against the injunctive relief sought.

A.    **Prohibiting Physicians From Providing Emergency Abortion Care Egregious Harms Pregnant Patients.**

As the amici States' experience demonstrates, preventing hospitals from performing abortions needed to treat an emergency medical condition, as determined by a treating physician, threatens the lives and health of pregnant patients. As explained above, many pregnancy and miscarriage complications are emergency medical conditions requiring time-sensitive stabilizing

treatment that can include abortion. In an emergency, any failure to provide, or delays in providing, necessary abortion care puts the pregnant patient's life or health at risk.[11]

These situations can arise with a range of medical conditions. As one example, a physician explained that a clear sign of uterine infection can be life threatening "because there is an extremely high risk that the infection inside of the uterus spreads very quickly into [the patient's] bloodstream and she becomes septic. If she continues the pregnancy it comes at a very high risk of death."[12] Another observed that, "under certain conditions, continuing a pregnancy could significantly increase the morbidity risk for the pregnant person or even jeopardize their life. . . . [F]or people with certain cardiovascular disease conditions, like Eisenmenger's syndrome and pulmonary hypertension, carrying a pregnancy could cause as high as a 40% risk of maternal death."[13] While not all circumstances will necessarily require an abortion, abortion care is necessary to stabilize the patient in at least some of these circumstances.

Sadly, examples abound of patients suffering grave harm when they do not receive necessary emergency care. For example, since Texas passed its six-week abortion ban (S.B. 8) and the law took effect on September 1, 2021, pregnant people in Texas have been experiencing delays in treatment and corresponding harms to their health. Doctors in Texas reported postponing care "until a patient's health or pregnancy complication has deteriorated to the point that their life was

---

[11] *See, e.g.*, Reuters, *Fact Check – Termination of Pregnancy*, *supra* (discussing, for example, that placental abruption presents a risk of hemorrhage, which if left untreated, threatens the pregnant person's life and that preeclampsia if not treated quickly can result in the pregnant person's death); ACOG, *Facts Are Important: Understanding Ectopic Pregnancy* (2022) (internet) (advising that "[a]n untreated ectopic pregnancy is life threatening; withholding or delaying treatment can lead to death").

[12] Reuters, *Fact Check – Termination of Pregnancy*, *supra*.

[13] Sarah Friedmann, *What a Medical Emergency for an Abortion Actually Means, According to OB/GYNs*, Bustle (June 6, 2019) (internet)

in danger, including multiple cases where patients were sent home, only to return once they were in sepsis."[14] As another example, a physician at an academic medical center described how a hospital asked her to accept a patient "who was already septic" after the transferring hospital, on conscience-refusal grounds, refused to perform the abortion needed to save the patient's life, instead transferring the patient in an unstable state because the fetus had cardiac activity.[15] The physician who treated the patient after the transfer reported the transferring hospital for violating EMTALA.[16]

Delaying life-saving emergency treatment is also gravely risky because physicians cannot easily predict at which point during a medical emergency a pregnant patient's death is imminent.[17] Lisa Harris, a professor of reproductive health at the University of Michigan, discussed that "there are many circumstances in which it is not clear whether a patient is close to death."[18] She explained, "It's not like a switch that goes off or on that says, 'OK, this person is bleeding a lot, but not enough to kill them,' and then all of a sudden, there is bleeding enough to kill them. . . .

---

[14] Eleanor Klibanoff, *Doctors Report Compromising Care out of Fear of Texas Abortion Law*, Texas Trib. (June 23, 2022) (internet); *see also* Whitney Arey et al., *A Preview of the Dangerous Future of Abortion Bans—Texas Senate Bill 8*, 387 New England J. of Med. 388 (2022) (internet).

[15] Lori R. Freedman et al., *When There's a Heartbeat: Miscarriage Management in Catholic-Owned Hospitals*, 98 Am. J. Pub. Health 1774, 1776-77 (2008) (internet).

[16] *Id.*

[17] *See* Tina Reed, *Defining "Life-Threatening" Can Be Tricky in Abortion Law Exceptions*, Axios (June 28, 2022) (internet). For example, Utah-based obstetrician Lori Gawron explained that if a pregnant patient experiences a ruptured membrane in the second trimester, there is a much greater risk of infection to the pregnant woman, and "[i]f the infection progresses to sepsis, the maternal life is absolutely at risk. But we can't say how long that will take or how severe the infection will get in that individual." *Id.*

[18] Aria Bendix, *How Life-Threatening Must a Pregnancy Be to End It Legally?*, NBC News (June 30, 2022) (internet).

It's a continuum, so even how someone knows where a person is in that process is really tricky.'"[19] A recent study of maternal morbidity at two Texas hospitals following the enactment of the Texas six-week ban found that when a pregnant patient presented at the hospital with specified pregnancy complications, and an expectant-management approach was used (observation-only care until serious infection develops or the fetus no longer has cardiac activity), the rate of serious maternal morbidity (57%) is almost double the rate that occurs when the treating physician follows the standard protocol of terminating the pregnancy to preserve the pregnant patient's life or health (33%).[20] In Illinois, a pregnant patient with an ectopic pregnancy died in 2018 after the hospital failed to timely provide her with the necessary care. While this tragedy was related to the hospital's failure to properly staff the emergency department and provide the patient with the required care, it illustrates the dangers to pregnant patients when hospitals do not meet their EMTALA obligation to provide stabilizing care for an emergency medical condition.[21]

Since the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the mere uncertainty created by the flagrant disregard shown by states like Texas for EMTALA's requirements has caused great confusion for doctors and created dangerous situations for pregnant people.[22] Determinations of when an abortion is allowed under these States'

---

[19] *Id.* Dr. Harris also impressed that the confusion about where the medical emergency becomes life-threatening enough to warrant intervention under state law is a difficult point, stating "What does the risk of death have to be, and how imminent must it be? Might abortion be permissible in a patient with pulmonary hypertension, for whom we cite a 30-to-50% chance of dying with ongoing pregnancy? Or must it be 100%?" *Id.*

[20] Anjali Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, Am. J. Obstetrics & Gynecology (forthcoming 2022) (internet).

[21] *Id.*

[22] *See* Frances Stead Sellers & Fenit Nirappil, *Confusion Post-Roe Spurs Delays, Denials for Some Lifesaving Pregnancy Care*, Wash. Post (July 16, 2022) (internet).

laws have "become fraught with uncertainty and legal risk," forcing doctors to "significantly alter the care they provide to women whose pregnancy complications put them at high risk of harm."[23] For instance, a woman sought care in Michigan after being denied treatment for an ectopic pregnancy in her home State due to providers' worries that providing abortion care might violate state laws because the fetus still had cardiac activity.[24] In a hospital in Missouri, hospital administrators temporarily required pharmacist approval to dispense medications needed to stop post-partum hemorrhaging, leading to delays in access.[25] A pregnant patient in Wisconsin who experienced a miscarriage was bleeding in the hospital for ten days before the hospital would remove the fetal tissue because of confusion about the legality of doing so in that State.[26] These uncertainties are heightened when a state seeks an injunction against enforcement of the requirements of a federal law like EMTALA, which provides a nationwide floor for emergency abortion care.

**B.     Prohibiting Physicians from Providing Emergency Abortion Care Harms Other States.**

Allowing Texas to ban abortion care, including in medical emergencies where it is required under EMTALA, risks significant effects in other States as well. Amici's experience demonstrates that state abortion restrictions force many women to travel out of State for care. A comprehensive

---

[23] J. David Goodman & Azeen Ghorayshi, *Women Face Risks as Doctors Struggle With Medical Exceptions on Abortion*, N.Y. Times (July 20, 2022) (internet).

[24] Sellers & Nirappil, *supra*; *see id.* ("many of the two dozen doctors interviewed by The Post about their experiences since the Supreme Court overturned the right to abortion were hesitant to describe details of individual cases for fear of running afoul of lawyers and hospital administrators, violating patient privacy or prompting a criminal investigation").

[25] *Id.*

[26] *Id.*

study published earlier this year examined where women obtained abortion care in the United States in 2017. Overall, 8% of all women who received an abortion had to cross state lines to obtain care—but this number was vastly higher in states with significant restrictions on abortion.[27] In 2017, over 30% of all Idaho residents who received an abortion had to leave the state to do so, approximately 550 women in total.[28] Over 40% of women from Kentucky, South Dakota, and West Virginia had to cross state lines to receive care; and in Missouri, Mississippi, and South Carolina, the figure was over 50%.[29] When more severe abortion restrictions in many jurisdictions took effect after *Dobbs*, women from these and other states have crossed state lines in even greater numbers, crowding waiting rooms and leading to longer waiting times for the procedure.[30] In the first four months during which Texas' six-week abortion ban was in effect, the number of Texans seeking abortion care in neighboring states increased by nearly 600%, as compared to the month before the law's effective date.[31]

If hospitals in States like Texas fail to comply with their obligations under EMTALA, Amici States anticipate even further strain on their health systems. Emergency rooms in New Mexico and Colorado and other neighboring states will inevitably need to absorb the out-of-state

---

[27] Mikaela H. Smith et al., *Abortion Travel Within the United States: An Observational Study of Cross-State Movement to Obtain Abortion Care in 2017*, 10 The Lancet – Reg'l Health: Americas art. 100214 (Mar. 3, 2022) (internet).

[28] *Id.*

[29] *Id.*

[30] *E.g.*, Angie Leventis Lourgos, *Abortions in Illinois for Out of State Patients Have Skyrocketed*, Chi. Trib. (Aug. 4, 2022) (internet) (reporting a 700% increase in the number of out-of-state patients served in Illinois); Matt Bloom & Bente Berkland, *Wait Times at Colorado Clinics Hit Two Weeks as Out-of-State Patients Strain System*, KSUT (July 28, 2022) (internet) (100% increase in wait times from before *Dobbs* was decided).

[31] Kari White et al., Tex. Pol'y Evaluation Project, *Out-of-State Travel for Abortion Following Implementation of Texas Senate Bill 8* (Mar. 2022) (internet).

patient need for care that Texas's law will cause, at a time when the states continue to wrestle with an ongoing global pandemic and new public health crises. Emergency departments are already faced with overcrowding, long wait times, and staff shortages, especially in rural and underserved areas such as those that would be impacted by the injunctive relief sought here.[32] An additional influx of patients needing urgent care to address an emergency medical condition will only add to these concerns. If hospitals in a particular state fail to meet their obligations under EMTALA, it will cause harm to other states and the patients whom EMTALA is designed to protect.

---

[32] *See generally* Stephen Bohan, *Americans Deserve Better Than 'Destination Hallway' in Emergency Departments and Hospital Wards*, STAT News (Aug. 1, 2022) (underline>internet) (discussing increasing demands for in-patient and emergency hospital services).

## CONCLUSION

Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied.

Dated:     New York, New York
           August 15, 2022

                                          Respectfully submitted,


ROB BONTA                                 LETITIA JAMES
  *Attorney General*                        *Attorney General*
  *State of California*                      *State of New York*
Renu R. George
  *Senior Assistant Attorney General*       /s/ Laura Etlinger*
Karli Eisenberg                           LAURA ETLINGER
  *Supervising Deputy Attorney General*     *Assistant Solicitor General*
David Houska                              N.Y. State Bar No. 2725190
Brenda Ayon Verduzco
Hayley Penan                              Barbara D. Underwood
  *Deputy Attorneys General*                *Solicitor General*
                                          Ester Murdukhayeva
California Department of Law                 *Deputy Solicitor General*
1300 I Street                             Laura Etlinger
P.O. Box 944255                             *Assistant Solicitor General*
Sacramento, CA 94244-2550                     *of Counsel*
(916) 210-7785
                                          Office of the Attorney General
                                          The Capitol
                                          Albany, NY 12224
                                          (518) 776-2028
                                          (518) 915-7723 (fax)
(*Counsel listing continues on next page.*)   Laura.Etlinger@ag.ny.gov

                                          *Admission pro hac vice pending

19

PHILIP J. WEISER
 *Attorney General*
 *State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French Street
Wilmington, DE 19801

HOLLY T. SHIKADA
 *Attorney General*
 *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
 *Attorney General*
 *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
 *Attorney General*
 *State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

MAURA HEALEY
 *Attorney General*
 *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
 *Attorney General*
 *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
 *Attorney General*
 *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
 *Acting Attorney General*
 *State of New Jersey*
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
 *Attorney General*
 *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

JOSHUA H. STEIN
 *Attorney General*
 *State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court Street NE
Salem, OR 97301

JOSH SHAPIRO
 *Attorney General*
 *Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
 *Attorney General*
 *State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

KARL A. RACINE
 *Attorney General*
 *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001