**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| STATE OF TEXAS, et al., <br><br> *Plaintiffs,* <br><br> *v.* <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, et al., <br><br> *Defendants.* | Civil Action No. 5:22-cv-00185-H |

**BRIEF OF *AMICI CURIAE* MEDICAL AND PUBLIC HEALTH SOCIETIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

I.      INTERESTS OF AMICI CURIAE .................................................................... 1

II.     PRELIMINARY STATEMENT .......................................................................... 2

III.    ARGUMENT ......................................................................................................... 5

        A.  Providing Stabilizing Care for Pregnant Patients with Emergency Conditions
            Sometimes Requires Abortion. ........................................................................ 5

            1.  The Nature of Emergency Care ................................................................. 5

            2.  Caring for Pregnant Patients Is an Essential Component of Emergency
                Medicine ..................................................................................................... 7

        B.  Where Abortion Is the Clinically Indicated Stabilizing Treatment for an
            Emergency Medical Condition, It Is Required by EMTALA ......................... 10

            1.  EMTALA Enshrines Physicians' Commitment to Treating and
                Stabilizing Patients ................................................................................. 10

            2.  The Guidance Correctly Advises that, in Some Situations, EMTALA
                Requires Abortion ................................................................................... 12

        C.  The Balance of the Equities and the Public Interest Weigh Against an
            Injunction ...................................................................................................... 15

            1.  An Injunction Would Place Pregnant Women at Risk ............................. 16

            2.  An Injunction Would Particularly Harm Women in Rural Areas,
                Minoritized Women, and Women with Low Incomes ............................. 17

            3.  Forcing Physicians to Decide Between Obeying State Law and
                Obeying EMTALA Would Harm Physicians and the Public Interest ....... 20

IV.     CONCLUSION .................................................................................................... 23

## TABLE OF AUTHORITIES

**Statutes**

42 U.S.C. § 1395dd ("EMTALA") ............................................................................ *passim*

Idaho Code § 18-622 .............................................................................................21

Tex. Health & Safety Code 245.002 ........................................................................10

**Regulatory Documents**

Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals with Emergency Medical Conditions, 68 Fed. Reg. 53221 (Nov. 10, 2003) (codified at 42 C.F.R. 413, 482, and 489) ..........................................5

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* (July 11, 2022) ......................................................22

**Other Authorities**

ACEP, *Code of Ethics for Emergency Physicians* (Jan. 2017) ..........................7, 18, 22, 26

ACEP, *Delivery of Emergency Care in Rural Settings*, at 1 (2017) ..................................19

ACEP, *EMTALA Fact Sheet* .........................................................................11, 21

ACEP, Policy Statements, Definition of Emergency Medicine (Jan. 2021) .......................5

ACEP, *Public Opinion on the Value of Emergency Physicians* (Aug. 26, 2021)................6

ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management* (Sept. 2021)................................................................17

ACOG, *Code of Professional Ethics* (Dec. 2018) ...........................................................21

ACOG Committee Opinion No. 586, *Health Disparities in Rural Women*, at 2 (2014, reaff'd 2021) ......................................................................................................19

ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (2016, reaff'd 2020) ....................................................................................................6, 9

ACOG Obstetric Care Consensus, *Placenta Accreta Spectrum* (July 2012, reaff'd 2021) ...............................................................................................17

ACOG Practice Bulletin No. 183, *Postpartum Hemorrhage* (Oct. 2017) ........................17

ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018)................17

ACOG Practice Bulletin No. 193, *Tubal Ectopic Pregnancy,* at e91 (Mar. 2018, reaff'd 2022) .......................................................................................................8, 13

ACOG Practice Bulletin No. 198*, Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, reaff'd 2022) ......................................................17

ACOG Practice Bulletin No. 200, *Early Pregnancy Loss*, at e197 (Nov. 2018, reaff'd 2021) .......................................................................................................8, 14

ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, at e80 (Mar. 2020, reaff'd 2022) ..................................................................................................8

ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (Dec. 2018) ............................................................................................................17

Agency for Healthcare Rsch. & Quality, *2019 Nat'l Healthcare Quality and Disparities Report* (2019) ....................................................................................................19

AMA, *Code of Medical Ethics Opinions on Patient-Physician Relationships* (2016)......22

AMA, *Principles of Medical Ethics* (2001) .......................................................................23

Michael S. Beeson et al., *The Model of the Clinical Practice of Emergency Medicine*, AM. BOARD OF EMERGENCY MED. (2019) ......................................................................9

Lyndsey S. Benson et al., Early Pregnancy Loss in the Emergency Department, 2021 J. AM. C. EMERGENCY PHYSICIANS OPEN e12549 (2021).....................................8, 18, 20

Cleveland Clinic, *High-Risk Pregnancy*.............................................................................9

Juanita Chinn, et al., *Health Equity Among Black Women in the United States*, 30 J. WOMEN'S HEALTH 212 (2021).....................................................................................20

CMS, *Advancing Rural Maternal Health Equity*, at 1 (May 2022).............................19, 20

CMS, *Rural Health Strategy* (2018) ................................................................................18

*The Diagnosis of Ectopic Pregnancy*, 12018/021 HEALTHCARE SAFETY INVESTIGATION BRANCH (Mar. 2020) .................................................................................................7

Econ. Rsch. Serv., U.S. Dep't of Agric., *Rural America at a Glance* (2021) ...................18

iii

Healthcare Cost and Utilization Project, *Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence* (Dec. 14, 2021) ........................................................................................16

Donna Hoyert, *Maternal Mortality Rates in the United States, 2020*, NAT'L CTR. FOR HEALTH STAT. (Feb. 2022) ...............................................................................9

Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During Pregnancy: An Observational Study* 216 AM. J. OF OBSTETRICS AND GYNECOLOGY (Feb. 2017) .................................................................................................9

March of Dimes, *Maternity Care Desert* ...........................................................................18

Carolyn A. Miller et al., Patient Experiences with Miscarriage Management in the Emergency and Ambulatory Settings, 134 OBSTETRICS AND GYNECOLOGY 1285 (Dec. 2019) ........................................................................................................8

Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research*, 49 ANN. EMERGENCY MED. 696 (May 2007)....................6

Office of the Ass't Sec'y for Planning & Evaluation, HHS, *Trends in the Utilization of Emergency Dep't Servs., 2009–2018* 1, 22 (Mar. 2021) ...............................................19

Nancy Ochieng et al., *How Many Physicians Have Opted-Out of the Medicare Program?* KFF (Oct. 22, 2020) ........................................................................... 10-11

Emily E. Peterson et. al., *Vital Signs: Pregnancy-Related Deaths, United States 2011–2015, and Strategies for Prevention, 13 States, 2013–2017*, 68 MORBIDITY & MORTALITY WKLY. REP. 423 (May 10, 2019)..............................................................16

Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, COMMONWEALTH FUND (Nov. 18, 2020) ......................................................................................................17

Katherine Tucker et al., *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. 1 (Aug. 2017)................................................7

## I.    INTERESTS OF AMICI CURIAE[1]

*Amici curiae* are leading medical and public health societies representing physicians, other clinicians, and public health professionals who serve patients in Texas and nationwide. Among other organizations, they include the American College of Emergency Physicians ("ACEP"), the leading advocate for emergency physicians; the American College of Obstetricians and Gynecologists ("ACOG"), the nation's leading organization of physicians who provide health services unique to people seeking obstetric or gynecologic care; the American Medical Association ("AMA"), the largest professional association of physicians, residents, and medical students in the country; and the Society for Maternal-Fetal Medicine ("SMFM"), the medical professional society for maternal-fetal medicine subspecialists, who are obstetricians with additional training in high-risk pregnancies.[2]

Ensuring access to evidence-based health care and promoting health care policy that improves patient health are central to *Amici*'s missions. *Amici* believe that all patients are entitled to prompt, complete, and unbiased emergency health care that is medically and scientifically sound, and is provided in compliance with the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). *Amici* submit this

---

[1]    As noted in *Amici*'s Motion for Leave, Defendants consent to the filing of this brief and Plaintiffs do not oppose its filing. Counsel for *Amici* authored this brief in whole; no party's counsel authored, in whole or in part, this brief; and no person or entity other than *amici* and their counsel contributed monetarily to preparing or submitting this brief.

[2]    The identities and interests of each *amicus* are explained in more detail in *Amici*'s accompanying Motion for Leave.

1

brief to explain how EMTALA has been understood and applied in the practice of emergency medicine, and the role that abortion care plays in providing the stabilizing treatment required by EMTALA.

*Amici*'s ability to care for their patients in compliance with professional medical ethics requires that they be subject to consistent legal requirements that allow them to provide necessary, clinically appropriate medical care in emergency situations. Accordingly, they have a strong interest in ensuring that EMTALA is correctly understood and implemented.

## II.     PRELIMINARY STATEMENT

*Amici* submit this brief to provide the Court with the perspective of the clinicians who treat patients experiencing emergency medical conditions every day, and who have been regulated by EMTALA for the past 36 years. As *Amici* will explain, updated EMTALA guidance (the "Guidance") recently issued by the Centers for Medicaid & Medicare Services reflects the way that EMTALA has long been understood and applied. The Guidance merely reasserts what EMTALA has always required: that physicians who are treating patients with serious emergency medical conditions provide treatment that will stabilize those conditions, rather than allowing their patients' health to deteriorate.

The State's challenge in this case misunderstands both EMTALA and the on-the-ground practice of emergency medicine. The Guidance is not an "Abortion Mandate," nor does it turn emergency rooms into "walk-in abortion clinic[s]."[3] It merely restates

---

[3]     Am. Compl. ¶ 1.

physicians' obligations under federal law and medical ethics, and explains how those obligations may manifest themselves in real-world emergency situations involving pregnant patients. Indeed, as the Government explains, the Guidance does not even appear to conflict with Texas law.[4]

For nearly four decades, EMTALA has provided the foundation of the emergency care safety net in this country. EMTALA requires hospitals and physicians to provide stabilizing treatment to any patient presenting with an emergency medical condition that has the potential to cause serious harm to the patient or that endangers their life. Emergency treatment by definition requires physicians to act quickly, often with limited information, to treat and stabilize the patient. Timely care is crucial, as patients' conditions can deteriorate rapidly and with little or no warning. Waiting to treat a condition until it becomes life-threatening poses a substantial risk that the patient's outcome will be much worse—not only because the condition will deteriorate in the interim, but also because the required intervention at that point will often be far more invasive. In providing emergency care, physicians must act swiftly to implement a treatment plan based on their best medical judgment—honed by over a decade of medical education, training, and fellowship, as well as their years of practice, and based on evidence-backed guidelines and ethical obligations to meet the patient's individual health care needs.

Well-established clinical guidelines for the treatment of pregnant patients recognize that abortion may be the necessary stabilizing treatment for some emergency conditions.

---

[4] Defs.' Br. in Supp. of their Mot. to Dismiss & in Opp'n to Pls.' Mot. for TRO and Prelim. Inj. ("Defs.' Br."), ECF No. 40, at 11-15.

Although the word abortion is often associated with care provided outside the emergency setting, abortion also includes termination of pregnancy in cases where a fetus will not survive, such as treating an ectopic pregnancy or a first-trimester placental abruption, which if not performed can threaten the mothers' health and life. Withholding that care is directly contrary to EMTALA's mandate and to bedrock principles of medical ethics—and always has been. The State is thus incorrect to suggest that the Guidance sets out new requirements or interprets EMTALA in a novel fashion. It does not require hospitals or physicians to do anything that EMTALA and their obligations as physicians do not already require. It simply recognizes the reality of emergency medicine and reassures doctors that they can follow their professional obligations and federal law without running afoul of state laws. Indeed, interpreting EMTALA any other way would be a novel, dangerous, and unworkable constraint on how emergency medicine is practiced.

Thus, at bottom, this case is not about Texas law. As the Government explains, it is about a guidance document that makes no new law.[5] That Guidance merely reflects the reality of emergency medicine and how EMTALA has been understood for decades. Accordingly, for the reasons set forth by the Government and below, the State's motion for a preliminary injunction should be denied and the Guidance should not be enjoined.

---

[5]   Defs.' Br. at 8, 11-14, 22-23.

4

### III.   ARGUMENT

####   A.   Providing Stabilizing Care for Pregnant Patients with Emergency Medical Conditions Sometimes Requires Abortion

#####   1.   The Nature of Emergency Care

"Emergency medicine is the medical specialty dedicated to the diagnosis and treatment of unforeseen illness or injury."[6] This essential medical specialty includes "initial evaluation, diagnosis, treatment, coordination of care among multiple clinicians or community resources, and disposition of any patient requiring expeditious medical, surgical, or psychiatric care."[7] Emergency care is not limited to treatment provided in the emergency department ("ED"), but is practiced in a broad variety of settings both within the hospital and in other locations.[8] Emergency care may be provided to pregnant patients in the ED or in labor and delivery units, by obstetrician-gynecologists, by family physicians, or by any number of other medical specialists.[9]

---

[6]   ACEP, Policy Statements, Definition of Emergency Medicine (Jan. 2021), https://www.acep.org/patient-care/policy-statements/definition-of-emergency-medicine/ ("ACEP, *Definition of Emergency Medicine*").

[7]   *Id.*

[8]   *Id.*; *see also* Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals with Emergency Medical Conditions, 68 Fed. Reg. 53221, 53229 (Nov. 10, 2003) (codified at 42 C.F.R. 413, 482, and 489) ("CMS believes that EMTALA requires that a hospital's dedicated emergency department would not only encompass what is generally thought of as a hospital's 'emergency room,' but would also include other departments of hospitals, such as labor and delivery . . . ").

[9]   *Id.* ("Emergency medicine is not defined by location but may be practiced in a variety of settings including, but not limited to, hospital-based and freestanding emergency departments (EDs), urgent care clinics, observation medicine units, emergency medical response vehicles, at disaster sites, or via telehealth."); *see also*

5

The general public places trust in these physicians. A recent study underscored this, finding that 93% of adults polled "trust an emergency physician to provide medical care . . . in the event [they] went to the emergency department."[10] Those adults also consider 24/7 access to an emergency department to be just as essential to their communities as fire departments or water utility services.[11] And they most trust a physician to lead care in the ED, especially for more severe injuries and illnesses.[12] This trust is the byproduct of the demonstrated expertise of countless clinicians providing stabilizing medical care pursuant to EMTALA every day in the United States and a singular dedication to treating any patient who presents with any emergency medical condition.

It is essential to the life and health of patients that emergency care be provided based on sound medical standards. Emergency physicians identify and treat conditions when patients first present, often making the difficult determination of what care is needed and what specialists should be involved in a time-sensitive situation. Because of the complexities inherent in most health emergencies, physicians must use their medical judgment—honed through years or decades of medical education, training, and experience—to provide evidence-based care that is consistent with clinical guidance, and

---

ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (2016, reaff'd 2020).

[10] ACEP, *Public Opinion on the Value of Emergency Physicians* 17 (Aug. 26, 2021), https://www.emergencyphysicians.org/globalassets/emphysicians/all-pdfs/value-and-sop-august-2021-poll-final.pdf.

[11] *Id.* at 10.

[12] *Id.* at 17–19.

responsive to their patient's individualized needs.

It is axiomatic that rapid treatment improves patient outcomes, while delays increase the risk of complications, permanent injury, or death.[13] Rapid treatment is a core ethical responsibility for physicians in emergency scenarios: "Patients often arrive at the emergency department with acute illnesses or injuries that require immediate care. . . . [E]mergency physicians have little time to gather additional data, consult with others, or deliberate about alternative treatments. Instead, there is a presumption for quick action guided by predetermined treatment protocols."[14] This includes treatment of pregnancy-related emergencies, where "[e]arly diagnosis and treatment are paramount in reducing maternal morbidity and mortality."[15]

> 2.    Caring for Pregnant Patients Is an Essential Component of Emergency Medicine

Pregnant women [16] regularly seek emergency care—and that care sometimes involves treatment that can be characterized as abortion. In virtually every shift (and often

---

[13]    *See, e.g.*, Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research.* 49(5) ANN. EMERGENCY MED.  696–697 (May 2007).

[14]    ACEP, *Code of Ethics for Emergency Physicians*, at 4 (Jan. 2017) ("ACEP, *Code of Ethics*").

[15]    Katherine Tucker et al., *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. 1, 1 (Aug. 2017); *see also, e.g.*, *The Diagnosis of Ectopic Pregnancy*, 12018/021 HEALTHCARE SAFETY INVESTIGATION BRANCH, at para. 3.2.1 (Mar. 2020) ("A delay in or failure to diagnose ectopic pregnancy can be life-threatening to women.").

[16]    *Amici* use the term "women" and "she/her" inclusively and recognize that people with female anatomy who do not identify as women can also become pregnant and need emergency care.

multiple times a shift), emergency practitioners see pregnant patients presenting with abdominal pain, vaginal bleeding, or other pregnancy-related issues. While most do not require emergency intervention, emergencies involving pregnant patients are frequent and dangerous. For example, conditions pregnant patients may present with include:

- **Tubal ectopic pregnancy**, or pregnancy that occurs outside the uterine cavity in the fallopian tube, in which the fertilized egg cannot survive and the growing tissue may cause life-threatening bleeding if left untreated. As the nonviable pregnancy grows, the structure where it is implanted can burst, or rupture, causing major internal bleeding and requiring emergency surgery. If identified early, this condition can be treated with surgery or methotrexate, but severe cases require immediate surgical intervention.[17]

- **Prelabor rupture of membranes**, where the amniotic sac ruptures before fetal viability, potentially leading to serious infection and sepsis.[18]

- **Miscarriage**, which is extremely common, occurring in approximately 10% of clinically recognized pregnancies.[19] 500,000–900,000 women seek care in the ED with miscarriage-related concerns each year.[20] In some cases after a miscarriage, retained products of conception (i.e., dead fetal tissue) remain in the womb and can cause serious infection.

The American Board of Emergency Medicine's Model of Clinical Practice of Emergency Medicine, the definitive source and guide to the core content found on

---

[17]   ACOG Practice Bulletin No. 193, *Tubal Ectopic Pregnancy,* at e91 (Mar. 2018, reaff'd 2022).

[18]   ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, at e80 (Mar. 2020, reaff'd 2022).

[19]   ACOG Practice Bulletin No. 200, *Early Pregnancy Loss*, at e197 (Nov. 2018, reaff'd 2021).

[20]   Carolyn A. Miller et al., Patient Experiences With Miscarriage Management in the Emergency and Ambulatory Settings, 134 OBSTETRICS AND GYNECOLOGY, 1285 (Dec. 2019); Lyndsey S. Benson et al., Early Pregnancy Loss in the Emergency Department, 2021 J. AM. C. EMERGENCY PHYSICIANS OPEN e12549, 1–2 (2021) ("Benson, *EPL*").

emergency physicians' board examinations, contains an entire section devoted to "Complications of Pregnancy."[21] Nearly all listed conditions are graded as typically "critical" or "emergent," meaning that they "may progress in severity or result in complications with a high probability for morbidity if treatment is not begun quickly."[22]

Given the risks associated with being pregnant,[23] emergency care providers regularly treat pregnant patients for the emergent medical conditions described above, as well as other trauma that may implicate the pregnancy's safety or viability, like car accidents.[24] Hospital-based obstetric units collaborate with EDs because "labor and delivery units frequently serve as emergency units for pregnant women."[25] Hospitals structure these collaborative treatment efforts by establishing protocols for cooperation and

---

[21]   Michael S. Beeson et al., *The Model of the Clinical Practice of Emergency Medicine*, AM. BOARD OF EMERGENCY MED. (2019), https://www.abem.org/public/resources/em-model.

[22]   *Id*.

[23]   The U.S. mortality rate associated with live births was a staggering 23.8 per 100,000 live births in 2020, up from 20.1 in 2019. Donna Hoyert, *Maternal Mortality Rates in the United States, 2020*, NAT'L CTR. FOR HEALTH STAT. (Feb. 2022). Pre-existing conditions and comorbidity with other illnesses further increase the likelihood of pregnancy complications. *See, e.g.*, Cleveland Clinic, *High-Risk Pregnancy*, https://my.clevelandclinic.org/health/diseases/22190-high-risk-pregnancy (last visited Aug. 16, 2022) (describing how preexisting conditions exacerbate the risks of the pregnancy).

[24]   Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During Pregnancy: An Observational Study* 216 AM. J. OF OBSTETRICS AND GYNECOLOGY, 1, 2 (Feb. 2017).

[25]   *See* ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (July 2016, reaff'd 2020).

triage between delivery units and EDs, as well as for the appropriate stabilization of pregnant patients in accordance with EMTALA.[26]

As discussed further below,[27] the clinically recognized, necessary, evidence-based medical treatment for some emergency medical conditions involves medical intervention that ends a pregnancy.[28] In such cases, a pregnant patient's condition may make it such that the fetus will not survive, and a delay in treatment can result in the death of the patient or substantial long-term impairment. While emergency medicine does not involve the performance of abortions that are not medically indicated, it sometimes requires abortion in emergency situations as the only way to avoid significant harm to the pregnant patient.

B. **Where Abortion Is the Clinically Indicated Stabilizing Treatment for an Emergency Medical Condition, It Is Required by EMTALA**

1. EMTALA Enshrines Physicians' Commitment to Treating and Stabilizing Patients

Because of the unique nature of emergency medicine, federal law has, for more than 35 years, required nearly all physicians and hospitals to meet a minimum standard of care.[29] EMTALA defines an emergency medical condition as "a medical condition

---

[26]    *See id.*

[27]    *See infra* Part I(B)(2).

[28]    Note that state definitions of abortion vary; what one state defines and prohibits as an abortion may not be defined as such by another state. For example, procedures to remove an ectopic pregnancy are not defined as abortions under Texas law. *See* Tex. Health & Safety Code 245.002; Pls.' Br. in Support of Mot. for TRO & Prelim. Inj., ECF No. 23 ("Pls.' Br."), at 8 n.16. Thus, while Texas's law does not appear on its face to be inconsistent with EMTALA, that is not necessarily the case for other states' laws.

[29]    All physicians and hospitals participating in government funded health care programs are subject to EMTALA. Only about 1% of non-pediatric physicians have

10

manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the individual's health . . . in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of bodily organs."[30] EMTALA requires that physicians provide treatment to any patient that presents with an emergency condition "until the emergency medical condition is resolved or stabilized."[31]

This mandate requires no more (and often less) than what physicians are taught to view as their ethical and professional responsibility. Faced with a medical emergency, intervening and stabilizing the patient—what EMTALA requires—is the *bare minimum* care that physicians are ethically bound to provide.

EMTALA does not specify the particular treatment that should be provided in a given situation. Instead, when a physician determines that an individual has an emergency medical condition, they must provide "*such treatment as may be required* to stabilize the medical condition." [32] EMTALA properly defers to the medical judgment of the physician(s) responsible for treating the patient to determine how best to achieve the designated objective of stabilization. That decision making, in turn, is informed by

---

opted out of Medicare. Nancy Ochieng et al., *How Many Physicians Have Opted-Out of the Medicare Program?* KFF (Oct. 22, 2020), https://www.kff.org/medicare/issue-brief/how-many-physicians-have-opted-out-of-the-medicare-program.

[30]    42 U.S.C. § 1395dd(e).

[31]    ACEP, *EMTALA Fact Sheet*, https://www.acep.org/life-as-a-physician/ethics--legal/emtala/emtala-fact-sheet/ (last visited Aug. 16, 2022).

[32]    42 U.S.C. § 1395dd(b)(1)(A) (emphasis added).

established clinical guidelines, developed and regularly updated according to the latest advancements in medical science. Just as EMTALA does not specify particular treatments, it does not allow for physicians to withhold specific treatments for non-medical reasons. Rather, if a treatment is "required to stabilize the medical condition," it must be provided—full stop.[33]

### 2.    The Guidance Correctly Advises that, in Some Situations, EMTALA Requires Abortion

As explained above, pregnant patients present to the emergency room on a daily basis, some of whom have (or develop) emergency medical conditions that require stabilizing treatment under EMTALA. In some cases, the only way to stabilize those patients is by performing an abortion. When a physician determines that that is the case, EMTALA mandates what their ethical obligations already required: providing the patient stabilizing—and perhaps even life-saving—care.

At its core, this is all that the Guidance says. The Guidance explains that "[i]f a physician believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician ***must*** provide that treatment."[34] This is not a new requirement, and the Guidance creates no new legal obligations. It simply states what the law has required since Congress passed EMTALA in 1986—and what medical ethics required long before that.

---

[33]    *Id.*

[34]    Pls.' Br., Ex. 1, Appx. 002.

The State expresses concern that the Guidance requires treatment in "situations that do not presently threaten the life of the mother but are 'likely . . . to become emergent.'"[35] This, however, is merely what EMTALA requires. EMTALA makes clear that "emergency medical condition[s]" are conditions that "[in] the absence of immediate medical attention" could result in serious harm or place the patient's health in jeopardy—not just those that presently threaten the patient's life.[36] It further sets the standard for "stabilizing" treatment as "such medical treatment of the condition as may be necessary to *assure, within reasonable medical probability, that no material deterioration of the condition is likely to result* from or occur during the transfer of the individual from a facility."[37] To avoid deterioration, ending the pregnancy may be necessary—and may be necessary early in the patient's presentation, rather than when they are already at death's door. For example, early treatment of an ectopic pregnancy is critical to improving the patient's prognosis and avoiding a rupture of the ectopic pregnancy—which not only carries an increased chance of death, but may require more intensive intervention such as removing the fallopian tube, which could render the patient infertile (among other potential life-long consequences).[38]

---

[35]   Pls.' Br. at 11-12 (quoting Pls.' Br. Ex 1, Appx. 002).

[36]   42 U.S.C. § 1395dd(e)(1)(A).

[37]   *Id.* § 1395dd(e)(3)(A) (emphasis added).

[38]   *See* ACOG Practice Bulletin No. 193, *Tubal Ectopic Pregnancy,* at e91, e100 (Mar. 2018, reaff'd 2022).

Similarly, where miscarriage is suspected, prompt care is necessary to assure that the patient's miscarriage does not develop into a septic infection.[39]

Indeed, the Guidance's approach is not only what EMTALA already requires, it is the only workable approach to providing emergency care. At what point does the condition of a pregnant woman with a uterine hemorrhage deteriorate from risky to life-threatening? How many blood units does she have to have lose? One? Two? Five? How fast does she have to be bleeding? Soaking through two pads an hour? Three? How low does her blood pressure need to be? 90 mm HG over 60 mm HG? 80 over 50? And at what point in time does the condition of a pregnant woman with sepsis from a uterine infection deteriorate from health-threatening to life-threatening? If the standard treatment of IV fluids does not stop her blood pressure from dropping, is her condition now life-threatening? Is it when she is unconscious and any further treatment has become more complex and fraught with complications?

It is the physicians in the room with their patients, not lawmakers or courts, that are uniquely equipped to make these decisions, and they must make them in the moment and based on the facts they have in front of them. There is simply no medically appropriate way to apply a "life-threatening" test in emergency medicine. The fact is that a pregnant patient's health and life exist on a continuum, and in emergent situations, physicians must and do act quickly. EMTALA prohibits doctors from delaying stabilizing treatment until a legislatively imagined but medically nonexistent line has been crossed.

---

[39] *See* ACOG Practice Bulletin No. 200, *Early Pregnancy Loss*, at e197 (Nov. 2018, reaff'd 2021).

The State similarly misunderstands emergency medicine when it criticizes the Guidance for purportedly "attempt[ing] to force hospitals and physicians to complete chemical abortions that began elsewhere—even illegally—even when the mother's life is not at risk."[40] If EMTALA's standard is met—that is, if a patient is experiencing a medical condition that could reasonably be expected to jeopardize the patient's health without immediate medical attention—then the circumstances that led to that emergency are irrelevant. When treating a gunshot wound, a physician does not ask what the patient was doing at the time of the wound; when treating a car crash victim, they do not ask whether the patient was speeding. In an emergency room, it would be dangerously dilatory for a physician to investigate whether a patient had attempted to induce an abortion and then refuse to provide necessary medical care if they suspect she had. Except insofar as it helps inform the clinically appropriate course of treatment, physicians do not ask whether a patient's conduct caused their current medical need; they treat the current medical need. Neither medical ethics nor EMTALA permit anything less.

### C.    The Balance of the Equities and the Public Interest Weigh Against an Injunction

Even if the State could show that it was likely to succeed on the merits, an injunction would still be inappropriate. An interpretation of EMTALA that allowed states to override EMTALA would cause irremediable harm to patients and profoundly interfere with physicians' ability to practice consistent with professional obligations.

---

[40]    Pls.' Br. at 12.

1.    An Injunction Would Place Pregnant Women at Risk

For all the reasons explained above, there are situations where abortion is a necessary stabilizing treatment for emergency medical conditions. The Guidance challenged in this case does nothing more than recognize that abortion may be stabilizing treatment in some circumstances, and must be provided where that is the case. If the Guidance were struck down because the Court concluded EMTALA does not require this treatment, and states have authority to prohibit hospitals and physicians from providing emergency treatment, the health and lives of pregnant patients would be jeopardized.

Approximately three in five pregnancy-related deaths are preventable. [41] "Standardized approaches to addressing obstetric emergencies" are critical to avoiding these unnecessary deaths. [42] If states can prohibit the standard, clinically indicated treatments for pregnant patients experiencing emergency medical conditions, the rate of death among pregnant patients will surely increase. Nationwide, emergency departments receive more than 3.8 million visits by pregnant patients in a given year.[43] While the vast majority of these visits do not require abortion care, prohibiting that care in the cases where it is necessary—or delaying that care by forcing physicians to wait until a patient's

---

[41]    *See* Emily E. Peterson et. al., *Vital Signs: Pregnancy-Related Deaths, United States 2011–2015, and Strategies for Prevention, 13 States, 2013–2017*, 68 MORBIDITY & MORTALITY WKLY. REP. 423, 426 (May 10, 2019).

[42]    *Id.*

[43]    Healthcare Cost and Utilization Project, *Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence* 3, 8 (Dec. 14, 2021), https://www.hcup-us.ahrq.gov/reports/ataglance/HCUPanalysisHospUtilPregnancy.pdf.

condition deteriorates—will cause countless women to experience preventable suffering, long-term impairment, or even death.

Even under the best of circumstances, pregnancy and childbirth impose significant physiological changes on a person's body that can exacerbate underlying preexisting conditions and can severely compromise health. [44] These risks can create emergency situations in which a pregnant person's health and life are in the balance, as illustrated by the nation's ongoing maternal health crisis.[45] Pregnant people—like all other persons in this country—are entitled to receive health- and life-saving medical care.

>2. An Injunction Would Particularly Harm Women in Rural Areas, Minoritized Women, and Women with Low Incomes

The consequences described above will be especially devastating for underserved populations, including patients living in rural areas, minoritized communities, and pregnant patients with low incomes. As a result of structural inequities and social determinants, these

---

[44] *See, e.g.*, ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018); ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (Dec. 2018); ACOG Practice Bulletin No. 183, *Postpartum Hemorrhage* (Oct. 2017); ACOG Obstetric Care Consensus, *Placenta Accreta Spectrum* (July 2012, reaff'd 2021); ACOG Practice Bulletin No. 198*, Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, reaff'd 2022); ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management* (Sept. 2021).

[45] *See generally* Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, COMMONWEALTH FUND (Nov. 18, 2020), https://www.commonwealthfund.org/publications/issue-briefs/2020/nov/maternal-mortality-maternity-care-us-compared-10-countries (noting that the United States "has the highest maternal mortality rate among developed countries" and maternal deaths "have been increasing in the United States").

populations are "more likely to face barriers in accessing routine health care services," including to prenatal care.[46] ED use has been "consistently increasing," with use by low-income populations and people of color rising at the highest rates.[47] This is exacerbated by the lack of access in many parts of the country to maternity health care.[48] In light of the socioeconomic constraints these populations already face in accessing health care services, EDs and "emergency physicians have been given a unique social role and responsibility to act as health care providers of last resort for many patients who have no other ready access to care."[49]

The 46 million U.S. residents living in rural areas would be particularly endangered if their states were allowed to override EMTALA's mandate.[50] "[R]ural Americans are more likely to be living in poverty, unhealthy, older, uninsured or underinsured, and medically underserved." [51] Rural hospitals and EDs are "the safety net" for rural

---

[46]    Lyndsey S. Benson et al., *Early Pregnancy Loss in the Emergency Department*, J. AM. C. OF EMERGENCY PHYSICIANS OPEN, 1, 1–2 (2021) ("Benson*, EPL*").

[47]    *Id.* at 2.

[48]    *See, e.g.*, March of Dimes, *Maternity Care Desert*, https://www.marchofdimes.org/peristats/data?top=23&lev=1&reg=99&slev=1 (last visited Aug. 16, 2022) ("More than 2.2 million women of childbearing age live in maternity care deserts (1,095 counties) that have no hospital offering obstetric care, no birth center and no obstetric provider. . . . An additional 4.8 million women of child bearing age live in counties with limited access to maternity care.").

[49]    ACEP, *Code of Ethics*, at 4; *see also* Benson, *EPL*, at 7 (EDs play a "vital role" in "caring for those who are socioeconomically vulnerable").

[50]    *See* Econ. Rsch. Serv., U.S. Dep't of Agric., *Rural America at a Glance* 2 (2021), https://www.ers.usda.gov/webdocs/publications/102576/eib-230.pdf.

[51]    CMS, *Rural Health Strategy*, at 2 (2018), https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Rural-Strategy-2018.pdf.

18

Americans, including rural pregnant patients.[52] Rural women are "more likely to be poor, lack health insurance or rely substantially on Medicaid and Medicare" and "must travel longer distances to receive care."[53] Pregnant rural patients accordingly are less likely to seek prenatal care,[54] and the initiation of prenatal care in the first trimester is lower for rural pregnant women and girls compared with those in suburban areas.[55] Rural women "experience poorer maternal outcomes compared to their non-rural counterparts, including high pregnancy-related mortality."[56]

People of color similarly will be disproportionately harmed if EMTALA cannot be followed when treating pregnant patients. People of color and people with low incomes generally have worse access to care and higher rates of ED visits.[57] Pregnant women of color are also less likely to receive prenatal care, resulting in an increased risk for complex

---

[52]    ACEP, *Delivery of Emergency Care in Rural Settings*, at 1 (2017).

[53]    ACOG Committee Opinion No. 586, *Health Disparities in Rural Women*, at 2 (2014, reaff'd 2021).

[54]    *Id.* at 2.

[55]    *Id.*

[56]    CMS, *Advancing Rural Maternal Health Equity*, at 1 (May 2022), https://www.cms.gov/files/document/maternal-health-may-2022.pdf ("CMS, *Advancing Rural Maternal*").

[57]    Agency for Healthcare Rsch. & Quality, *2019 Nat'l Healthcare Quality and Disparities Report*, at A22 (2019), https://www.ahrq.gov/sites/default/files/wysiwyg/research/findings/nhqrdr/2019qdr-cx061021.pdf; Office of the Ass't Sec'y for Planning & Evaluation, HHS, *Trends in the Utilization of Emergency Dep't Servs., 2009–2018* 1, 22 (Mar. 2021), https://aspe.hhs.gov/sites/default/files/migrated_legacy_ files//199046/ED-report-to-Congress.pdf.

health issues occurring in pregnancy.[58] Women of color experience higher rates of severe maternal morbidity and are more likely to suffer pregnancy-related deaths.[59] Women of color are also more likely to experience early pregnancy loss (or miscarriage), the standard treatment for which can include abortion, and to visit an ED for miscarriage-related care.[60]

These populations are therefore more likely to experience emergency medical conditions when pregnant, and thus more likely to need the critical care that EMTALA requires.

3.    Forcing Physicians to Decide Between Obeying State Law and Obeying EMTALA Would Harm Physicians and the Public Interest

The Guidance's interpretation of EMTALA is also necessary to allow physicians to practice consistent with medical ethics and without the specter of government sanctions. If physicians must choose between complying with EMTALA and complying with contrary state law, they will be placed in an untenable lose-lose situation: compliance with one set of obligations necessitates the violation of another.

If EMTALA does not preempt contrary state laws, clinicians will be in the untenable position of choosing between providing care consistent with their best medical

---

[58]    Benson, *EPL*, at 2; *see also* Juanita Chinn, et al., *Health Equity Among Black Women in the United States*, 30 J. WOMEN'S HEALTH 212, 215 (2021) ("Chinn, *Health Equity*") (explaining that "Black women are at a disadvantage regarding the protective factor of the early initiation of prenatal care").

[59]    CMS, *Advancing Rural Maternal Health Equity*, at 1 (May 2022); *see also* Chinn, *Health Equity*, at 215 (Black and Latina women "are at greater risk of poor pregnancy outcomes").

[60]    Benson, *EPL*, at 5–7.

judgment, scientific evidence, and the clinicians' ethical obligations, or risking legal retribution. Will they violate their state's law and be subject to indictment, arrest, prosecution, and license suspension, jeopardizing not only their livelihoods but also their ability to render care to patients in the state?[61] Or will they violate EMTALA and subject themselves and their hospital to termination of their Medicare provider agreement, fines, and civil damages, thereby depriving patients who rely on these facilities for care?[62] This not only places physicians in an impossible bind, it will delay or prevent the provision of critical, stabilizing care to pregnant patients.

Limiting EMTALA in the manner the State proposes would jeopardize long-established and widely accepted principles of medical ethics by undermining the patient-physician relationship and pitting physicians' interests against their patients' interests. Physicians are subject to ethical obligations that require them to put the patient first. ACOG's Code of Professional Ethics states that "the welfare of the patient must form the basis of all medical judgments" and that obstetrician-gynecologists should "exercise all reasonable means to ensure that the most appropriate care is provided to the patient."[63] Similarly, ACEP's Code of Professional Ethics states that "[e]mergency physicians shall embrace patient welfare as their primary professional responsibility" and explains that it is unethical to deny or delay the provision of emergency care on the basis of "type of illness

---

61    *See, e.g.*, Idaho Code § 18-622(2)-(3).

62    *See* ACEP, *EMTALA Fact Sheet*, https://www.acep.org/life-as-a-physician/ethics--legal/emtala/emtala-fact-sheet/ (listing penalties for physicians).

63    ACOG, *Code of Professional Ethics* 2 (Dec. 2018) ("ACOG, *Code of Ethics*").

or injury."[64] And the AMA Code of Medical Ethics places on physicians the "ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others." [65] EMTALA's requirement that a physician must provide "stabilizing treatment [to] prevent material deterioration" of all patients and must "act prior to the patient's condition declining"[66] merely codified what was already paramount in physicians' professional obligations.

Without EMTALA, physicians in some states will be forced to supplant their own medical judgment regarding what medical treatment is in the patients' best interests with a state legislature's non-expert decision regarding whether and when physicians may provide clinically indicated treatment. Such laws also create inherent conflicts of interest and may delay needed emergency treatment. Physicians need to be able to offer appropriate treatment options based on patients' individualized needs without regard for their own self-interest.[67] But if providing that care could subject physicians to criminal prosecution under a state's laws, the looming threat of criminal liability would result in dangerous delay. In the time that clinicians and hospital administrators would need to evaluate their legal exposure, a time-sensitive emergent situation could advance and the patient could

---

[64]    ACEP, *Code of Ethics*, at 4, 11.

[65]    AMA, *Code of Medical Ethics Opinions on Patient-Physician Relationships* § 1.1.1 (2016) ("AMA, *Code of Ethics*").

[66]    CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* (July 11, 2022).

[67]    *See, e.g.*, AMA, *Code of Ethics*, at §1.1.1 (stating that a physician has an "ethical responsibility to place patients' welfare above the physician's own self-interest").

deteriorate in front of them. Such laws obstruct physicians' ability to put their pregnant patients first and place them in the untenable position of choosing between the ethical practice of medicine and obeying the state law.

The obligation to promote the wellbeing of others (known as "beneficence") and to do no harm and cause no injury ("non-maleficence") have been the cornerstones of the medical profession since the Hippocratic traditions nearly 2,500 years ago.[68] Both of these principles arise from the foundation of medical ethics, which requires that the welfare of the patient forms the basis of all medical decision making. EMTALA recognizes these principles by prohibiting physicians from placing their own interests above their patients' interests. If a physician concludes that an abortion is medically necessary, the principles of beneficence and non-maleficence require the physician to recommend, provide, and/or (if time permits and the patient is stable) refer the patient for that course of treatment. Placing physicians in the ethical impasse of choosing between providing the best available medical care and risking substantial penalties under state law, or protecting themselves and their medical practice, challenges the very core of the Hippocratic Oath: "Do no harm."

## IV.    CONCLUSION

For the foregoing reasons and those in the Government's brief, this Court should deny the preliminary injunction requested by the Plaintiffs.

---

[68]    ACEP, *Code of Ethics*, at 6; *see generally* AMA, *Principles of Medical Ethics* (2001).

Dated: August 16, 2022

Respectfully submitted,

s/      *Jessica Anne Morton*
Jessica Anne Morton*
   (D.C. Bar No. 1032316)
Jeffrey B. Dubner*
John T. Lewis*
Skye L. Perryman*
DEMOCRACY FORWARD FOUNDATION
655 15th St. NW, Ste 800
Washington, D.C. 20005
Tel.: (202) 448-9090
jmorton@democracyforward.org
jdubner@democracyforward.org
jlewis@democracyforward.org
sperryman@democracyforwrd.org

Shannon Rose Selden*
Leah Martin*
Adam Aukland-Peck*
DEBEVOISE & PLIMPTON LLP
919 Third Ave.
New York, NY 10022
Tel.: 212-909-6000
srselden@debevoise.com
lmartin@debevoise.com
aauklandpeck@debevoise.com

*Counsel for* Amici

Molly A. Meegan*
AMERICAN COLLEGE OF OBSTETRICIANS
AND GYNECOLOGISTS
409 12th Street, SW
Washington, DC 20024
(202) 863-2585
mmeegan@acog.org

*Counsel for* Amicus Curiae *American
College of Obstetricians and Gynecologists*

* *pro hac vice application
pending/forthcoming*

24

25