# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; and CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,** | § § § § § § | |
| *Plaintiffs*, | § | |
| | § | **CIVIL ACTION NO. 5:22-CV-00185** |
| v. | § | |
| | § | |
| **XAVIER BECERRA,** in his official capacity as Secretary of Health and Human Services; **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS); KAREN L. TRITZ,** in her official capacity as Director of the Survey and Operations Group for CMS; **DAVID R. WRIGHT,** in his official capacity as Director of the Quality Safety and Oversight Group for CMS, | § § § § § § § § § § § | |
| *Defendants*. | § | |

---

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

## TABLE OF CONTENTS

Table of Contents ..................................................................................................... 2

Table of Authorities ................................................................................................ 3

I.    EMTALA Does Not Require Abortions or Impose Any Standard of Care ............................ 7

II.   Plaintiffs Have Standing ............................................................................ 10

III.  Plaintiffs Will Likely Succeed on the Merits of Their Claims ........................................... 17

   A.  The Abortion Mandate constitutes final agency action ................................................. 17

       1.  The Abortion Mandate marks the consummation of HHS's decision-making .......... 17

       2.  Legal consequences flow from the Abortion Mandate ................................................ 18

   B.  Defendants acted ultra vires and exceeded statutory authority when they
       promulgated the Abortion Mandate .................................................................... 18

   C.  The Abortion Mandate violates the Presumption Against Preemption and the
       Major Questions Doctrine ................................................................................. 21

IV.   The Guidance Violates the Constitution ........................................................... 21

   A.  The Abortion Mandate violates the Spending Clause .................................................. 21

   B.  The Abortion Mandate violates the First Amendment and RFRA .................................. 24

Certificate of Service .................................................................................. 28

## Table of Authorities

**Cases**                                                                                          **Page(s)**

*ACLU v. Trinity Health*,
   178 F. Supp. 3d 614 (E.D. Mich. 2016) ...................................................................... 9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) .......................................................................................................... 9

*Assoc. of Am. Phys. & Surgeons v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) ......................................................................................... 15

*Bennett v. Ky. Dep't of Educ.*,
   470 U.S. 656 (1985) ........................................................................................................ 22

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................................ 16

*Biden v. Missouri*,
   142 S. Ct. 647 (2022) ...................................................................................................... 17

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ..................................................................................... 13, 23, 25

*Chamber of Commerce v. Whiting*,
   563 U.S. 582 (2011) ........................................................................................................ 19

*Christian Emps. All. v. EEOC*,
   No. 1:21-CV-195, 2022 WL 1573689 (D.N.D. May 16, 2022) ............................... 24

*De La Garza Gutierrez v. Pompeo*,
   741 Fed. Appx. 994 (5th Cir. 2018) ............................................................................ 16

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ..................................................................................................... 9

*Dordt College v. Burwell*,
   801 F.3d 946 (8th Cir. 2015) ......................................................................................... 24

*E. Texas Baptist Univ. v. Burwell*,
   793 F.3d 449 (5th Cir. 2015) ......................................................................................... 24

*FEC v. Cruz*,
   142 S. Ct. 1638 (2022) ................................................................................................... 12

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ........................................................................................................ 19

*Franciscan All., Inc. v. Becerra*,
   553 F. Supp. 3d 361 (N.D. Tex. 2021) ....................................................................... 24

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ........................................................................................................ 20

*Her Majesty the Queen in Right of Ontario*,
  912 F.2d 1525 (D.C. Cir. 2011) ............................................................... 17

*Humane Soc. of the U.S. v. Hodel*,
  840 F.2d 45(D.C. Cir. 1988) ................................................................... 25

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ........................................................................... 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................ 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ................................................................................ 23

*Nat'l Pork Producers Council v. E.P.A.*,
  635 F.3d 738 (5th Cir. 2011) .................................................................. 16

*Nitro-Lift Techs., L.L.C. v. Howard*,
  568 U.S. 17 (2012) .................................................................................. 19

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) .................................................................................... 20

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  734 F.3d 406 (5th Cir. 2013) .................................................................. 10

*POET Biorefining, LLC v. E.P.A.*,
  970 F.3d 392 (D.C. Cir. 2020) ............................................................... 17

*Religious Sisters of Mercy v. Azar*,
  513 F. Supp. 3d 1113 (D.N.D. 2021) ...................................................... 24

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ................................................................................ 20

*Sackett v. EPA*,
  556 U.S. 120 (2012) ................................................................................ 16

*Sherbert v. Verner*,
  374 U.S. 398 (1963) .......................................................................... 14, 25

*South Coast Air Quality Mgmt. Dist. v. EPA*,
  472 F.3d 882 (D.C.Cir.2006) ................................................................. 15

*Stiles v. Tenet Hosps., Ltd.*,
  494 F. App'x 432 (5th Cir. 2012) ........................................................... 18

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*,
  37 F.4th 1078 (5th Cir. 2022) ................................................................. 15

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................................ 14

*Tex. Off. of Pub. Util. Couns. v. FCC*,

183 F.3d 393 (5th Cir. 1999)..................................................................................9

*Texas Med. Ass'n v. HHS*,
   --- F. Supp.3d. ----, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022) .....................................12, 13

*Texas v. Becerra*,
   577 F. Supp. 3d 527 (N.D. Tex. 2021)................................................................10, 12

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019)..........................................................................passim

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015)...............................................................................9

*Va. ex rel. Cuccinelli v. Sebelius*,
   656 F.3d 253 (4th Cir. 2011)..............................................................................10

*West Virginia v. E.P.A.*,
   142 S. Ct. 2587 (2022).....................................................................................20

*West Virginia v. HHS*,
   289 F.3d 281 (4th Cir. 2002)..........................................................................22, 23

*Zubik v. Burwell*,
   578 U.S. 403 (2016).......................................................................................24

**Statutes & Constitutions**                                **Page(s)**

42 U.S.C. § 1395.....................................................................................7, 18, 21

42 U.S.C. § 1395dd.....................................................................................6, 21

42 U.S.C. § 1396c.........................................................................................22

42 U.S.C. § 18023.........................................................................................19

42 U.S.C. § 238n........................................................................................7, 18

Act of May 25, 2021, 87th Leg., R.S., ch. 800, § 2, 2021 Tex. Sess. Law Serv. 1887.................9

Tex. Health & Safety Code § 170A.002....................................................................9

Tex. Occ. Code § 103.001.................................................................................11

Tex. Rev. Civ. Stat. art. 4512.1.........................................................................10

Tex. Rev. Civ. Stat. art. 4512.2.........................................................................10

Tex. Rev. Civ. Stat. art. 4512.3.........................................................................10

Tex. Rev. Civ. Stat. art. 4512.4.........................................................................10

Tex. Rev. Civ. Stat. art. 4512.6.........................................................................10

**Regulations**.........................................................................................**Page(s)**

42 C.F.R. § 1003.500.....................................................................................15

42 C.F.R. § 482.28.......................................................................................17

42 C.F.R. § 482.62 ................................................................................................................. 17

73 Fed. Reg. 78 ....................................................................................................................... 8

76 Fed. Reg. 9 ......................................................................................................................... 8

83 Fed. Reg. 3 .................................................................................................................... 8, 9

84 Fed. Reg. 23 .................................................................................................................. 8, 9

87 Fed. Reg. 40 ...................................................................................................................... 8

Plaintiffs hereby reply to Defendants' Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. #38, 40).

## I.   EMTALA Does Not Require Abortions or Impose Any Standard of Care

Defendants' entire argument is based on their incorrect theory that EMTALA requires abortions in situations where Texas law prohibits them. HHS claims that EMTALA requires abortions, or "termination of the pregnancy," in various circumstances, and that it "has long been understood" to do so. Dkt. #40 at 1. But labeling the Abortion Mandate a mere "reminder" does not make it so. When one examines the text, context, and judicial interpretations of EMTALA, the opposite is apparent, at every turn.

*First*, the text of EMTALA says nothing about abortion, "termination of pregnancy," or indeed any specific procedure—as Defendants concede. *See* Dkt. #39 at 11. This is all the more remarkable as the statute is explicitly about pregnancy. If Congress really used EMTALA to require abortions, it could not have avoided naming that procedure. Instead, in EMTALA one finds exactly the opposite of an abortion mandate: four times Congress explicitly required providing care to the "unborn child." Congress seems to have written EMTALA to ensure that an abortion is the last thing the government could require under that law. EMTALA then specifies that it preempts no state law unless EMTALA's text "directly" does so. 42 U.S.C. § 1395dd(f). This clause precludes any use of EMTALA to require an abortion, since there is no "direct" mention of abortion, and there are direct requirements to treat the unborn child. *Id.* §§ 1395dd(c)(1)(A)(ii); 1395dd(2)(A); 1395dd(e)(1)(A); 1395dd(e)(1)(B)(ii).

*Second*, the surrounding text of the Social Security Act, into which Congress inserted EMTALA, similarly states EMTALA cannot be used to impose standards of care or particular care: no "supervision or control over the practice of medicine or the manner in which medical

services are provided." 42 U.S.C. § 1395. Other statutes specifically preclude the federal government from requiring the performance of abortions (including through EMTALA); namely, 42 U.S.C. § 238n(a) and the Weldon Amendment to annual HHS appropriations bills.

*Third*, as discussed in our opening brief, Dkt. #23 at 3–5, courts have uniformly insisted that EMTALA is an anti-dumping statute that does not require specific care, but only ensures providers do not provide different care based on a patient's ability to pay. In light of this text, context, and precedent, it is simply not possible to construe EMTALA as requiring abortions.

HHS's response to this textual argument is to cite: (1) a CMS guidance from less than a year ago that never mentions abortion; and (2) two guidances from another agency in HHS that has no role vis-à-vis EMTALA. This is inadequate, to say the least. At the outset, it is worth noting that not once in EMTALA's 36-year history HHS ever issued a regulation requiring abortions, under EMTALA or otherwise. All HHS can cite are guidances, only one of which is more than a year old. Guidances are not capable of overriding the text, context, and judicial precedent interpreting EMTALA, nor of giving states and other recipients clear notice of statutory conditions on federal funding. But the guidances HHS cites do not create the EMTALA Abortion Mandate that the Guidance challenged here claims has always existed.

HHS chiefly relies on a guidance document CMS issued less than a year ago.[1] Dkt. #40 at 7. But the guidance never mentions abortion or termination of pregnancy. It states the obvious, that emergencies can occur with ectopic pregnancies and other conditions. And it lists possible treatments, only one of which (dilation and curettage (D&C)) can be used as an abortion. But it does not say D&C is required, and indeed D&C need not be an abortion. It can also used after a

---

[1] Available at https://www.cms.gov/files/document/qso-21-22-hospital.pdf

baby has died, or after the baby has been delivered. The 2021 document does not even remotely establish that EMTALA has always required abortions. Nor does it contain what the Abortion Mandate challenged here imposes: an explicit duty to abort, through statements like "the physician **must** provide" an "abortion." Guidance at 1 (Dkt. # 23-1 at 2).

HHS's only other official support for the notion that EMTALA has always required abortions is two guidance statements from another agency in HHS—its Office for Civil Rights (OCR)—from 2021[2] and 2011.[3] Dkt. #40 at 7, 34. These documents show nothing of the sort, for two reasons. First, OCR has no role in interpreting or enforcing EMTALA. As HHS notes elsewhere, CMS and HHS's Inspector General enforce EMTALA. Dkt. #40 at 16. And CMS, not OCR, issues regulations under EMTALA, since it is a Medicare provision.[4] Second, although these documents suggest EMTALA may sometimes require abortions in tension with conscience laws, HHS does not mention that OCR said otherwise three different times, in 2009, 2018, and 2019.[5] At that time OCR rejected the suggestion by commenters that OCR should not enforce conscience laws on the theory that EMTALA requires abortions. Indeed, OCR repeatedly cited a 2016 lawsuit, which based on that theory had tried to force Catholic hospitals to perform abortions,

---

[2] Available at https://www.hhs.gov/sites/default/files/church-guidance.pdf

[3] 76 Fed. Reg. 9,968 (Feb. 23, 2011).

[4] *See, e.g.*, 87 Fed. Reg. 40,350 (July 6, 2022) (CMS proposed rule amending its EMTALA regulation).

[5] "Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law," 73 Fed. Reg. 78,071 (Jan. 20, 2009); "Protecting Statutory Conscience Rights in Health Care; Delegations of Authority," 83 Fed. Reg. 3,880 (Jan. 26, 2018); "Protecting Statutory Conscience Rights in Health Care; Delegations of Authority," 84 Fed. Reg. 23,170 (July 22, 2019).

as an example of "confusion" that justified enforcing conscience laws more vigorously.[6] None of OCR's statements from 2009–2019 were made in regulatory text, much less in EMTALA regulations. In other words, in the two recent Republican administrations, a sub-agency that does not enforce EMTALA has opined that EMTALA does not seem to require abortions, and in the two recent Democrat administrations, it has suggested maybe it does. In contrast, the Abortion Mandate challenged here was issued by CMS, the agency that actually enforces EMTALA, and it repeatedly uses binding language about what those regulated by EMTALA must do.

## II.    <u>Plaintiffs Have Standing</u>

"[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

Under *Dobbs*, Texas has authority to regulate or prohibit abortions, just as it does "other health and welfare laws." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022). Texas's regulation of abortion is codified in two places—the Human Life Protection Act, Act of May 25, 2021, 87th Leg., R.S., ch. 800, § 2, 2021 Tex. Sess. Law Serv. 1887 (to be codified at Tex. Health & Safety Code § 170A.002(b)(2)) ("H.B. 1280")[7], and Texas's pre-*Roe* criminal statutes,

---

[6] 83 Fed. Reg. at 3,888–89 (citing *ACLU v. Trinity Health*, 178 F.Supp.3d 614 (E.D. Mich. 2016)); 84 Fed. Reg. at 23,178 (citing the same case).

[7] The Human Life Protection Act is scheduled to go into effect thirty days after the issuance of a United States Supreme Court judgment in a decision overruling *Roe v. Wade*. H.B. 1280 at § 3(1). Accordingly, the Human Life Protection Act will be effective on August 25.

Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6 (2010) (former Tex. Penal Code arts. 1191–1194, 1996 (1925)), both of which include criminal enforcement provisions. The Abortion Mandate purports to preclude Texas from enforcing these provisions, which inflicts an injury-in-fact, *see Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011), and this injury to Texas's sovereign interest is "necessarily" irreparable. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).

Defendants' contention that "Texas does not claim to be enforcing" its pre-*Roe* laws is wholly unsupported, and their observation that that Human Life Protection Act "has not yet taken effect" does not insulate their actions from judicial review. *See* Dkt. #40 at 2. The Human Life Protection Act takes effect on August 25, 2022—eight days from the time of this filing. The injury is imminent, certain, and "trace[able] to the challenged action of the defendant." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Indeed, because Defendants failed to conduct notice and comment, Texas suffered the irreparable injury of being denied its procedural right to comment on the Abortion Mandate. *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right."); *Texas v. Becerra*, 577 F. Supp. 3d 527 (N.D. Tex. 2021) (same).

Contrary to Defendants' contention otherwise, it is the Abortion Mandate's requirements that inflicts this sovereign injury—not EMTALA itself. *See* Dkt. #40 at 10. EMTALA does not require, mandate, or direct hospitals or physicians to provide abortions. That requirement is a feature of the Abortion Mandate, not of EMTALA. Defendants concede as much. *Id*. at 11. Defendants' interpretation of EMTALA gives hospitals and physicians unbounded authority. *Id*. at 12, 13, 31. Defendants contend, "[I]f a hospital determines that an emergency medical condition

exists, and that Procedure X is necessary to stabilize a patient with that condition, then EMTALA—entirely of its own force, and without any need for agency guidance—requires the hospital to offer Procedure X." *Id.* at 12. This interpretation leads to absurd results. This would allow every hospital and physician to hold their own veto power over State laws. Indeed, it is hard to imagine how there could ever be a violation of EMTALA if each healthcare provider determines on its own what the appropriate stabilizing treatment is—without regard to any State law.

Defendants' contention that there is no "conflict between Texas law and EMTALA itself" misses the mark. Dkt. 40 at 14. That both EMTALA and the Human Life Protection Act have similar language relating to substantial impairment of bodily functions is beside the point. The *Abortion Mandate* is what specifies a particular procedure—abortion—must be offered and performed—not EMTALA. Defendants' contention that Texas fails to identify any "gap between Texas law and EMTALA" is similarly misplaced. It is the Abortion Mandate, not EMTALA, that requires hospitals and physicians to perform abortions in circumstances that are far broader than what Texas law allows. The Abortion Mandate's requirement that providers perform abortions under circumstances other than when the life of the mother is at risk necessarily means that healthcare providers are required to perform abortions that are prohibited by State law. It is the Abortion Mandate, not EMTALA, that prohibits Texas from enforcing its own laws.

The Abortion Mandate's imposition of a legal duty to perform an abortion also deprives conflicts with Texas's conscience law. Under Texas law, no "physician, nurse, staff member, or employee of a hospital or other health care facility" may be required to "directly or indirectly perform or participate in the [act of an abortion]" against their will. Tex. Occ. Code § 103.001. Yet, the Abortion Mandate contains no such conscience exception and conditions the physicians'

participation in Medicare and Medicaid on participation in such a procedure. Any circumstance in which a doctor is penalized for not participating in an abortion deprives the doctor of rights given to them in that conscience law.

The doctor plaintiffs likewise have standing to bring this challenge, as shown by their declarations. App. 16–36. The doctors have procedural injuries sufficient to sustain their APA claims because they suffer the same procedural injury as does Texas. *See Texas v. EEOC*, 933 F.3d at 447; *Texas v. Becerra*, 577 F. Supp. 3d 527. Notice and comment was required because the Abortion Mandate is a binding requirement. It undercuts doctors' interests in practicing consistent with their rights under federal and state abortion conscience laws and RFRA and the First Amendment. Even where a rule merely causes "pressure" for different conduct, "[t]his claimed procedural injury is sufficient to confer Article III standing." *Texas Med. Ass'n v. HHS*, --- F. Supp.3d. ----, 2022 WL 542879 at *4 (E.D. Tex. Feb. 23, 2022). Here the Abortion Mandate is intended to pressure pro-life doctors to do abortions and pro-life hospitals to let pro-abortion doctors do abortions. "[P]ressure . . . to change" behavior is cognizable injury. *Texas v. EEOC*, 933 F.3d at 449.

HHS's main argument against the doctors' standing is that the Abortion Mandate is not a rule and does not require abortions as Plaintiffs claim. But, in the first place, this is an impermissible inquiry when considering Plaintiffs' standing. "For standing purposes, we accept as valid the merits of [plaintiffs'] legal claims." *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022). Consequently, the Court cannot, as HHS requests, deem that the doctors have no standing because they are wrong that the guidance is a new, unauthorized Abortion Mandate. For standing purposes, the Court

must assume the doctors are right about the Abortion Mandate violating their rights, and then consider whether that violation would injure them either procedurally or otherwise.

As a result, the doctors can challenge this rule because they are regulated by it and face penalties thereunder. Regulated persons have standing to challenge a binding rule that governs them. "If, in a suit challenging the legality of government action, the plaintiff is himself an object of the action there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Texas v. EEOC*, 933 F.3d at 446 (cleaned up). *See also Texas Med. Ass'n*, 2022 WL 542879 at *5 ("[S]tanding is usually self-evident when the plaintiff is a regulated party or an organization representing regulated parties."); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014) (standing exists for regulated businesses to challenge a CMS regulation where there are penalties for noncompliance).

As discussed in Plaintiffs' opening brief, the threat the Abortion Mandate poses is exacerbated by the fact that if the doctors stray in the direction of that mandate they risk violating state law, and vice versa. EMTALA, and the Abortion Mandate, both explicitly regulate "physicians." Several specific doctor members submitted evidence, of their own practices, treating pregnant women in emergency room settings subject to EMTALA, and AAPLOG and CMDA submitted that they have many similar members. Dkt. 23-1 at 17, 24, 30, 32–33, 36. As such, the Abortion Mandate applies to them, and penalties for violating it apply to them as well. This credible threat of enforcement is only reinforced by HHS's brief, in which it insists that EMTALA itself mandates abortions and has done so for decades. The text of the Abortion Mandate—its mandatory language—likewise demonstrates a credible threat of enforcement. This

surpasses the mere "substantial risk" of harm needed to show a threat of future injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Two more points. First, doctors can draw different lines about what to do in particular cases. But to require any of those abortions violates their rights under the federal abortion conscience laws because Congress wrote no exceptions into those laws, and it violates their RFRA rights because HHS has no compelling interest due to having no authority to issue the mandate.

Second, and more importantly, interjecting HHS into situations EMTALA has never allowed it to regulate is inherently harmful. To the doctors here, all abortions are medically, morally, and religiously fraught, especially in emergency rooms. Bringing the federal bureaucracy into that room, without Congressional authority, and without clarity on what they are mandating except that it appeased their political base and mentions non-emergency situations like incomplete medication abortions, creates pressure on the doctors to behave differently. That pressure is itself injury. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("[g]overnmental imposition" of "pressure" to violate one's beliefs is a substantial burden on religious exercise); *Texas v. EEOC*, 933 F.3d at 449 ("pressure … to change" behavior is itself injury). Neither the doctors nor HHS can define exactly how the Abortion Mandate will apply in every medical situation, and this Court need not do so, because the fact that the Abortion Mandate requires any abortions and threatens to require abortions regularly inflicts a sufficient risk of harm for the regulated physicians who object to abortions to challenge the legality of this rule. Nor do the doctors need to wait until specific enforcement occurs. *Id.* (finding standing despite no enforcement).

As to HHS's argument that the Abortion Mandate somehow lets physicians act according to their judgment, this is incoherent. All EMTALA violations involve after-the-fact agency review

of a decision by a hospital or physician. The Abortion Mandate explicitly states that "physicians have an affirmative obligation to provide all necessary stabilizing treatment options," repeatedly specifies "abortion" as a stabilizing option, and then "threatens a "physician ($119,942/violation) pursuant to 42 C.F.R. § 1003.500 for refusing to provide [] any necessary stabilizing care." Dkt. 23-1 at 6. So although, in part, the mandate's purpose is to use EMTALA as a shield for pro-abortion physicians' judgment, the mandate also wields EMTALA as a sword against *pro-life* physicians for *not* doing abortions even if they disagree.

AAPLOG and CMDA also have associational standing to represent the interests of their members. Associational standing exists if some individual members would have standing, the interests protected are germane to the organization's purpose, and individual members' participation as litigants is not strictly necessary. *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022) (finding associational standing); *see also Assoc. of Am. Phys. & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (same). Here both AAPLOG and CMDA have affirmed their members would have standing, that the groups exist to represent those interests, and that other courts have let them do exactly that. Dkt. #23-1 at 16–18, 23–27. Moreover, specific individual doctor-members have submitted testimony showing they are emergency room practitioners treating pregnant patients, and therefore are regulated by EMTALA. *Id*. at 29–36. *See also South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895–96 (D.C.Cir.2006) (an association of oil refineries had standing to challenge EPA standards).

AAPLOG and CMDA have shown "indicia of membership" because they presented evidence that they have many similar members, provided details on those members' numbers and practices, and said those members share AAPLOG's and CMDA's views as elucidated. *See*

*Students for Fair Admissions*, 37 F.4th at 1084–85; Dkt. #23-1 at 16–18 (for AAPLOG), 23–25 (for CMDA).

Plaintiffs' claims are ripe for pre-enforcement review. Plaintiffs "need not . . . run the risk of enforcement proceedings or pursue an arduous, expensive, and long . . . process to seek review of an already-final agency action," such as the Abortion Mandate. *De La Garza Gutierrez v. Pompeo*, 741 Fed. Appx. 994, 998 (5th Cir. 2018) (internal quotation marks omitted). When administrative action imposes immediate consequences on regulated parties, courts routinely allow pre-enforcement challenges even if the parties could raise the same arguments as defenses in an eventual enforcement action. *See Sackett v. EPA*, 556 U.S. 120 (2012).

### III.   Plaintiffs Will Likely Succeed on the Merits of Their Claims

#### A. The Abortion Mandate constitutes final agency action

Final agency action is action that (1) "mark[s] the consummation of the agency's decision-making process" and (2) "by which rights or legal obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d at 441 (internal quotations omitted).

#### 1. *The Abortion Mandate marks the consummation of HHS's decision-making*

"Guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council v. E.P.A.*, 635 F.3d 738, 755 (5th Cir. 2011). When an agency's action "serve[s] to confirm a definitive position that has a direct and immediate impact on the parties," and the action's statement of that position cannot "be appealed to a higher level of [the agency's] hierarchy," the action is generally final. *Id*. at 755–56. Agency action is final when, for example, it has "a direct and immediate ... effect on the day-to-day business of the parties challenging the

action." *Her Majesty the Queen in Right of Ontario*, 912 F.2d 1525, 1531 (D.C. Cir. 2011).

Defendants' argument that the Abortion Mandate merely "remind[s] hospitals of their existing obligation to comply with EMTALA," ignores the text of the Guidance itself. It purports to interpret authoritatively the statutory requirements of EMTALA and gives rise to significant legal consequences detailed below.

### 2. *Legal consequences flow from the Abortion Mandate*

Courts look for mandatory language to determine "whether an agency's action binds it and accordingly gives rise to legal consequences." *Texas v. EEOC*, 933 F.3d at 441. The Abortion Mandate "chang[ed] the text" of EMTALA, *POET Biorefining, LLC v. E.P.A.*, 970 F.3d 392, 407 (D.C. Cir. 2020), and threatens to withhold billions of dollars in funding to Texas healthcare providers. *See* Dkt. #23-1 at 12–14; *Texas v. EEOC*, 933 F.3d at 441–42. The Abortion Mandate's requirements constitute a legislative rule that imposes new duties on recipients of federal funds. Legislative rules are, "by definition, final agency action." *Id.* at 441.

### B. Defendants acted ultra vires and exceeded statutory authority when they promulgated the Abortion Mandate

Defendants point to no provision of the Social Security Act or EMTALA that allows them to promulgate the Abortion Mandate. Defendants claim that § 1395 "does not prevent the federal government from establishing and enforcing conditions of participation in Medicare," citing *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022), Dkt. #40 at 4, and that "it is quite common for Medicare's conditions of participation to require the provision of certain types of care," Dkt. #40 at 31, citing that case, 42 C.F.R. § 482.62(e) ("The [psychiatric] hospital must provide or have available psychological services to meet the needs of the patients.") and 42 C.F.R. § 482.28(b)(1) ("[Hospital] [m]enus must meet the needs of the patients."). But *Biden v. Missouri* upheld

Defendants' Interim Final Rule requiring staff at health care facilities to be vaccinated against Covid-19, and the two cited regulations also say nothing whatsoever about the "practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. The weakness of Defendants' authority betrays the emptiness of their position. EMTALA does not provide or dictate a national standard of care. *See, e.g.*, *Stiles v. Tenet Hosps., Ltd.*, 494 F. App'x 432, 437 (5th Cir. 2012).

The Abortion Mandate likewise exceeds HHS's statutory authority by violating federal abortion conscience laws, despite HHS's mistaken arguments to the contrary. Dkt. #40 at 26–27. As noted in Plaintiffs' opening brief, both 42 U.S.C. § 238n(a) (the Coats-Snowe Amendment) and the annual appropriations provision the Weldon Amendment explicitly and unequivocally prohibit "[t]he Federal government" from discriminating against an entity because it declines to "provide" or "perform" "abortions." Dkt. #23 at 10–11. In this case, this policy of threatening and penalizing hospitals and physicians under EMTALA if they do not perform abortions, but not penalizing a similarly situated provider that does, is a straightforward case of discrimination violating both of those statutes.

Multiple canons of statutory construction require the plain text of the federal abortion conscience statutes to override HHS's Abortion Mandate. First, they are statutes, while the Abortion Mandate is an improperly issued regulation. Statutes override regulations. HHS contends EMTALA itself requires abortions, but that argument is shown to be erroneous above. Second, Congress enacted the federal abortion conscience statutes more recently than EMTALA: Coats-Snowe in 1996, and Weldon in every appropriations statute since 2005. Even where the conflict is between statutes, the more recently enacted law controls. *Food & Drug Admin. v. Brown*

*& Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (where statutes conflict the later in time statute controls, especially if it deals with more specific situations, and even if the later statue does not expressly amend the earlier). Third, the federal abortion conscience statutes deal with a more specific situation—abortion—than EMTALA, which governs all types of health issues. The more specific conscience statutes control. *See*, *e.g.*, *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 21 (2012). EMTALA never mentions abortion and contains its own rule of construction explicitly disavowing preemption of state laws absent "direct" language which, on abortion, it lacks. *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011) ("When a federal law contains an express preemption clause, we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.") (internal quotation marks omitted).

HHS does not grapple with the text of these federal abortion conscience laws, for good reason: they are plainly inconsistent with the Abortion Mandate. HHS instead cites district court decisions that essentially disagree with the policy Congress enacted in the federal abortion conscience laws. Dkt. #40 at 27. In any event, those courts did not strike down federal abortion conscience laws—no court has ever done so. They are not persuasive on the issue of whether the plain text of conscience laws supersede this Abortion Mandate.

Finally, HHS suggests that the Affordable Care Act states that EMTALA requires abortions. Dkt. #40 at 26. This is false. The ACA has a catch all provision of "[s]pecial rules," one of which is that "[n]othing in this Act," that is, the entire ACA, "shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1395dd of this title (popularly known as 'EMTALA')." 42 U.S.C. § 18023(d).

That provision says literally nothing about what EMTALA specifically requires, much less that it requires abortions.

### C. The Abortion Mandate violates the Presumption Against Preemption and the Major Questions Doctrine

HHS's position conflicts with the presumption against preemption. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.") (internal quotations omitted). Moreover, HHS is asserting authority to overrule state abortion laws for the first time since EMTALA was enacted in 1986. This is one of those cases where "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2608 (2022).

### IV.   The Guidance Violates the Constitution

### A. The Abortion Mandate violates the Spending Clause

In Spending Clause cases, "[t]he crucial inquiry" is "whether Congress spoke so clearly that we can fairly say that the State could make an informed choice. In this case, Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with [a section of the Act that did not impose conditions]." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981) (emphasis added).

By enacting EMTALA, Congress put Texas other and recipients of Medicare funds on clear notice that by accepting Medicare funds, recipients must provide "treatment as may be required to stabilize [an emergency medical condition]," 42 U.S.C. § 1395dd(b)(1)(A), and that "[n]othing in [EMTALA] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided," 42 U.S.C. § 1395. Yet Defendants argue, "Put simply, if a hospital determines that an emergency medical condition exists, and that Procedure X is necessary to stabilize a patient with that condition, then EMTALA—entirely of its own force, and without any need for agency guidance—requires the hospital to offer Procedure X." Dkt. #40 at 12. The Guidance says the same thing. Guidance at 1, bullet point 5. This is the opposite of the clear notice on which Congress put Medicare recipients when it adopted EMTALA. Contrary to the statute, the Guidance and Defendants assert that hospitals must offer certain procedures. That is "supervision or control over the practice of medicine or the manner in which medical services are provided," which is prohibited by § 1395.

The Guidance contains additional illegal micromanagement: "Hospitals and physicians have an affirmative duty to provide all necessary stabilizing treatment options to an individual with an emergency medical condition." This is also "supervision or control over the practice of medicine or the manner in which medical services are provided," which is prohibited by § 1395.

Contrary to the Guidance and Defendants' argument, EMTALA puts Plaintiffs on notice that they are not required to perform any particular medical procedure. That is one reason why the Guidance is not a valid exercise of authority under the Spending Clause (in addition to violating the APA).

Defendants claim that § 1395 "does not prevent the federal government from establishing and enforcing conditions of participation in Medicare," but that is incorrect, as explained above.

Despite asserting that "EMTALA's terms are perfectly clear on their face," Defendants also cite *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656 (1985), for various cherry-picked propositions implying that, despite Pennhurst's requirement that Congress give clear notice, notice under the Spending Clause can be "unclear" and that "parameters of those conditions can be permissibly set out in agency interpretations, guidance, or regulations." Dkt. #40 at 36. But they skip the holding of that case: "[T]he programs approved by Kentucky for fiscal year 1974 clearly violated then-existing requirements for Title I, and therefore neither ambiguity in the application of those requirements to other situations nor the policy debates that later arose within the Office of Education avail the State here." *Bennett*, 470 at 673. In other words, the State violated a statutory condition of which it had clear notice. Bennett does not support the idea that notice can be less than clear or can be given by agencies rather than Congress.

Finally, Defendants deny that the threat of losing all Medicare funds is unconstitutionally coercive because "the possibility that CMS may impose a lesser penalty that is proportionate to the breach saves the Guidance from Tenth Amendment challenge." Dkt. #40 at 37 (cleaned up, citing *West Virginia v. HHS*, 289 F.3d 281, 292 (4th Cir. 2002)). The cited opinion says:

> [T]he Medicaid Act gives the Secretary the ability to impose upon a non-compliant state a penalty less drastic than the withholding of the state's entire FMAP; the Secretary may instead withhold funds only from the categories that are affected by the failure. 42 U.S.C. § 1396c.[8] This discretion allows the Secretary to impose a

---

[8] "If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds … that in the administration of the plan there is a failure to comply substantially with any such provision[,] the Secretary shall notify such State agency that further payments will not be

> penalty that is proportionate to the breach, which we believe saves the estate recovery provisions from West Virginia's Tenth Amendment challenge.

*West Virginia v. HHS*, 289 F.3d at 292 (footnote added). But the Supreme Court overruled this holding in the first Obamacare case:

> In this case, the financial "inducement" Congress has chosen is much more than "relatively mild encouragement"—it is a gun to the head. Section 1396c of the Medicaid Act provides that if a State's Medicaid plan does not comply with the Act's requirements, the Secretary of Health and Human Services may declare that "further payments will not be made to the State." 42 U.S.C. § 1396c. A State that opts out of the Affordable Care Act's expansion in health care coverage thus stands to lose not merely "a relatively small percentage" of its existing Medicaid funding, but all of it.

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). Thus, the threat of losing all funds under § 1396—the threat Defendants admit is present here—is unconstitutionally coercive.

**B. The Abortion Mandate violates the First Amendment and RFRA**

HHS essentially argues that RFRA and the First Amendment cannot be used to seek pre-enforcement injunctions because RFRA must be analyzed with respect to particular parties and facts that arise in specific enforcement. Previous RFRA litigation renders the government's position untenable. A decade of litigation over other HHS mandates show that plaintiffs can raise and win injunctions in pre-enforcement RFRA claims. Most circuit courts and the Supreme Court considered pre-enforcement challenges to an HHS rule issued under the ACA that required employers to cover contraceptives in their employee health insurance plans. The Supreme Court ultimately granted RFRA relief in those cases. *Hobby Lobby Stores,* 573 U.S. 682. None of the

---

made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure)."

plaintiffs in those cases had been subject to a specific complaint or enforcement procedure by HHS. Even where the courts of appeals disagreed on the merits of those RFRA claims, the parties had standing to bring their pre-enforcement challenges. *Compare*, *e.g.*, *Dordt College v. Burwell*, 801 F.3d 946 (8th Cir. 2015) (ruling in favor of RFRA claims) *with E. Texas Baptist Univ. v. Burwell*, 793 F.3d 449, 456 (5th Cir. 2015) (entertaining the claims despite ruling against them on the merits), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016). Across nearly every circuit, courts handled scores of RFRA challenges to HHS's contraceptive mandate, but no court adopted the government's view that RFRA cannot provide pre-enforcement relief.

HHS has also recently been subject to multiple pre-enforcement RFRA injunctions against other HHS rules and guidance documents, including one that required abortions. In *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 371 (N.D. Tex. 2021), the plaintiffs included the CMDA, and they obtained an injunction against HHS's rules and guidances that claimed it was "discrimination" if doctors refused to perform abortions or gender transition interventions. Two other associations of health care entities also obtained RFRA injunctions protecting their members from the gender identity mandate. *Christian Emps. All. v. EEOC*, No. 1:21-CV-195, 2022 WL 1573689 (D.N.D. May 16, 2022); *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021).

HHS also claims that AAPLOG and CMDA have not adequately affirmed that their members have religious beliefs that would be injured by the Abortion Mandate. This is incorrect because it understates the injury that sustains a RFRA or First Amendment claim. The government need only exert "pressure" on parties to change their conduct for plaintiffs to have a religious liberty injury. *Texas v. EEOC*, 933 F3d at 449 ("pressure . . . to change" behavior is itself injury);

*Sherbert*, 374 U.S. at 404 ("[g]overnmental imposition" of "pressure" to violate one's beliefs, merely by denying employment benefits, is a substantial burden on religious exercise). Pressure exists here in two forms. First, the Abortion Mandate imposes massive financial penalties and disqualification from federally funded health programs for doctors who do not do abortions in the undefined circumstances where the mandate applies. Such penalties substantially burden religious exercise. *Hobby Lobby Stores*, 573 U.S. at 720 (describing financial penalties as substantial burdens under RFRA). Second, because the Abortion Mandate issues yet ill-defined threats requiring abortions, it inherently, and intentionally, imposes substantial pressure for them to do abortions regardless of their religious beliefs. That pressure is an irreparable injury.

HHS claims the beliefs of AAPLOG's and CMDA's members are not sufficiently uniform. This is incorrect. Associations can seek relief for some of their members. *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 59 (D.C. Cir. 1988) (association can represent interests of some members even if others might disagree). AAPLOG and CMDA both seek relief on behalf of their religious members who are subject to EMTALA. Both groups exist to represent the conscientious objections of their members to abortion. Dkt. 23-1 at 17, 24. Both groups contend that their members share beliefs against performing abortions in various circumstances encompassed by the broadly applicable Abortion Mandate. *Id*. at 5 ¶ 23; 19–20. Both groups also provided declarations of specific members who affirm their beliefs against performing abortions. *Id*. at 29–36. The fact that emergency cases can give rise to difficult circumstances where the groups' members must apply religious, ethical, and medical judgments in ways that might differ case by case only exacerbates the injury on the doctors. The Abortion Mandate does not define how it applies, but for the first time inserts HHS into those complicated situations to mandate abortions. All of the religious

doctors have religious liberty rights to decide how to practice in those cases. A broad mandate to do abortions under EMTALA threatens those rights.

Finally, with respect to RFRA, HHS "did not look to RFRA's requirements or discuss RFRA at all when formulating their solution." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020). This justifies relief against the mandate under the APA in conjunction with the doctors' RFRA claim. *Id.*

The Court should grant Plaintiffs' request for a preliminary injunction.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

**CHRISTOPHER D. HILTON**
Chief, General Litigation Division
Texas Bar No. 24087727
Christopher.Hilton@oag.texas.gov

*/s/ Amy Snow Hilton*
**AMY SNOW HILTON**
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**WILLIAM D. WASSDORF**
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

CHARLES K. ELDRED
Special Counsel for Legal Strategy
Texas Bar No. 00793681
Charles.Eldred@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**COUNSEL FOR THE STATE OF TEXAS**

*/s/ Ryan L. Bangert*
RYAN L. BANGERT
TX Bar No. 24045446
rbangert@ADFlegal.org

MATTHEW S. BOWMAN*
DC Bar No. 993261
mbowman@ADFlegal.org

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622

**COUNSEL FOR AMERICAN ASSOCIATION
OF PRO-LIFE OBSTETRICIANS AND
GYNECOLOGISTS, AND CHRISTIAN
MEDICAL AND DENTAL ASSOCIATIONS**


*\*Application for admission forthcoming*


## CERTIFICATE OF SERVICE


We certify that a true and accurate copy of the foregoing document was filed electronically via CM/ECF.

*/s/ Amy S. Hilton*          */s/ Ryan Bangert*
Amy S. Hilton              Ryan Bangert