## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; and CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS, | § § § § § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 5:22-CV-00185 |
| | § | |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS); KAREN L. TRITZ, in her official capacity as Director of the Survey and Operations Group for CMS; DAVID R. WRIGHT, in his official capacity as Director of the Quality Safety and Oversight Group for CMS, | § § § § § § § § § § § § § | |
| | § | |
| *Defendants*. | § | |

---

**BRIEF OF THE THOMAS MORE SOCIETY AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

## TABLE OF CONTENTS

Table of Authorities ------------------------------------------------------------------ iii

Introduction ------------------------------------------------------------------------- 1

Interests of *Amicus Curiae* ----------------------------------------------------------- 1

Summary of Argument --------------------------------------------------------------- 2

Argument ---------------------------------------------------------------------------- 3

    I.    Contrary to Defendants' Contentions, The Abortion Mandate
          Imposes New Requirements on Healthcare Providers, Making
          It A New Rule, Rather Than a Mere Restatement of Existing
          Law, That Attempts to Make Abortion a National
          Standard Of Care. ------------------------------------------------------------- 3

          A.  Comparison of the New Abortion Mandate with Prior CMS
              Guidance Shows the Requirements it Places on Healthcare
              Providers ------------------------------------------------------------- 3

          B.  Evidence from *Amici* Supporting Defendants Shows that
              the New CMS Mandate Both Requires Abortions and Attempts
              to Establish a National Standard of Care. ------------------------------ 6

    II.   The Abortion Mandate Violates, and Should Be Enjoined
          Under, RFRA. --------------------------------------------------------------- 7

    III.  Federalism and the Tenth Amendment Protect Individual
          Liberty, Including Religious Liberty, and Should Likewise
           Here Protect the Rights of Pro-Life Healthcare Workers. -------------- 12

Conclusion --------------------------------------------------------------------------- 14

# TABLE OF AUTHORITIES

**Cases**

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ................................................................................................. 8, 11

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520, 113 S. Ct. 2217, (1993) ........................................................................ 7

*Davila v. Gladden*,
   777 F.3d 1198 (11th Cir. 2015) ............................................................................... 8, 10

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ............................................................................................. 1, 3

*Dr. A. v. Hochul*,
   142 S. Ct. 2569 (2022) ................................................................................................. 2

*Employment Division, Department of Human Resources of Oregon v. Smith*,
   494 U.S. 872, (1990) .................................................................................................... 7

*FERC v. Mississippi*,
   456 U.S. 742 (1982) ................................................................................................... 13

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021) ............................................................................................. 8, 11

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ................................................................................................... 13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ................................................................................................... 10

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) .................................................................................... 9

*Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*,
   452 U.S. 264 (1981) ................................................................................................... 14

*Holt v. Hobbs*,
   574 U.S. 352 (2015) ..................................................................................................... 8

*Kaemmerling v. Lappin*,
   553 F.3d 669 (D.C. Cir. 2008) ..................................................................................... 9

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367, 2392 (2020) ...................................................................................... 10

*Medellin v. Texas*,
    552 U.S. 491 (2008) .......................................................................................... 13

*New York v. United States*,
    505 U.S. 144 (1992) .......................................................................................... 13

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) .......................................................................................... 13

*Printz v. United States*,
    521 U.S. 898 (1997) .......................................................................................... 13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) (per curiam) ...................................................................... 7

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ............................................................................................ 7

*Singh v. McHugh*,
    109 F. Supp. 3d 72 (D.D.C. 2016) ..................................................................... 8

*Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*
    140 S. Ct. 2367 ................................................................................................. 10

*South Dakota v. Dole*,
    483 U.S. 203 (1987) .......................................................................................... 12

*Steward Machine Co. v. Davis*,
    301 U.S. 548 (1937) .......................................................................................... 12

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ................................................................................. 7, 11

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
    450 U.S. 707 (1981) ................................................................................... 7-8, 8

*U.S. Navy Seals 1-26 v. Biden, No. 22-10077*,
    2022 WL 594375 (5th Cir. Feb. 28, 2022) .......................................... 8, 10, 11

*Wilson v. Jones*,
    45 F. Supp. 2d 945 (S.D. Ala. 1999) ................................................................ 13

**Statutes**

42 U.S.C. § 1395dd ................................................................................................. 3, 5

42 U.S.C. § 2000bb ...................................................................................................... 7

42 U.S.C. § 2000bb-1 ................................................................................................... 9

42 U.S.C. § 2000bb-2 ................................................................................................... 9

42 U.S.C. §§ 2000cc-5 .................................................................................................. 9

HUMAN LIFE PROTECTION ACT, CH. 800, § 2 .............................................................. 6

TEX. HEALTH & SAFETY CODE § 170A.002 ................................................................. 6

TEX. OCC. CODE § 103.001 ........................................................................................ 14

TEX. OCC. CODE § 103.002 ........................................................................................ 14

TEX. OCC. CODE § 103.004 ........................................................................................ 14

**Rules**

FED. R. CIV. P. 5 ......................................................................................................... 16

v

## INTRODUCTION

*Amicus Curiae* Thomas More Society (TMS) submits this brief to support plaintiffs' motion for entry of a temporary restraining order and preliminary injunction as well as to oppose defendants' motion to dismiss plaintiffs' amended complaint. *Amicus* TMS submits this brief to emphasize that, when a mandate like that at issue in this case is issued by the federal government, it must be carried out by healthcare workers, many of whom have a calling to work in medicine but who also have sincere and deeply held religious beliefs against abortion. Federal mandates like this one fail to properly account for the powers that the sovereign States retain under our Constitution, especially in light of *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), to limit abortion. They also fail to protect the religious liberties of pro-life healthcare workers. Therefore, amicus TMS offers this brief to help explain the perspective of these workers on this important issue.

## INTERESTS OF *AMICUS CURIAE*[1]

The Thomas More Society is a national non-profit, public-interest law firm dedicated to restoring respect in law for life, family, and religious liberty. The Thomas More Society provides legal services to clients free of charge and often represents individuals who cannot afford a legal defense with their own resources. Throughout its history, the Thomas More Society has advocated for the protection of religious liberty and worked to eliminate discrimination against persons of faith. It

---

[1] It is hereby certified that no party's counsel authored this brief, in whole or in part, and that no person or entity other than *amicus* or its counsel contributed monetarily or otherwise to preparing or submitting this brief.

is often called upon to defend, through litigation when necessary, the rights of healthcare workers whose religious beliefs have come into conflict with the demands of their employers or governmental mandates. *See, e.g., Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022).

## SUMMARY OF ARGUMENT

The federal government's Abortion Mandate from CMS in this case controls healthcare, and this necessarily means the federal government is controlling healthcare providers. Many of those providers, both individuals and entities, hold pro-life religious beliefs. Even though federal statutory law protects these religious beliefs, defendants are attempting to use the Abortion Mandate to override religious liberty protections by means of a purported interpretation of EMTALA.

Because defendants' actions imperil the free exercise of pro-life healthcare providers' religious beliefs in violation of federal statutory law and the U.S. Constitution, the Abortion Mandate should be enjoined by the granting of plaintiffs' requested TRO and then preliminary injunction. Furthermore, defendants' motion to dismiss should be denied.

## ARGUMENT

**I.   CONTRARY TO DEFENDANTS' CONTENTIONS, THE ABORTION MANDATE IMPOSES NEW REQUIREMENTS ON HEALTHCARE PROVIDERS, MAKING IT A NEW RULE, RATHER THAN A MERE RESTATEMENT OF EXISTING LAW, THAT ATTEMPTS TO MAKE ABORTION A NATIONAL STANDARD OF CARE.**

### A.   Comparison Of The New Abortion Mandate With Prior CMS Guidance Shows The Requirements It Places On Healthcare Providers.

The guidance issued by defendants Karen Tritz and David Wright, both from Centers for Medicare & Medicaid Services, on July 11, 2022 (hereinafter "Abortion Mandate"), is no mere "guidance" restating existing law under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). Instead, just as the context of its creation would suggest, the mandate attempts to circumvent the U.S. Supreme Court's ruling in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), that returned the issue of abortion to the states.  *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2305 (2022) (Kavanaugh, J., concurring) ("After today's decision, all of the States may evaluate the competing interests and decide how to address this consequential issue [of abortion].").

The Abortion Mandate, of course, came in response to a directive from the President of the United States to the Department of Health and Human Services, of which CMS is a part.  Only four days later, the Abortion Mandate was issued by CMS. Far from merely restating existing law or even reiterating prior guidance, the July 11, 2022 "guidance," seeks to make EMTALA a loophole in any State's abortion laws.

This shift in the law is apparent when looking at the differences between the July 11, 2022 Abortion Mandate and the CMS guidance of September 17, 2021 cited

by defendants in support of their motion to dismiss.  While the two documents are similar in many respects, the differences are highly significant on the question of what procedures are to be purportedly required under EMTALA even though they may be illegal under state law:

- One of the most striking such changes is the expanded definition of "Emergency Medical Condition" (EMC).  Under the Abortion Mandate, an EMC can include situations far broader than simply the life of a pregnant woman or a serious threat to her health, thereby allowing a non-life-threatening situation and other less than serious threats to the woman's health to be used as the justification for an abortion.

- The Abortion Mandate also contains a lengthy section defining "stabilizing treatment."  New language appears that is likely to be used to mandate the providing of elective abortions to women presenting to emergency departments: "Emergency medical conditions involving pregnant patients may include, but are not limited to: ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features."[2]

---

[2] Of note, some of the care described throughout the guidance is manifestly not abortion (*e.g.*, treatment for ectopic pregnancy).  Defendants appear to be engaging in some sleight of hand by lumping such care, which is indisputably life-saving treatment and universally allowed even under the strictest of abortion bans, along with the provision of elective abortions.

4

- The new Abortion Mandate goes on at length to severely threaten physicians that they must follow EMTALA rather than state law due to EMTALA's preemption provisions.

- The New Abortion Mandate also introduces the concept of requiring healthcare providers to complete chemical abortions that the mother began elsewhere.

The Abortion Mandate's clear partisanship in favor of abortion is ironic given that the statutory language of EMTALA itself creates a presumption in favor of preserving the life of *both* the mother and the unborn child in emergency medical situations. EMTALA expressly holds that providers are required to provide stabilizing care for an "emergency medical condition," which is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain), such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (*or, with respect to a pregnant woman, the health of the woman or her unborn child*) in serious jeopardy . . . ." 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added). The Abortion Mandate now turns this presumption on its head by excluding the unborn child from the scope of persons covered by EMTALA, despite its express language, and making EMTALA a voluntary abortion-on-demand statute.

Though defendants now argue in Court that the Abortion Mandate was nothing but a reminder of existing legal obligations, it really is far more. It purports to announce expanded duties under EMTALA for healthcare providers to perform abortions, even when there is no "life threatening physical condition" arising from a

pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed" (the conditions under which abortion is to be allowed under Texas law).  Human Life Protection Act, Act of May 25, 2021, 87th Leg., R.S., ch. 800, § 2, 2021 Tex. Sess. Law Serv. 1887 (H.B. 1280) at § 2 (to be codified at Tex. Health & Safety Code § 170A.002(b)(2)).

The Abortion Mandate is not only a mandate that threatens to turn every hospital emergency department into an abortion clinic, even in states with pro-life protections, but is also a novel policy, not existing federal statutory or regulatory law.

## B. Evidence From *Amici* Supporting Defendants Shows That The New CMS Mandate Both Requires Abortions And Attempts To Establish A National Standard Of Care.

The Court need not take the word of the plaintiffs or this *amicus* as proof that the Abortion Mandate aims to expand access to abortion, state law notwithstanding. The *amici* supporting defendants show that fact to be the case.

*Amici* Medical and Public Health Societies misleadingly label such conditions as the treatment of ectopic pregnancies and miscarriages as "abortions," even though they emphatically are not, but beyond that it is telling that they also argue for the ability to conduct abortion in other situations as well.  (D.E. #54.)  Likewise, several States filed as *amici* to oppose an injunction.  They, too, attempt to say that nothing new is added with the Abortion Mandate that has not been required for years.  (D.E. #43.)  Yet, if the Abortion Mandate adds nothing new to long existing interpretation of EMTALA, why the need to file in opposition to plaintiffs' request to enjoin it?  They

filed, of course, because the Abortion Mandate does add something new—something that conflicts with Texas law and that gives rise to a justiciable case and controversy.

## II. THE ABORTION MANDATE VIOLATES, AND SHOULD BE ENJOINED UNDER, RFRA.

The Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, was enacted to address the constraints on religious liberty analysis created by *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, (1990), which requires a comparator analysis to determine whether a law or regulation that purports to be neutral and generally applicable does in fact—either textually or by operation—"treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (cleaned up) (emphasis in original) (citing *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 141 S. Ct. 63, 67-68 (2020) (*per curiam*)); *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535, 113 S. Ct. 2217, 2228, (1993) ("Apart from the text, the *effect* of a law in its real operation is strong evidence of its object.") (emphasis added).

RFRA is intended to restore the pre-*Smith* standard for determining religious liberty violations: that a law or regulation imposing a substantial burden on the practice of religion as a condition for obtaining an important societal benefit must undergo strict scrutiny, which requires the government to demonstrate that (1) there is a compelling governmental interest justifying the burden and that (2) the challenged measure is narrowly tailored to achieve that interest. *Sherbert v. Verner*, 374 U.S. 398, 408 (1963); *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,* 450 U.S.

7

707, 717-18 (1981).  In *Thomas v. Review Board of Indiana*, the Supreme Court

announced what is now the core of RFRA:

> Where the state conditions receipt of an important benefit upon conduct
> proscribed by a religious faith, or where it denies such a benefit because
> of conduct mandated by religious belief, thereby putting substantial
> pressure on an adherent to modify his behavior and to violate his beliefs,
> a burden upon religion exists.  While the compulsion may be indirect,
> the infringement upon free exercise is nonetheless substantial . . .
>
> The state may justify an inroad on religious liberty by showing that it is
> the least restrictive means of achieving some compelling state interest…
> [O]nly those interests of the highest order . . . can overbalance legitimate
> claims to the free exercise of religion.

*Id.* (cleaned up)

Accordingly, as the Supreme Court has recently affirmed, RFRA provides

"very broad protection[s] for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*,

573 U.S. 682, 693-94 (2014), which means "*greater protection* for religious exercise

than is available under the First Amendment."  *Holt v. Hobbs*, 574 U.S. 352, 357

(2015) (emphasis added).  "The question, then, is not whether [the government] has

a compelling interest in enforcing its . . . policies generally, but whether it has such

an interest in denying an exception to [the Plaintiff]."  *Fulton v. City of Philadelphia*,

141 S. Ct. 1868, 1881 (2021); *see U.S. Navy Seals 1-26 v. Biden*, No. 22-10077, 2022

WL 594375, at *10 (5th Cir. Feb. 28, 2022); *Davila v. Gladden*, 777 F.3d 1198, 1206

(11th Cir. 2015); *Singh v. McHugh*, 109 F. Supp. 3d 72, 87 (D.D.C. 2016) (elements

of Army's grooming and uniform policies substantially burdened cadet's religious

beliefs).

Under RFRA, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that application of the burden to the person" furthers "a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).

Moreover, RFRA protects "*any* exercise of religion, *whether or not compelled by, or central to*, a system of religious belief." 42 U.S.C. §§ 2000cc-5(7)(A); 42 U.S.C. § 2000bb-2(4)(emphasis added). The "importance" of a religious belief is irrelevant. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1134, 1137 (10th Cir. 2013) ("substantial burden" relates to the degree of coercion applied by government, not the substantiality of the religious belief at issue, which would require an impermissible theological inquiry by the court). Courts must "focus not on the centrality of the particular activity to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008). A "substantial burden" exists when government action rises above *de minimis* inconveniences and puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (cleaned up).

There are indisputably pro-life individuals and entities in the healthcare field who are caught up in the Abortion Mandate's sweep, but defendants' Mandate does not even consider those rights. As the facts of this case make clear, the Mandate fails, as a matter of law, to meet the compelling interest/narrow tailoring inquiries.

9

First, under RFRA, to establish a compelling interest sufficient to withstand strict scrutiny defendants may not merely recite "broadly formulated interests," but rather must survive "scrutin[y] [of] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006).  That has not been, and cannot be, done here.

Second, as to the actual existence of a compelling government interest, "officials cannot simply utter the magic words . . . and as a result receive unlimited deference." *Davila*, 777 F.3d at 1206 (citing *O Centro*, 546 U.S. at 438).  In *Davila*, the Court listed a multitude of *situation-specific* evidence that could have helped its evaluation of compelling interest, such as historical incidents that justify the interest asserted and evidence of the effectiveness of other measures serving the same interest.  Here, again, defendants did nothing to consider specific situations.

Third, the requirement that a compelling government interest must be established as to the *particular claimant* sets a "high bar." *Navy Seals*, 2022 WL 594375, at *10 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2392 (2020) (Alito, J., concurring). In *Little Sisters*, Justice Alito described that "high bar" thus: "In *Sherbert v. Verner*… the decision that provides the foundation for the rule codified in RFRA, we said that '[o]nly the gravest abuses, endangering paramount interest' could 'give occasion for [a] permissible limitation' on the free exercise of religion." *Id.* at 2392.

10

The Fifth Circuit's reasoning on this point in *Navy Seals* ought to inform the result in this case.  In denying a stay of the district court's injunction barring enforcement of the Navy's vaccine mandate as to the unvaccinated plaintiff SEALs, the Fifth Circuit observed that they had "successfully deployed overseas before and after the vaccine became available, and one even received a Joint Service Commendation Medal for 'safely navigating restricted movement and distancing requirements' while deployed in South Korea between January and June 2020. Plaintiffs also trained other SEALs preparing for deployments at various points during the pandemic *while remaining unvaccinated*." *Navy Seals*, 2022 WL 594375, at *12 (emphasis added).

And, even if there were a compelling governmental interest at stake here, defendants cannot establish that their Abortion Mandate is the "least restrictive means" they could have employed to serve it.  The "least-restrictive-means standard is exceptionally demanding" in that it requires the government to show "it lacks other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728.  "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881.  Under this standard, defendants must "show that measures less restrictive of the First Amendment activity could not address [the] interest" to be advanced.  *Tandon*, 141 S. Ct. at 1296-1297.  This, defendants cannot do, because they cannot offer more than conclusory supposition.

Despite being fully cognizant of the fact that they were imposing the Abortion Mandate on a large group, many of whose members hold religious objections to

participating in or facilitating abortion, defendants issued a "guidance" to medical providers (along with a letter from the Secretary) that uttered not one word about their federally protected civil rights under RFRA. Defendants not only failed to *consider* how their Abortion Mandate would violate their RFRA rights prior to issuance, but they have further shown they would like to actively curtail those rights as well. Relief from this Court is necessary to ensure these rights are protected as Congress intended them to be.

III. **FEDERALISM AND THE TENTH AMENDMENT PROTECT INDIVIDUAL LIBERTY, INCLUDING RELIGIOUS LIBERTY, AND SHOULD LIKEWISE HERE PROTECT THE RIGHTS OF PRO-LIFE HEALTHCARE WORKERS.**

Defendants' disrespect of federalism and the Tenth Amendment embodied in the Abortion Mandate causes injury not just to the States, but to countless individuals in the healthcare sector whose religious liberties are now placed at risk. Plaintiffs' briefing explains how the threats to federal funding create coercive conditions in excess of Congress's powers under the Spending Clause. Thus, unconstitutional commandeering exists, due to the federal government's use of its Spending Clause powers to coerce a State into taking certain actions. "[I]n some circumstances the financial inducement offered by Congress [to the States] might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). A "shift in kind, not merely degree" by the federal government in a spending program constitutes such unconstitutional coercion of a state. *See NFIB v. Sebelius*, 567 U.S. 519, 583 (2012).

12

This is a danger that federalism and the Tenth Amendment were intended to prevent by keeping the federal government confined to its proper role.    "[T]he Constitution divides authority between federal and state governments for the protection of individuals," *New York v. United States*, 505 U.S. 144, 181 (1992), and "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front[,]" *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991); *see Wilson v. Jones*, 45 F. Supp. 2d 945, 949 (S.D. Ala. 1999) ("The separation of powers protected by the Tenth Amendment is intended for the protection of individual liberty, not simply sovereign prerogative.") (citations omitted).    Because "the Framers rejected the concept of a central government that would act upon and through the States," *Printz v. United States*, 521 U.S. 898, 920 (1997), the Constitution prohibits using States as mere instrumentalities of the federal government.    *See New York*, 505 U.S. at 162 (1992) ("[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."); *cf. Medellin v. Texas*, 552 U.S. 491, 532 (2008) (foreign affairs power could not support "a Presidential directive issued to state courts, much less one that reaches deep into the heart of the State's police powers").    More specifically, this means that the federal government may not give a "command to the States to promulgate and enforce laws and regulations," *FERC v. Mississippi*, 456 U.S. 742, 761-62 (1982), nor may it "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory

program." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981).

And yet, in this case, acting through administrative guidance, not even legislation, a federal agency has attempted to wipe away state laws that protect unborn lives and has in the process infringed on any state laws that provide conscience protections for the religious beliefs of pro-life healthcare providers. *See, e.g.,* Tex. Occ. Code § 103.001 (right of healthcare workers to object to participating abortion); *id.* § 103.002 (prohibition on discrimination against healthcare workers who refuses to participate in abortion); *id.* § 103.004 (no general duty of private hospital to make facility available for abortion). If defendants had no intent to do the latter, they certainly did nothing to make that intent known in their Abortion Mandate.

Just as the Supreme Court has said that the States should no longer be prohibited by the federal government from regulating abortion, the State should not be deprived of the ability to protect the religious liberties of their citizens. The Abortion Mandate hinders that ability, though, through an egregious misuse of the federal government's Spending Clause power, and thus this Court should act.

## CONCLUSION

For the foregoing reasons, Amicus Curiae Thomas More Society respectfully urges that plaintiffs' motion for TRO and preliminary injunction should be granted and that defendants' motion to dismiss should be denied.

14

Respectfully submitted, this the <u>18th</u> day of August, 2022.

<u>/s/ Thomas P. Brandt</u>
**THOMAS P. BRANDT**
State Bar No. 02883500
tbrandt@fhmbk.com

**FANNING, HARPER, MARTINSON,**
**BRANDT & KUTCHIN, P.C.**
Two Energy Square
4849 Greenville Ave. Suite 1300
Dallas, Texas 75206
(214) 369-1300 (office)
(214) 987-9649 (telecopier)


**B. TYLER BROOKS**[†]
N.C. Bar No. 37604
S.C. Bar. No. 100553
Tenn. BPR No. 025291
Mich. Bar No. P82567
btb@btylerbrookslawyer.com

Special Counsel
**THOMAS MORE SOCIETY**
P.O. Box 10767
Greensboro, North Carolina 27404
(336) 707-8855 (cell)
(336) 900-6535 (facsimile)

[†] *pro hac vice* motion forthcoming.

**COUNSEL FOR AMICUS CURIAE**
**THOMAS MORE SOCIETY**

15

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a true and correct copy of the foregoing instrument has

been delivered to all parties of record, in compliance with the Court's ECF/CM system

and/or Rule 5 of the Federal Rules of Civil Procedure, on August 18, 2022.

<u>/s/ Thomas P. Brandt</u>
**THOMAS P. BRANDT**

16