UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| STATE OF TEXAS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS; and CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,<br><br>*Plaintiffs*,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS); KAREN L. TRITZ, in her official capacity as Director of the Survey and Operations Group for CMS; DAVID R. WRIGHT, in his official capacity as Director of the Quality Safety and Oversight Group for CMS,<br><br>*Defendants*. | Civil Action No. 5:22-CV-00185 |

**BRIEF OF THE CATHOLIC HEALTH CARE LEADERSHIP ALLIANCE, CATHOLIC MEDICAL ASSOCIATION, CATHOLIC BENEFITS ASSOCIATION, CATHOLIC BAR ASSOCIATION, THE NATIONAL CATHOLIC BIOETHICS CENTER, CHRIST MEDICUS FOUNDATION AND NATIONAL ASSOCIATION OF CATHOLIC NURSES-U.S.A. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Table of Contents..........................................................................................................i

Table of Authorities ...................................................................................................ii

Introduction................................................................................................................1

Interests of *Amici Curiae* ...........................................................................................1

Summary of the Argument.........................................................................................4

Argument ...................................................................................................................5

   I.      AN UNBORN CHILD IS PROTECTED UNDER EMTALA, WHICH PRECLUDES INTENTIONAL ABORTION AS A TREATMENT..................6

   II.     REQUIRING ABORTIONS UNDER EMTALA PREJUDICES THE RIGHTS OF CATHOLIC HEALTH CARE PROVIDERS, WHO HAVE LONG TREATED PREGNANCY EMERGENCIES WITHOUT INTENTIONALLY TERMINATING THE LIVES OF UNBORN CHILDREN ...............................8

   III.    DEFENDANTS' UPDATED GUIDANCE VIOLATES FEDERAL CONSCIENCE LAWS SPECIFIC TO HEALTH CARE...................................11

Conclusion ...............................................................................................................13

Certificate of Service ........................................................................................................

# TABLE OF AUTHORITIES

*Case Law*

*Asadi v. G.E. Energy United States, L.L.C.,* 720 F.3d 620 (5th Cir. 2013) ..........................7

*Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990) ........................5

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).........................................8

*Ek Hong Djie v. Garland*, 39 F.4th 280 (5th Cir. 2022)........................................................8

*Harris v. McRae*, 448 U.S. 297 (1980)................................................................................12

*Little Sisters of the Poor Saints Peter & Paul Home v. Penn.*, 140 S. Ct. 2367 (2020) ........10

*Mohammad Abubakar Khalid v. Holder*, 655 F.3d 363 (5th Cir. 2011)................................8

*RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639 (2012)................................12

*Romine v. St. Joseph Health Sys.*, 541 F. App'x 614 (6th Cir. 2014)....................................5

*Watt v. Alaska*, 451 U.S. 259 (1981)...................................................................................12

*United States v. Haggar Apparel Co.*, 526 U.S. 380 (1999).................................................8

*Constitutions and Statutes*

42 U.S.C. § 300a-7 *et seq.* .........................................................................................*passim*

42 U.S.C. § 238n....................................................................................................................8

42 U.S.C. § 1395dd.......................................................................................................*passim*

42 U.S.C. § 2000bb..............................................................................................................10

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506-07 ..................................................................................................................................................11

Weldon Amendment, Consolidated Appropriations Act, 2009, Pub. L. No. 111-117, 123 Stat. 3034 ..................................................................................................................................................12

*Other Authorities*

John A. Di Camillo & Jozef D. Zalot, *Medical Interventions During Pregnancy in Light of* Dobbs, 47 Ethics & Medics (Aug. 2022) ...............................................................................9-10

157 Cong. Rec. 6877-78 (2011)..............................................................................................9

Letter from Xavier Becerra, Secretary, U.S. Dep't of Health & Human Servs., to Health Care Providers (July 11, 2022).................................................................................................*passim*

Edward C. Liu & Wen W. Shen, Congressional Research Service, *The Hyde Amendment: An Overview* (July 20, 2022).................................................................................................11

Exec. Order No. 14,076, 87 Fed. Reg. 42,053 (July 8, 2022)................................................*passim*

*Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, (QSO-21-22-Hospitals-UPDATED JULY 2022), July 11, 2022
.................................................................................................................................*passim*

United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (6th ed. 2018)....................................................................................8-9

INTRODUCTION

*Amici Curiae* Catholic Health Care Leadership Alliance, Catholic Medical Association, Catholic Benefits Association, Catholic Bar Association, Christ Medicus Foundation, The National Catholic Bioethics Center, and National Association of Catholic Nurses-U.S.A. submit this brief to support Plaintiffs' motion for entry of a temporary restraining order and preliminary injunction as well as to oppose Defendants' motion to dismiss Plaintiffs' amended complaint. *Amici* argue that Defendants' position entirely disregards the duties and responsibilities owed by health care providers to an unborn child under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. To assert that abortion—which is the intentional termination of the unborn child—is permitted, or even required, under EMTALA is contrary to the unambiguous text and intent of the statute. Defendants' position that intentional abortion is required for emergency situations during pregnancy unnecessarily violates Catholic health care providers' conscience rights, since the Catholic Church's ethical guidelines for treatment of pregnancy complications (including the complications cited by Defendants and their *amici*) can be safely and ethically treated without intentionally terminating the life of an unborn child. Therefore, *Amici* offer this brief to help explain the significant impact of requiring intentional abortions to both the unborn child in violation of EMTALA and to Catholic health care providers, who can provide safe and ethical treatment of all pregnancy complications without performing intentional abortions.

INTERESTS OF THE *AMICI CURIAE*[1]

*Amicus Curiae* **Catholic Health Care Leadership Alliance** (CHCLA) is an alliance of Catholic organizations whose mission is to support the rights of patients and professionals to

---

[1] No party's counsel authored this brief, in whole or in part, and no party or party's counsel contributed monetarily to support its preparation.

1

receive and provide health care in accordance with the moral, ethical, and social teachings of Jesus Christ and His Church through ongoing evangelization, education, advocacy, and mutual support. CHCLA's allied members include professionals involved in all areas of health care, including physicians and nurses, as well as practice groups and hospitals. These CHCLA members are engaged in the active practice of health care on a daily basis, working in both secular and religious environments, and adhere to Catholic doctrine as their sincerely held religious beliefs. These members collectively provide medical care to hundreds of thousands of patients across the country. CHCLA believes that the position taken by Defendants' will significantly impact: (1) the duty of health care providers in general to protect the life of an unborn child under EMTALA; (2) the ability of CHCLA members to practice medicine without being forced or required to perform intentional abortions as a treatment option under EMTALA, which is a violation of CHCLA members' conscience rights as practitioners of the Catholic faith; and (3) health care access for the underserved patients for whom CHCLA members provide care.

*Amicus Curiae* **Christ Medicus Foundation** (CMF) was established in 1997 to defend religious freedom by educating religious and lay leaders on the intersection of health care, the exercise of faith and religious freedom, and the right to life. For decades, it has led coalitions, campaigns, and conferences to educate and inform Christ-centered health care decisions. As part of this mission, CMF helps defend the rights, health, and wellbeing of patients and families through the Health Care Civil Rights Taskforce and builds momentum around this movement through the Religious Freedom Campaign.

*Amicus Curiae* **National Catholic Bioethics Center** (NCBC) is a nonprofit research and educational institute committed to applying the principles of natural moral law, consistent with many traditions including the teachings of the Catholic Church, to ethical issues arising in health

care and the life sciences. NCBC is committed to fostering a culture of respect for human life and human dignity, particularly in the medical context.

*Amicus Curiae* **Catholic Bar Association** (CBar) is a community of legal professionals that educates, organizes, and inspires its members to faithfully uphold and bear witness to the Catholic faith in the study and practice of law. The CBar's mission and purpose include upholding the principles of the Catholic faith in the practice of law, and assisting the Church in the work of communicating Catholic legal principles to the legal profession and society at large. This includes the principles of religious liberty and rights of conscience with respect to religious beliefs.

*Amicus Curiae* **Catholic Medical Association** (CMA) has over 2,000 physicians and hundreds of allied health members nationwide. CMA members seek to uphold the principles of the Catholic faith in the science and practice of medicine—including the belief that every person's conscience and religious freedoms should be protected. The CMA's mission includes defending its members' right to follow their conscience and Catholic teaching in their professional work.

*Amicus Curiae* **National Association of Catholic Nurses-U.S.A.** (NACN-USA) is the national professional organization for Catholic nurses in the United States. A nonprofit group of hundreds of nurses of different backgrounds, the NACN-USA focuses on promoting moral principles of patient advocacy, human dignity, and professional and spiritual development in the integration of faith and health within the Catholic context in nursing.

*Amicus Curiae* **The Catholic Benefits Association** ("CBA") is an Oklahoma non-profit limited cooperative association committed to assisting its Catholic employer members in providing health coverage to their employees consistent with Catholic values. The CBA provides such assistance through its website, training webinars, legal and practical advice for member employers, and litigation services protecting members' legal and conscience rights. The CBA's member

employers include 78 Catholic dioceses, over 7000 parishes, over 1300 schools and colleges, as well as social services agencies, hospitals, senior housing, and closely held for profit employers. One of the conditions of membership is that the member affirm that its health care coverage complies with Catholic values.

## SUMMARY OF THE ARGUMENT

The U.S. Department of Health and Human Services, following a July 8, 2022 executive order from President Biden, directed the Center for Medicare & Medicaid Services (CMS) to issue guidance regarding the provision of intentional abortions as a treatment option under EMTALA. The guidance memorandum issued by CMS on July 11, 2022, along with an email letter from HHS Secretary Xavier Becerra to all health care providers, stated that, in certain circumstances, intentional abortion is *required* in response to an emergent complication that arises during pregnancy. Defendants' communications about the responsibilities under EMTALA fail to mention, at all, the concurrent responsibilities to the unborn child and that permitting an intentional abortion under EMTALA is contrary to the intent and unambiguous language of the statute to protect the health of the unborn child from serious jeopardy.

There is absolutely zero Congressional authorization under EMTALA for HHS to require emergency departments to perform abortions. To the contrary, there are clear Congressional enactments protecting the medical conscience and religious freedom rights of medical professionals and health care entities to decline to participate in abortions. The Congressional authorization applicable to the Defendants' July 11 guidance shows that Defendants not only exceeded their authority, but also violated the clear intent of Congress. Furthermore, Defendants' position requires health care providers to perform intentional abortions, a position that is directly contrary to the teachings of the Catholic faith, and Defendants have taken this position despite

4

there being substantial evidence that all of the medical emergencies Defendants have identified as reasons to purportedly justify intentional abortion under EMTALA can be safely and ethically treated without the intentional termination of the unborn child.

For these reasons, Plaintiffs' requested temporary restraining order and preliminary injunction should be granted, and Defendants' motion to dismiss should be denied.

## ARGUMENT

### I. AN UNBORN CHILD IS PROTECTED UNDER EMTALA, WHICH PRECLUDES INTENTIONAL ABORTION AS A TREATMENT.

The Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, provides no authority for Defendants to coerce medical providers into performing abortions and *in fact requires them to care for the unborn child*. Specifically, EMTALA's plain language states that it protects the health of the "unborn child," just as it does the health of a pregnant woman, from being placed in "serious jeopardy." This duty arises in the context of an "emergency medical condition," which EMTALA defines as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in – (i) placing the health of the individual (or, *with respect to a pregnant woman, the health of the woman or her unborn child*) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part; or (B) with respect to a pregnant woman who is having contractions – (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that *transfer may pose a threat to the health or safety of the woman or the unborn child*.

42 U.S.C. § 1395dd(e)(1)(A) (emphasis added).

Based on the very statutory definition of "emergency medical condition" in EMTALA, unborn children are a protected class. *Cf. Romine v. St. Joseph Health Sys.*, 541 F. App'x 614, 618 (6th Cir. 2014) (citing *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir.

1990)) ("EMTALA 'applies to any and all patients'").  Because an abortion of that unborn child would mean intentionally terminating his or her life and thus placing the unborn child's health in "serious jeopardy," in accordance with the statutory language of EMTALA, intentional abortion is necessarily prohibited.

Defendants' position then is entirely contrary to EMTALA's text, which unambiguously protects the life and health of an unborn child.  The July 8 executive order by President Biden, however, discussed only the pregnant mother when it ordered HHS to rely on EMTALA as a means of increasing access to abortion and makes no mention whatsoever of the responsibility under EMTALA to the "unborn child."  In his executive order, the President directed HHS to

> (iii) identify[] steps to ensure that all patients—including pregnant women and those experiencing pregnancy loss, such as miscarriages and ectopic pregnancies—receive the full protections for emergency medical care afforded under the law, including by considering updates to current guidance on obligations specific to emergency conditions and stabilizing care under the Emergency Medical Treatment and Labor Act, 42 U.S.C. 1395dd, and providing data from the Department of Health and Human Services concerning implementation of these efforts.

Exec. Order No. 14,076, 87 Fed. Reg. 42,053 (July 8, 2022).

Three days later, on July 11, Department of Health & Human Services (HHS) Secretary Xavier Becerra issued a letter to health care providers outlining their duties under EMTALA.  The letter states that, when a pregnant woman presents to the emergency department with an emergency medical condition and "abortion is the stabilizing treatment necessary to resolve that condition, the physician must provide that treatment."  Letter from Xavier Becerra, Secretary, U.S. Dep't of Health & Human Servs., to Health Care Providers (July 11, 2022), *available at* https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-

6

providers.pdf (last visited Aug. 20, 2022). Secretary Becerra, however, never mentions in his letter the responsibilities of health care providers under EMTALA to the unborn child.

In the guidance memorandum issued by the Center for Medicare & Medicaid Services (CMS) the same date as the Secretary's letter, mention of the duties owed to the unborn child is likewise totally omitted. The guidance (technically an update to a prior guidance memorandum) explains what constitutes an "emergency medical condition:"

> An EMC includes medical conditions with acute symptoms of sufficient severity that, in the absence of immediate medical attention, could place the health of a person (including pregnant patients) in serious jeopardy, or result in a serious impairment or dysfunction of bodily functions or any bodily organ. Further, an emergency medical condition exists if the patient may not have enough time for a safe transfer to another facility, or if the transfer might pose a threat to the safety of the person.

*Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, (QSO-21-22-Hospitals-UPDATED JULY 2022), July 11, 2022, *available at* https://www.cms.gov/files/document/qso-22-22-hospitals.pdf (last visited Aug. 20, 2022). The updated CMS guidance memorandum goes into further detail about "stabilizing treatment" and again only discusses duties to the "pregnant patient." As with the President and the Secretary, CMS makes no mention of the duties EMTALA imposes on providers to treat the "unborn child."

Taking these three documents together, a health care provider could read the materials, which purport to set forth the statutory duties and obligations under EMTALA when a pregnant woman presents for emergency treatment, and come away after reading them with no idea that EMTALA requires providers to protect the life and health of the unborn child and the mother alike. This is not guidance. This is misdirection. Moreover, it is a clear example of cherry-picking certain words in a statute and an ignoring of others, which is impermissible. *See, e.g., Asadi v. G.E. Energy United States, L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) ("In construing a statute, a

7

court should give effect, if possible, to every word and every provision Congress used.") (citations omitted).

Regardless of how much Defendants disagree with the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), it does not allow them to rewrite EMTALA's unambiguous terms to justify causing harm to an unborn child. *See United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999) (if a "regulation is inconsistent with the statutory language . . . the regulation will not control"); *Ek Hong Djie v. Garland*, 39 F.4th 280, 284 (5th Cir. 2022) (citations omitted) ("To the extent a regulation attempts to carve out an exception from a clear statutory requirement, the regulation is invalid."); *Mohammad Abubakar Khalid v. Holder*, 655 F.3d 363, 366 (5th Cir. 2011) (citation omitted) (agency regulation that fails to give effect to clear intent of Congress is invalid). On these grounds alone, an injunction should be granted since the plain language of EMTALA does not and cannot mandate performance of abortion.

## II. REQUIRING ABORTIONS UNDER EMTALA PREJUDICES THE RIGHTS OF CATHOLIC HEALTH CARE PROVIDERS, WHO HAVE LONG TREATED PREGNANCY EMERGENCIES WITHOUT INTENTIONALLY TERMINATING THE LIVES OF UNBORN CHILDREN.

Catholic health care providers have an established record of providing safe and ethical treatment of pregnancy complications that do not involve or require abortions. Unlike Defendants in their hastily issued guidance, the Catholic Church has taken great pains to define the term 'abortion' and set forth what is ethically acceptable medical treatment. The United States Conference of Catholic Bishops' *Ethical and Religious Directives for Catholic Health Care Services* (ERDs) specifically defines what constitutes an abortion. Directive 45 of the ERDs states:

> Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion.

United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services*, 18 (6th ed. 2018), *available at* https://www.usccb.org/resources/ethical-and-religious-directives-catholic-health care-services (last visited Aug. 20, 2022).

The ERDs also specifically give direction for those situations where there is a risk to the life of the mother, treatment of the mother will unintentionally cause the death of the unborn child, and this treatment is justified and acceptable. Directive 47 of the ERDs states:

> Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

*Id.* at 19. It is therefore entirely incorrect to assert or imply that Defendants' guidance, with its policy of requiring providers to participate in voluntary abortions, is needed to ensure the lives of pregnant mothers are protected. *See, e.g.,* 157 Cong. Rec. 6877-78 (2011) (letters of physicians entered into record in support of legislation to protect the right of health care workers to refuse to participate in abortions and opining that intentional abortion is never medically necessary); *id.* at 6878 (letter of John Thorp, M.D., of Univ. of N. Carolina School of Medicine, OB-GYN) ("I have not seen a situation where an emergent or even urgent abortion was needed to prevent a maternal death.").

A recent article in *Ethics & Medics*, published by the National Catholic Bioethics Center on Health Care and the Life Sciences (NCBC), discusses in detail issues concerning various pregnancy complications and how they can be properly treated without directly and intentionally terminating the life of the unborn child. John A. Di Camillo & Jozef D. Zalot, *Medical Interventions During Pregnancy in Light of Dobbs*, 47 Ethics & Medics (Aug. 2022), *available at* https://static1.squarespace.com/static/5e3ada1a6a2e8d6a131d1dcd/t/62fd2714a7bfe76313e74b48

9

/1660757780241/E%26M_August_22_publish.pdf (last visited Aug. 20, 2022). The article specifically addresses the situations raised by Defendants related to the emergency medical conditions under EMTALA involving pregnancy complications, including ectopic pregnancy, complications of pregnancy loss, and emergency hypertension disorders, all of which can be treated consistent with medical ethics and Catholic teachings without performing an intentional abortion. For example, as treatment for an ectopic pregnancy, the article identifies intervention options that are deemed by NCBC ethicists to be consistent with Catholic doctrine. *Id.* at 3. The article also dispels the myth that treating a miscarriage is somehow providing an abortion: "If an unborn child dies in utero, it is permissible to remove the remains through a surgical procedure . . . typically a dilation and curettage, [which] is the same one used on living children in the case of elective abortions—but it is not a direct abortion when the child has already died[.]" *Id.* at 4.

Nonetheless, by mandating abortion as a treatment under EMTALA, Defendants place Catholic health care providers in an unfortunately all too familiar position of being forced to fight against an abortion requirement that conflicts with their sincerely held religious beliefs. *E.g., Little Sisters of the Poor Saints Peter & Paul Home v. Penn.*, 140 S. Ct. 2367 (2020) (long running legal dispute between Catholic women religious and states over exemption to contraception mandate). Defendants' have created unnecessary confusion given the fact that everyone agrees that medical treatments to save the life of the mother that unintentionally cause the death of the unborn child are permitted. The confusion arises in that, despite there being treatment options for all pregnancy complications that do not involve abortion, Defendants insist that all health care providers have a duty under EMTALA to perform an intentional abortion. Defendants' update to existing guidance is a violation of the rights of Catholic health care providers under federal conscience protection laws as well as the Religious Freedom Restoration Act (RFRA), 42 U.S.C.

10

§ 2000bb—statutes of which no analysis appears to have been performed by Defendants prior to requiring intentional abortion as a treatment option under EMTALA.

Defendants' updated guidance should therefore be enjoined by this Court to permit Catholic health care providers to act, as they always have, consistent with the highest standards of both medicine and the doctrines of their faith.

### III. DEFENDANTS' UPDATED GUIDANCE VIOLATES FEDERAL CONSCIENCE LAWS SPECIFIC TO HEALTH CARE.

Outside of EMTALA, the specific Congressional intent to the case at bar is expressed through federal laws that clearly and unequivocally protect the conscience and religious freedom rights of medical professionals, health care entities, and the public generally to decline to participate in or subsidize abortions.

The Church Amendments, 42 U.S.C. § 300a-7 *et seq.*, enacted in the 1970s, prohibit recipients of federal funds from discriminating against a health care provider who refuses to participate or assist in an abortion if doing so would be "contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d) & (e); *see id.* at § 300a-7d(c). Made a part of federal HHS appropriations laws enacted since 1976, the Hyde Amendment is a law that restricts federal funding of abortion. "The most recently enacted version of the Hyde Amendment (P.L. 117-103. Div. H, §§ 506-507), applicable for fiscal year (FY) 2022, prohibits covered funds to be expended for any abortion or to provide health benefits coverage that includes abortion" other than in cases of rape, incest, or life of the mother. Edward C. Liu & Wen W. Shen, Congressional Research Service, *The Hyde Amendment: An Overview* (July 20, 2022), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12167 (last visited Aug. 20, 2022); *see* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506-07; *cf.*

11

*generally Harris v. McRae*, 448 U.S. 297 (1980) (upholding constitutionality of Hyde Amendment). The Weldon Amendment, which has been a part of every HHS appropriations act passed since 2005, expressly forbids the federal government from discriminating against any health care provider, facility, or plan on the basis that it does not provide, perform, or cover abortion. Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H., Tit. V, §§ 506-07; *see* Weldon Amendment, Consolidated Appropriations Act, 2009, Pub. L. No. 111-117, 123 Stat 3034; *see also* 42 U.S.C. § 238n (Coats-Snowe Amendment of 1996) (prohibiting abortion-related discrimination in governmental activities regarding training and licensing of physicians). There is no conflict between EMTALA and the Weldon Amendment because the former does not require abortions, but if there were such a conflict, the Weldon amendment would govern because it is specific to abortion and enacted after EMTALA.[2]

In repeatedly passing these federal conscience laws, Congress has acted *for decades* to protect the conscience and religious freedom rights of medical professionals and health care entities, to prohibit the federal government from subsidizing abortions, and to prohibit discrimination against medical professionals and health care entities on the basis of refusing to perform abortions. By purporting to use EMTALA to require individuals and entities to provide abortions, Defendants have exceeded their statutory authority and have acted contrary to the express will of Congress under federal law. As such, Defendants should be enjoined as a matter of statutory construction.

---

[2] If two (or more) statutes conflict, the more recent enactment governs over the earlier and the more specific governs over the more general. *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (specific governs over the general); *Watt v. Alaska*, 451 U.S. 259, 266 (1981) (more recent of conflicting statutes governs). Thus, assuming there is a conflict between the general requirements of EMTALA (passed in 1986), and the federal conscience protections passed since EMTALA, the more recent conscience protections prevail.

## CONCLUSION

For these reasons, *Amici Curiae* Catholic Health Care Leadership Alliance and Christ Medicus Foundation respectfully ask the Court to grant Plaintiffs' motion for a temporary restraining order and preliminary injunction and deny Defendants' motion to dismiss.

                                              Respectfully submitted.

                                              /s/ Jonathan F. Mitchell

| | |
|---|---|
| LOUIS A. BROWN JR. | JONATHAN F. MITCHELL |
| Michigan Bar No. P70973 | Texas Bar No. 24075463 |
| Post Office Box 4323 | Mitchell Law PLLC |
| Ormond, Florida 32175 | 111 Congress Avenue, Suite 400 |
| (517) 974-0224 (phone) | Austin, Texas 78701 |
| info@catholichealthalliance.org | (512) 686-3940 (phone) |
| | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |
| | |
| Dated: August 22, 2022 | *Counsel for Amici Curiae* |

13

## CERTIFICATE OF SERVICE

I certify that on August 22, 2022, I served this document through CM/ECF upon:

CHRISTOPHER D. HILTON
AMY S. HILTON
CHARLES K. ELDRED
WILLIAM DAVID WASSDORF
Texas Attorney General's Office
Post Office Box 12548
Austin, Texas 78711-2548
(512) 463-2120 (phone)
(512) 320-0667 (fax)
christopher.hilton@oag.texas.gov
amy.hilton@oag.texas.gov
charles.eldred@oag.texas.gov
will.wassdorf@oag.texas.gov

RYAN BANGERT
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020 (phone)
(480) 444-0028 (fax)
rbangert@adflegal.org

*Counsel for Plaintiffs*

CHRISTOPHER ROBERT HEALY
ALEXANDER N. ELY
KATE TALMOR
U.S. Department of Justice
1100 L Street NW
Washington, DC 20005
(202) 514-8095 (phone)
(202) 616-8470 (fax)
christopher.healy@usdoj.gov
alexander.n.ely@usdoj.gov
kate.talmor@usdoj.gov

*Counsel for Defendants*

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Amici Curiae*